ANDREW L. PACKARD (State Bar No. 168690)
WILLIAM N. CARLON (State Bar No. 305739)
Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Tel: (707) 782-4060
Fax: (707) 782-4062
Email: andrew@packardlawoffices.com
         wncarlon@packardlawoffices.com

WILLIAM VERICK (State Bar No. 140972)
Klamath Environmental Law Center
1125 Sixteenth Street, Suite 204
Arcata, CA 95521
Tel. (707) 630-5061
Email: wverick@igc.org

Attorneys for Plaintiff
CALIFORNIANS FOR
ALTERNATIVES TO TOXICS

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CALIFORNIANS FOR ALTERNATIVES TO TOXICS,<br><br>           Plaintiff,<br><br>   vs.<br><br>REICHARDT DUCK FARM, INC., AND JOHN REICHARDT<br><br>           Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387)** |

CALIFORNIANS FOR ALTERNATIVES TO TOXICS ("CATs"), by and through its counsel, hereby alleges:

## I.     JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 (the "Clean Water Act", the "CWA" or "the Act") against Reichardt Duck Farm, Inc. and John Reichardt ("Defendants").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section

505(a)(1) of the Act, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). Specifically, this action arises under Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A) (citizen suit to enforce effluent standard or limitation). The relief requested is authorized pursuant to 33 U.S.C. § 1365(a) (injunctive relief), 33 U.S.C. §§ 1365(a), 1319(d) (civil penalties), and 28 U.S.C. §§ 2201–2202 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

2.      On or about October 21, 2022, Plaintiff provided written notice to Defendants, via certified mail, of Defendants' violations of the Act ("CWA Notice Letter"), and of their intention to file suit against Defendants, as required by the Act. *See* 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. § 135.2(a)(1) (1991). Plaintiff mailed a copy of the CWA Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"), pursuant to 40 C.F.R. § 135.2(a)(1) (1991). A true and correct copy of CATs' CWA Notice Letter is attached hereto as **Exhibit 1**, and is incorporated by reference.

3.      More than sixty days have passed since Plaintiff served this CWA Notice Letter on Defendants and the agencies. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this Complaint. This action's claims for civil penalties are not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Northern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this District. Venue is also proper under 28 U.S.C. § 1391(b) because Defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Intra-district venue is proper in San Francisco or Oakland, California, because the sources of the violations are located within Sonoma County, California. Civil Local Rule 3-2(d).

## II.      **INTRODUCTION**

5.      This Complaint seeks relief for Defendants' violations of the CWA at the approximately 373-acre facility owned and/or operated by Defendants ("Facility"). The Facility is

1   located at 3770 Middle Two Rock Road, in Petaluma, California.

2       6.      Defendants discharge pollutant-contaminated storm water from the Facility into an

3   unnamed creek, which drains to Laguna Lake.  Laguna Lake discharges to Chileno Creek, which is a

4   tributary to Walker Creek, which ultimately discharges to Tomales Bay and into the Pacific Ocean

5   (collectively the "Impacted Waters").

6       7.      The Impacted Waters are waters of the United States.

7       8.      Defendants are violating both the substantive and procedural requirements of the

8   CWA.

9       9.      Defendants' discharges of pollutant-contaminated storm water from the Facility

10  violate the Act and the State of California's General Industrial Permit for storm water discharges,

11  State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as

12  amended by Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ, and

13  Water Quality Order No. 2014-0057-DWQ, National Pollutant Discharge Elimination System

14  ("NPDES") General Permit No. CAS000001 (hereinafter "General Permit" or "Permit").

15      10.     Defendants' violations of the filing, monitoring, reporting, discharge and

16  management practice requirements, and other procedural and substantive requirements of the

17  General Permit and the Act are ongoing and continuous.

18      11.     The failure on the part of industrial facility operators such as Defendants to comply

19  with the General Permit is recognized as a significant cause of the continuing decline in water

20  quality of receiving waters, such as Tomales Bay and its tributaries.  The general consensus among

21  regulatory agencies and water quality specialists is that storm water pollution amounts to more than

22  half the total pollution entering the marine environment each year.

23  **III.   PARTIES**

24      12.     CATs is a non-profit public benefit corporation organized under the laws of

25  California, based in Arcata, California.  CATs is dedicated to the defense of the environment from

26  the effects of toxic chemicals, and the preservation and protection of the wildlife and natural

27  resources of California waters, including the waters into which Defendants discharge polluted storm

28  water.  To further its goals, CATs actively seeks federal and state agency implementation of state

and federal water quality laws, including the CWA, and as necessary, directly initiates enforcement actions on behalf of itself and its members.

13.     Members of CATs, including citizens, taxpayers, property owners, and residents, live, work, travel and recreate on and near the Impacted Waters, into which Defendants cause pollutants to be discharged.  These CATs members use and enjoy the impacted waters for cultural, recreational, educational, scientific, conservation, aesthetic and spiritual purposes.  Defendants' discharge of storm water containing pollutants impairs each of those uses.  Thus, the interests of CATs' members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Clean Water Act and the General Permit.

14.     Members of CATs reside in California and use and enjoy California's numerous rivers for recreation and other activities.  Members of CATs use and enjoy the Impacted Waters, into which Defendants have caused, are causing, and will continue to cause, pollutants to be discharged.  Members of CATs use these areas to fish, boat, kayak, swim, bird watch, view wildlife, and engage in scientific study, including monitoring activities, among other things.  Defendants' discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of CATs' members have been, are being, and will continue to be adversely affected by Defendants' ongoing failure to comply with the Clean Water Act.  The relief sought herein will redress the harms to Plaintiff caused by Defendants' activities.

15.     Defendant Reichardt Duck Farm, Inc. is a corporation organized under the laws of California.

16.     Defendant John Reichardt is the Chief Executive Officer of Reichardt Duck Farm, Inc.

17.     Defendant John Reichardt is the General Manager of Reichardt Duck Farm, Inc.

18.     Plaintiff is informed and believes, and thereupon alleges that Defendants own and/or operate the Facility, and are subject to the terms of the General Permit.

19.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy or adequate remedy at law.

IV.     **LEGAL BACKGROUND**

    **A.      Clean Water Act**

    20.     Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA establishes an "interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water . . . ." 33 U.S.C. § 1251(a)(2). To these ends, Congress developed both a water quality-based and technology-based approach to regulating discharges of pollutants from point sources into waters of the United States.

    21.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant from a point source into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

    22.     The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). Pollutants are defined to include, among other examples, industrial waste, chemical wastes, biological materials, heat, rock, and sand discharged into water. 33 U.S.C. § 1362(6).

    23.     A "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

    24.     "Navigable waters" means "the waters of the United States." 33 U.S.C. § 1362(7). Waters of the United States includes, among others things, waters that are, were, or are susceptible to use in interstate commerce, and tributaries to such waters. 40 C.F.R. § 230.3 (2015).

    25.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program, 33 U.S.C. § 1342(p), and, specifically, requires an NPDES permit for storm water discharges associated with industrial activity. *Id.* § 1342(p)(2)(B).

    26.     Section 505(a)(1) provides for citizen enforcement actions against any "person,"

including individuals, corporations, or partnerships, 33 U.S.C. § 1362(5), for violations of NPDES permit requirements and for unpermitted discharges of pollutants.  33 U.S.C. § 1365(a)(1) (authorizing actions against any person alleged to be in violation of an effluent standard or limitation); *id.* § 1365(f) (defining "effluent limitation" broadly to include "a permit or condition thereof issued under [section 402] of this title," and "any unlawful act under subsection (a) of [section 301] of this title").

27.     An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $59,973 per day for violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. §§ 19.1–19.4 (2008).

**B.     State Regulations**

28.     The Tomales Bay watershed in western Marin County is one of the major estuaries on the west coast of the United States.  It has a diverse ecosystem and several notable tributaries, including Lagunitas Creek, which has one of the few remaining viable coho salmon runs in central California. *Water Quality Control Plan for the San Francisco Bay Basin* ("Basin Plan") Section 4.1.3.3.  The Water Board identified Tomales Bay as an area where commercial shellfishery is threatened and authorized the formation of a technical advisory committee to investigate and develop a remediation strategy. California Regional Water Quality Control Board San Francisco Bay Region Resolution 94-018.  On February 8, 2007, the U.S. EPA approved the Total Maximum Daily Load ("TMDL") for pathogens in the Tomales Bay and the Basin Plan has been amended to incorporate the TMDL along with an implementation plan to achieve the TMDL.  Basin Plan Section 7.3.1.  "The overall goal of the Tomales Bay Watershed Pathogens Total Maximum Daily Load (TMDL) is to ensure protection of water contact recreational uses and Bay shellfish harvesting, thereby minimizing human exposure to disease-causing pathogens." *Id.* According to the 2020-2022 303(d) List of Impaired Water Bodies, Tomales Bay and its tributaries, including Walker Creek, downstream of the Facility are impaired for: Mercury, Nutrients, Sedimentation/Siltation, and Pathogens. 2020-2022 Integrated Report – All Assessed Waters, *available at* https://gispublic.waterboards.ca.gov/portal/apps/webappviewer/index.html?id=e2def63ccef54eedbee4ad

726ab1552c (last accessed December 21, 2022).

29.     The Basin Plan recognizes that wastes from animal confinement operations such as Defendants' Facility contain significant amounts of pathogens, oxygen-depleting organic matter, nitrogen compounds, and other suspended and dissolved solids.

30.     Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already impaired surface waters and aquatic-dependent wildlife.

**C.     California's General Industrial Storm Water Permit**

31.     Section 402 authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(b).

32.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

33.     The State Board elected to issue a statewide general permit for industrial discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on April 17, 1997 and again on April 1, 2014 (effective July 1, 2015), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

34.     Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent ("NOI").  The General Permit requires facilities to file their NOIs before the initiation of industrial operations.

35.     Facilities covered by the General Permit include concentrated animal feeding operations ("CAFO").  General Permit, Attachment A.

36.     To be considered a CAFO, a facility must first be defined as an animal feeding operation ("AFO") and meet the criteria established in the CAFO regulation.  An AFO is an agricultural operation where animals are kept and raised in confined situations where the following

conditions are met: (1) animals have been, are, or will be stabled or confined and fed or maintained for a total of 45 days or more in any 12-month period; and, (2) crops, vegetation, forage growth, or post-harvest residues are not sustained in the normal growing season over any portion of the lot or facility.  40 C.F.R. § 122.23(b)(1).

37.    A CAFO is an AFO that is defined as a Large CAFO or as a Medium CAFO by the terms of 40 C.F.R. § 122.23.  An operation that confines ducks is considered a Large CAFO if the above conditions are met, and there are at least 30,000 ducks (if the AFO uses other than a liquid manure handling system) or 5,000 ducks (if the AFO uses a liquid manure handling system).  40 C.F.R. § 122.23(b)(4)(xii) and (xiii).

38.    Once regulated by an NPDES permit, facilities must strictly comply with all of the terms and conditions of that permit.  A violation of the General Permit is a violation of the Act.  *See* General Permit, Section XXI.A.

39.    In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.

40.    The General Permit contains three primary and interrelated categories of requirements: 1) discharge prohibitions; 2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and 3) monitoring and reporting requirements, including the requirement to prepare an annual report.

41.    Discharge Prohibition III.B of the General Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to the waters of the United States.  Discharge Prohibition III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination or nuisance as defined in section 13050 of the California Water Code.  Receiving Water Limitation VI.A of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards in any affected receiving water.  Receiving Water Limitation VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human

health or the environment.

42.     Effluent Limitation V.A of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

43.     EPA has established Benchmark Levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT standards. 65 Fed. Reg. 64746, 64767 (Oct. 30, 2000).  The following benchmarks have been established for pollutants discharged by Defendants: Total Suspended Solids – 100 mg/L; Oil & Grease – 15 mg/L; pH 6.0-9.0 s.u., Nitrate plus Nitrite Nitrogen – 0.68 mg/L, and Phosphorus – 2.0 mg/L.

44.     The Regional Board has established water quality standards for the Impacted Waters in the Basin Plan.

45.     The Basin Plan identifies present and potential beneficial uses for the Impacted Waters, which include shellfish harvesting (SHELL), warm freshwater habitat (WARM), wildlife habitat (WILD), water contact recreation (REC-1), noncontact water recreation (REC-2), cold freshwater habitat (COLD), fish migration (MIGR), preservation of rare and endangered species (RARE), commercial, and sport fishing (COMM), navigation (NAV), marine habitat (MAR), and fish spawning (SPWN).

46.     The Basin Plan also establishes Water Quality Objectives ("WQO") for surface waters in the region.  Basin Plan at 3.3.

//

//

//

//

//

//

//

//

//

47.     The Basin Plan establishes the following WQOs for bacteria:

**Table 3-1: Water Quality Objectives for Coliform Bacteria[a]**

| Beneficial Use | Fecal Coliform (MPN/100ml) | Total Coliform (MPN/100ml |
|---|---|---|
| Water Contact Recreation | geometric mean < 200 90th percentile < 400 | median < 240 no sample > 10,000 |
| Shellfish Harvesting[b] | median < 14 90th percentile < 43 | median < 70 90th percentile < 230[c] |
| Non-contact Water Recreation[d] | mean < 2000 90th percentile < 4000 | |
| Municipal Supply: | | |
| - Surface Water[e] | geometric mean < 20 | geometric mean < 100 |
| - Groundwater | | < 1.1[f] |

NOTES:

a. Based on a minimum of five consecutive samples equally spaced over a 30-day period.

b. Source: National Shellfish Sanitation Program.

c. Based on a five-tube decimal dilution test or 300 MPN/100 ml when a three-tube decimal dilution test is used.

d. Source: Report of the Committee on Water Quality Criteria, National Technical Advisory Committee, 1968.

e. Source: DOHS recommendation.

f. Based on multiple tube fermentation technique; equivalent test results based on other analytical techniques, as specified in the National Primary Drinking Water Regulation, 40 CFR, Part 141.21(f), revised June 10, 1992, are acceptable.

48.     The General Permit requires dischargers to develop and implement a site-specific SWPPP.  General Permit, Section X.A.  The SWPPP must include, among other elements:  (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) an annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable.

49.     Dischargers must revise their SWPPP whenever necessary and certify and submit

via the Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS their SWPPP not more than once every three (3) months in the reporting year for any non-significant revisions.  General Permit, Section X.B.

50.     Dischargers must implement the minimum BMPs identified in Section X.H.1. of the General Permit.  In addition to the minimum BMPs identified in Section X.H.1, advanced BMPs must be implemented if necessary to reduce or prevent discharges of pollutants in storm water dischargers in a manner that reflects best industry practice.  General Permit, Section X.H.2.

51.     Special Conditions Section XX.B of the General Permit require a discharger to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of Receiving Water Limitations, Section VI.  The documentation must describe changes the discharger will make to its current BMPs in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  General Permit, Section XX.B.

52.     Section XV of the General Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities within 90 days of the annual evaluation.

53.     The General Permit requires dischargers to eliminate all non-storm water discharges to storm water conveyance systems other than those specifically set forth in Section IV of the General Permit unless authorized by another NPDES permit.  General Permit, Section III. B.

54.     The General Permit requires dischargers to implement a Monitoring Implementation Plan.  General Permit, Section X.I.  As part of their monitoring plan, dischargers must identify all storm water discharge locations.  General Permit, Section X.I.2.  Dischargers must then conduct monthly visual observations of each drainage area, as well as visual observations during discharge sampling events.  General Permit, Section XI.A.1 and 2.  Dischargers must also collect and analyze storm water samples from two (2) storm events within the first half of each reporting year (July 1 to December 31) and two (2) storm events during the second half of each

reporting year (January 1 to June 3).  General Permit, Section XI.B.  Section XI.B requires

dischargers to sample and analyze during the wet season for basic parameters such as pH, total

suspended solids ("TSS") and oil and grease ("O&G"), certain industry-specific parameters, and any

other pollutants likely to be in the storm water discharged from the facility base on the pollutant

source assessment.  General Permit, Section XI.B.6.

55.     Dischargers must submit all sampling and analytical results via SMARTS within

thirty (30) days of obtaining all results for each sampling event.  Section XI.B.11.  Sampling results

must be compared to the two types of Numeric Action Level ("NAL") values set forth at Table 2 of

the General Permit.  General Permit, Section XII.  An annual NAL exceedance occurs when the

average of the results for a parameter for all samples taken within a reporting year exceeds the

annual NAL value.  General Permit, Section XII.A.1.  An instantaneous NAL exceedance occurs

when two (2) or more results from samples taken for any single parameter within a reporting year

exceed the instantaneous maximum NAL value.  General Permit, Section XII.A.2.  If a discharger

has an NAL exceedance during a reporting year, the discharger's status changes to Level 1 status

under the General Permit and the discharger must comply with the requirements set forth for Level 1

status operators set forth at Section XII.C.  The discharger's status shall change to Level 2 status if

sampling results indicated an NAL exceedance for a parameter while the discharger is in Level 1

status.  If a discharger becomes Level 2 status it must comply with the obligations set forth at

Section XII.D of the General Permit.

56.     Dischargers must submit an Annual Report no later than July 15th following each

reporting year certifying compliance with the Permit and/or an explanation for any non-compliance.

General Permit, Section XVI.

## V.     STATEMENT OF FACTS

### A.  The Facility

57.     Defendants own and/or operate the Facility, a duck farm located in Petaluma,

California.

58.     CATs is informed and believes, and on that basis alleges, that the Facility confines at

least 30,000 ducks for more than 45 days each year, and that the areas within which the animals are

confined do not sustain any crops, vegetation, forage growth, or post-harvest residues in the normal growing season.

59.     The Facility is a Large CAFO and therefore is required to maintain coverage under the General Permit.

60.     Industrial activities associated with the operation of raising and slaughtering of ducks occur throughout the Facility.  The industrial activities at the Facility fall under Standard Industrial Classification Code 2015 ("Poultry Slaughtering and Processing").

61.     The industrial areas at the Facility include rows of houses in which ducks are confined, wastewater processing, storage, and disposal facilities, dry litter and manure processing, storage, and disposal facilities, a fueling station, a shop, and a network of roads that provide connectivity between the various industrial areas.

62.     The areas of industrial activity at the Facility are sources of pollutants.  Plaintiff is informed and believes that Defendants' storm water controls, to the extent any exist, fail to achieve BAT and BCT standards.

63.     The Facility discharges storm water associated with its industrial activities from at least eight (8) discharge points into an unnamed creek that runs through the Facility, as depicted below:



64.     On or about January 16, 2015, Defendants submitted a Notice of Intent to comply with the General Permit.  The Facility was assigned the Waste Discharge Identification number 2 49I014770.

65.     Since at least January 16, 2015, the Facility has operated under General Permit coverage.

66.     Under the General Permit, Defendants have sampled storm water discharges from the Facility and found level of pollutants in the samples that exceeded on various occasions EPA's benchmarks.  This information was reported to the Regional Board, as required by the General Permit.

67.     According to Defendants' self-monitoring reports submitted to the Regional Board, Defendants have measures discharges containing levels of pH, total suspended solids, nitrate plus nitrite nitrogen, and phosphorus in excess of the EPA Benchmark values on at least 19 occasions since October 21, 2017.

68.     The Facility's exceedances of EPA Benchmarks provided above indicate that Defendants have not implemented BAT and BCT at the Facility for its discharges of pH, total suspended solids, nitrate plus nitrite nitrogen, and phosphorus.

69.     During rain events, storm water laden with pollutants discharges from the Facility's storm water conveyances into the unnamed creek, which flows to Laguna Lake.  Laguna Lake discharges to Chileno Creek, which is a tributary to Walker Creek, which ultimately discharges to Tomales Bay and the Pacific Ocean.

70.     Information available to Plaintiff indicates that as a result of these practices, storm water containing pollutants harmful to fish, plant and bird life, and human health are being discharged from the Facility directly to these waters during significant rain events.

71.     Information available to Plaintiff indicates that Defendants have not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of significantly contaminated storm water.

**B.  The Facility's SWPPP**

72.     Defendants do not have a single document they rely on as their SWPPP, but rather a

confusing collection of documents that Defendants continue to add to, rather than to revise any single document.  The result is an incomprehensible patchwork that fails to comply with the General Permit's requirements.

73.     Defendants have submitted to SMARTS two documents that they designate as the Facility's SWPPP – a Powerpoint presentation ("Powerpoint SWPPP"), a true and correct copy of which is included herein as **Exhibit 2**, and a Word document ("Word SWPPP"), a true and correct copy of which is included herein as **Exhibit 3**.  Both the Powerpoint SWPPP and the Word SWPPP are dated June 23, 2015.

74.     Neither the Powerpoint SWPPP nor the Word SWPPP, separately or together, contains the information required by General Permit Section X.

75.     Neither the Powerpoint SWPPP nor the Word SWPPP contains all the information in both June 23, 2015 SWPPPs together, and therefore no SWPPP is complete.

76.     Defendants have either not revised their SWPPP since June 23, 2015, or have failed to certify and submit via SMARTS any revised SWPPP since June 23, 2015.

77.     The Word SWPPP does not identify a Pollution Prevention Team.

78.     The Powerpoint SWPPP identifies a "Storm Water Team," but the Powerpoint SWPPP does not identify the responsibilities, duties, and activities of each member of the Storm Water Team.

79.     The Powerpoint SWPPP does not include procedures to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

80.     The Word SWPPP does not identify the Facility's operating hours.

81.     The Word SWPPP does not include a site map of the Facility.

82.     The site maps contained in the Powerpoint SWPPP do not identify any storm water drainage areas within the Facility's boundary, and do not identify any flow directions of each drainage area.

83.     The site maps contained in the Powerpoint SWPPP do not provide enough

1    information to determine the specific boundaries of surface water bodies located on-Facility.

2        84.     The site maps contained in the Powerpoint SWPPP do not identify areas of soil

3    erosion at the Facility.

4        85.     The site maps contained in the Powerpoint SWPPP do not identify all locations of

5    storm water collection and conveyance systems at the Facility.

6        86.     The site maps contained in the Powerpoint SWPPP do not include the locations and

7    descriptions of all structural control measures that affect industrial storm water discharges.

8        87.     The site maps contained in the Powerpoint SWPPP do not identify all impervious

9    areas of the Facility.

10       88.     The site maps contained in the Powerpoint SWPPP do not identify all locations where

11   materials are directly exposed to precipitation.

12       89.     The site maps contained in the Powerpoint SWPPP do not identify all areas of

13   industrial activity subject to the General Permit.

14       90.     The site maps contained in the Powerpoint SWPPP do not identify all shipping and

15   receiving areas.

16       91.     The site maps contained in the Powerpoint SWPPP do not identify all vehicle and

17   equipment storage/maintenance areas.

18       92.     The site maps contained in the Powerpoint SWPPP do not identify all material

19   handling and processing areas.

20       93.     The site maps contained in the Powerpoint SWPPP do not identify all dust or

21   particulate generating areas.

22       94.     The site maps contained in the Powerpoint SWPPP do not identify all cleaning and

23   material reuse areas.

24       95.     The site maps contained in the Powerpoint SWPPP do not identify all areas of

25   industrial activity that may have potential pollutant sources.

26       96.     Neither SWPPP includes a complete list of industrial materials handled at the facility,

27   and the locations where each material is stored, received, shipped, and handled, as well as the typical

28   quantities and handling frequency.

97.     Neither SWPPP includes a complete description of potential pollutant sources at the Facility.

98.     Neither SWPPP includes a complete assessment of potential pollutant sources at the Facility.

99.     The Word SWPPP includes a chart labelled "Best Management Practices Development" which identifies "Problems," "Actions," and "Success Criteria."  The date of each Problem is identified, with the oldest arising on July 1, 1999, and the most recent post-dating the SWPPP on June 28, 2015.

100.    The Word SWPPP summary table does not identify any BMPs developed or implemented after June 28, 2015.

101.    The Powerpoint SWPPP does not contain a BMP summary table.

102.    The Powerpoint SWPPP identifies only six practices that Defendants describe as Minimum BMPs: "nutrient reduction, irrigation optimized for nutrient uptake in plants, erosion control, oil and grease collection points, chlorine containment, and spill contingencies.

103.    The Powerpoint SWPPP does not identify any other Minimum BMPs other than the six practices identified in ¶ 102 above.

104.    The six BMPs described in ¶ 102 above are only vaguely described in the Powerpoint SWPPP and do not contain enough detail to satisfy the requirements of the General Permit.  For example, the Powerpoint SWPPP does not: describe the pollutant or pollutants that each BMP is designed to reduce or prevent in industrial storm water discharges; describe the frequency, time(s) of day, or conditions when each BMP is scheduled for implementation; describe the procedures, including maintenance procedures, and/or instructions to implement the BMPs effectively; describe the equipment and tools necessary to implement the BMPs effectively; or, identify the BMPs that may require more frequent visual observations beyond the monthly visual observations required by General Permit Section XI.A.1.

105.    On or about June 13, 2018, Defendants uploaded to SMARTS a document titled "Assessment of Potential Pollutant Sources" ("2018 Assessment") a true and correct copy of which is attached hereto as **Exhibit 4**.

106.    Defendants did not certify or submit to SMARTS a revised SWPPP after submitting the 2018 Assessment.

107.    The stand-alone 2018 Assessment is wholly inadequate, even if it were to be considered part of either the Word SWPPP, the Powerpoint SWPPP or both.  For example, the 2018 Assessment identifies the areas of the facility that are likely sources of pollutants as simply the "duck raising areas," which is not only vague, considering the nature of the operation, but also ignores potential pollutant sources such as the equipment storage, maintenance, and fueling areas, the waste storage areas, and the wastewater storage basins.  The only pollutants identified by the 2018 Assessment are nitrogen and phosphorus, despite the Powerpoint SWPPP identifying sediment, oil and grease, and chlorine as other potential pollutants.  Furthermore, the Word SWPPP recognizes the potential for storm water to become contaminated with manure, and yet the 2018 Assessment does not recognize pollutants typically associated with manure, such as pathogens, oxygen-depleting organic matter, and ammonia.

108.    The Powerpoint SWPPP does not include a Monitoring Implementation Plan.

109.    The Word SWPPP does not include an adequate Monitoring Implementation Plan because it fails to identify the team members assigned to conduct the monitoring requirements, it lacks a description of all discharge locations at the Facility, it lacks a description of visual observation procedures, and it lacks a description of visual observation response procedures.

110.    The Monitoring Implementation Plan in the Word SWPPP also fails to identify any procedures for field instrument calibration instructions and it does not include an example chain of custody form used when handling and shipping water quality samples to the laboratory.

111.    The Monitoring Implementation Plan in the Word SWPPP also fails to include a justification for choosing an alternative discharge location.

112.    On or about July 15, 2020, a document titled "ERA Level 1 Evaluation and Report" was submitted to SMARTS in response to the Facility's exceedance of total suspended solids ("TSS ERA Report").  The TSS ERA Report includes sections 6.0-9.0 which discuss the evaluation of BMPs and modifications to the SWPPP.

113.    No revised SWPPP was certified and submitted via SMARTS that included the

1    revisions described in section 6.0-9.0 of the TSS ERA Report.

2        114.    On or about March 11, 2021, a document titled "ERA Level 1 Evaluation and Report

3    – Total Phosphorus as P" was submitted to SMARTS in response to the Facility's exceedance of

4    total suspended solids ("P ERA Report").  The P ERA Report includes sections 6.0-9.0 which

5    discuss the evaluation of BMPs and modifications to the SWPPP.

6        115.    No revised SWPPP was certified and submitted via SMARTS that included the

7    revisions described in section 6.0-9.0 of the P ERA Report.

8        116.    Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed

9    to develop and implement an adequate Storm Water Pollution Prevention Plan at the Facility.

10       **C.  Storm Water Monitoring**

11       117.    CATs is informed and believes, and on that basis alleges, that duck manure contains

12   pathogens and nutrients, which are related to the Facility's receiving water 303(d) listed impairments

13   and approved TMDLs.

14       118.    Defendants do not analyze their storm water samples for pathogens.

15       119.    CATs is informed and believes, and on that basis alleges, that Defendants use

16   incorrect test methods and method detection limits, and fail to comply with collection, preservation

17   and handling procedures as required by the General Permit.

18       120.    CATs is informed and believes, and on that basis alleges, that Defendants have failed

19   to submit all sampling and analytical results via SMARTS within 30 days of obtaining all results for

20   each sampling event.

21       121.    CATs is informed and believes, and on that basis alleges, that Defendants improperly

22   combine storm water samples, without having submitting a Qualified Combined Samples

23   Justification, or otherwise fail to sample all discharge locations.

24       122.    Defendants' self-monitoring results indicate that from at least October 21, 2017 to

25   November 16, 2017, Defendants failed to analyze samples of storm water for nitrate plus nitrite

26   nitrogen, phosphorus, chemical oxygen demand, and pathogens.

27       123.    Defendants' self-monitoring results indicate that on January 25, 2018, nitrate was

28   measured at 30 mg/L, over 44 times the annual Numeric Action Level ("NAL") set forth in the

General Permit – 0.68 mg/L.

124.    As of July 1, 2019, the Facility entered Level 1 Status for nitrate plus nitrite nitrogen.

125.    Defendants did not complete a Level 1 ERA Evaluation for nitrate plus nitrite nitrogen by October 1, 2019.

126.    Defendants did not complete a Level 1 ERA Report for nitrate plus nitrite nitrogen by January 1, 2020.

127.    Defendants' self-monitoring results indicate that the Facility exceeded the annual NAL for nitrate plus nitrite nitrogen on each and every sampling event following the January 25, 2018 sampling event.

128.    As of July 1, 2020, the Facility entered Level 2 Status for nitrate plus nitrite nitrogen.

129.    Defendants did not complete a Level 2 ERA Action plan for nitrate plus nitrite nitrogen by January 1, 2021.

130.    Defendants did not complete a Level 2 ERA Technical Report for nitrate plus nitrite nitrogen by January 1, 2022.

131.    Information available to Plaintiff indicates the continued existence of unlawful storm water discharges at the Facility.

132.    Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Discharges of Contaminated Storm Water from the Facility
in Violation of Permit Conditions and the Act
(Violations of 33 U.S.C. §§ 1311(a), 1342)**

133.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

134.    Receiving Water Limitations VI.A and VI.B of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in any affected receiving water.  Discharge Prohibition III.C of the General Permit

requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.

135.   Plaintiff is informed and believes, and thereupon alleges, that since at least October 21, 2017[1], Defendants have been discharging polluted storm water from the Facility into the Impacted Waters, in violation of the General Permit.

136.   During every significant rain event, storm water flowing over and through materials at the Facility becomes contaminated with pollutants, flowing untreated from the Facility into the Impacted Waters.

137.   Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing pollution and contamination of waters of the United States in violation of Discharge Prohibition III.C of the General Permit.

138.   Plaintiff is informed and believes, and thereupon allege, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations VI.A and VI.B of the General Permit.

139.   Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are contributing to the violation of the applicable water quality standards in the Statewide Water Quality Control Plan, and/or the applicable Regional Board's Basin Plan, in violation of Receiving Water Limitation VI.A of the General Permit.

140.   Plaintiff is informed and believes, and thereupon alleges, that every day since October 21, 2017, Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit.  These violations are ongoing and continuous.

141.   Every day Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since October 21, 2017.  See 33 U.S.C. §§ 1319 (d), 1365; 40 C.F.R.

---

[1] The five-year statute of limitations is tolled 60 days before filing of the complaint, to accommodate the statutorily-mandated 60-day notice period.  *Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1524 (9th Cir. 1987).

§ 19.4 (2008).

**SECOND CLAIM FOR RELIEF**
**Failure to Develop and Implement an Adequate**
**Storm Water Pollution Prevention Plan for the Facility**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

142.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

143.    Section X of the General Permit require dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP prior to commencement of industrial activities.

144.    Defendants have failed to develop and implement an adequate SWPPP for the Facility.  Defendants' ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, inter alia, the allegations set forth in paragraphs 72 through 116 above.

145.    Defendants have further failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring as required by the General Permit. General Permit, Sections X.B.1 and X.C.1.b.  Defendants continue to be in violation of the Act each day that they fail to develop and fully implement an adequate SWPPP for the Facility.  These violations are ongoing and continuous.

146.    Each day that Defendants have failed to develop and implement an adequate SWPPP for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since October 21, 2017.  See 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. § 19.4 (2008).

**THIRD CLAIM FOR RELIEF**
**Failure to Develop and Implement the Best Available**
**And Best Conventional Treatment Technologies at the Facility**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

147.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

148.    The General Permit's SWPPP requirements and Effluent Limitation D.32 require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

149.    Defendants have failed to implement BAT and BCT at the Facility for their discharges of TSS, phosphorus, and nitrate plus nitrite nitrogen in violation of Effluent Limitation D.32 of the General Permit.

150.    Each day that Defendants have failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

151.    Defendants continue to be in violation of the BAT and BCT requirements each day that it fails to develop and fully implement BMPs meeting the BAT and BCT standards. These violations are ongoing and continuous.

152.    Defendants have been in violation of the BAT and BCT requirements at the Facility every day since at least October 21, 2017.  Defendants are subject to civil penalties for each and every violation of the Act since October 21, 2017.  See 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

<u>FOURTH CLAIM FOR RELIEF</u>
**Failure to Implement an Adequate**
**Monitoring Implementation Plan for the Facility**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

153.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

154.    Section X.I and Section XI.A-D of the General Permit require dischargers of storm water associated with industrial activity to develop and implement a monitoring implementation plan (including, among other things, sampling and analysis of discharges) prior to commencement of industrial activities.

155.    Defendants have failed to develop and implement an adequate monitoring implementation plan for the Facility.  Defendants' ongoing failures to develop and implement adequate monitoring and reporting programs are evidenced by, inter alia, their continuing failure to collect and analyze storm water samples from all discharge locations, and their continuing failure to analyze storm water samples for pollutants likely to be present in the Facility's storm water discharges in significant quantities and other pollutants, as the General Permit requires.

156.    Defendants have failed to develop and implement an adequate monitoring and

reporting program for the Facility every day since at least October 21, 2017.  These violations are ongoing and continuous.

157.     Each day of violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since October 21, 2017.  See 33 U.S.C. §§ 1319 (d), 1365; 40 C.F.R. §19.4 (2008).

**FIFTH CLAIM FOR RELIEF**
**Failure to Complete Required Exceedance Response Actions**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

158.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

159.     Section XII.A of the General Permit requires dischargers to compare the results of their sampling to the two types of Numeric Action Level ("NAL") values in Table 2 of the General Permit to determine, for each applicable parameter, whether either type of NAL has been exceeded. If sampling results indicate that a NAL is exceeded, the discharger enters "Level 1 status" for that parameter.  General Permit, Section XII.C.

160.     By October 1 following the commencement of Level 1 status for any parameter, the discharger shall complete an evaluation, with the assistance of a Qualified Industrial Storm Water Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s) and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances.  General Permit, Section XII.C.1.

161.     Based on the above evaluation, the discharger shall, no later than January 1 following the commencement of Level 1 status: revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation; certify and submit via SMARTS a Level 1 Exceedance Response Action ("ERA") Report, prepared by a QISP, that includes a summary of the evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL; and certify and submit via SMARTS the QISP's identification number, name, and contact information.  General Permit, Section XII.C.2.

162.    Defendants' violations of the Exceedance Response Action requirements of the General Permit are evidenced, *inter alia*, by the allegation set forth in paragraphs 123 through 130 above.

163.    Each day Defendants failed to properly complete the ERA Level 1 Evaluation is a violation of the General Permit.  Defendants have been in violation of this requirement every day since October 2, 2019.  In addition, each day Defendants failed to complete the Level 1 ERA Report is a violation of the General Permit.  Defendants have been in violation of this requirement every day since January 2, 2020.

164.    Each day Defendants failed to complete the Level 2 ERA Action Plan is a violation of the General Permit.  Defendants have been in violation of this requirement every day since July 2, 2020.

165.    Each day Defendants failed to complete the Level 2 ERA Technical Report is a violation of the General Permit.  Defendants have been in violation of this requirement every day since January 2, 2021.

166.    Each day of violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since October 21, 2017.  See 33 U.S.C. §§ 1319 (d), 1365; 40 C.F.R. § 19.4 (2008).

## VII.   RELIEF REQUESTED

Wherefore, CATs respectfully requests that this Court grant the following relief:

a.    Declare Defendants to have violated and to be in violation of CWA section 301(a), 33 U.S.C. § 1311(a), for discharging pollutants from its the Facility in violation of a permit issued pursuant to CWA section 402, 33 U.S.C. § 1342 and for failing to comply with all substantive and procedural requirements of the General Permit and the CWA as alleged herein;

b.    Enjoin Defendants from discharging pollutants from the Facility and to the surface waters surrounding and downstream from the Facility in violation of the Act and the General Permit;

c.    Enjoin Defendants from further violating the substantive and procedural

1  requirements of the General Permit;

2            d.   Order Defendants to pay civil penalties of $ 59,973 per day per violation for all

3  violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505(a) of the Act, 33

4  U.S.C. §§ 1319(d) and 1365(a) and 40 C.F.R. §§ 19.1–19.4 (2008);

5            e.   Order Defendants to take appropriate actions to restore the quality of navigable

6  waters impaired by their activities;

7            f.   Award Plaintiff's costs and fees (including reasonable attorney, witness, and

8  consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

9            g.   Award any such other and further relief as this Court may deem appropriate.

10  Dated: December 21, 2022            Respectfully Submitted,

11             LAW OFFICES OF ANDREW L. PACKARD

12             By:   /s/ William N. Carlon

13

14             William N. Carlon
           Attorneys for Plaintiff
           CALIFORNIANS FOR

15             ALTERNATIVES TO TOXICS

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 1**

Law Offices Of

# ANDREW L. PACKARD

245 Kentucky Street, Suite B3, Petaluma, CA 94952
Phone (707) 782-4060   Fax (707) 782-4062
Info@PackardLawOffices.com

October 21, 2022

**VIA CERTIFIED MAIL**

John Reichardt                                    John Reichardt
Reichardt Duck Farm                               185 Mystic Mountain Drive
3770 Middle Two Rock Road                         Sparks, NV 89441
Petaluma, CA 94952

Re:     **NOTICE OF VIOLATIONS AND INTENT TO FILE SUIT UNDER THE
        FEDERAL WATER POLLUTION CONTROL ACT ("CLEAN WATER ACT")
        (33 U.S.C. §§ 1251** *et seq.***)**

Dear John Reichardt:

      This firm represents Californians for Alternatives to Toxics ("CATs") in regard to
violations of the Clean Water Act ("the Act") occurring at Reichardt Duck Farm Inc.'s ("RDF")
duck farm located at 3770 Middle Two Rock Road, in Petaluma, California ("Facility").  This
letter is being sent to you as the responsible owner and operator of the enterprise, and as the
registered agent for this entity.  Unless otherwise noted, John Reichardt and Reichardt Duck
Farm Inc. shall hereinafter be collectively referred to as "RDF."  The purpose of this letter is to
provide RDF with notice of the violations of the Industrial General Permit occurring at the
Petaluma Facility, including, but not limited to, noncompliant discharges of polluted storm water
associated with industrial activities from the Facility into local surface waters.

      RDF is in ongoing violation of the substantive and procedural requirements of the Clean
Water Act, 33 U.S.C. § 1251 *et seq.*, and National Pollutant Discharge Elimination System
("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water
Quality Order No. 14-57-DWQ ("General Permit" or "Permit").[1]

      Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil
Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Act subjects
RDF to a penalty for all violations occurring during the period commencing five years prior to
the date of the Notice Letter.  These provisions of law authorize civil penalties of up to $59,973

---

[1] RDF submitted a Notice of Intent ("NOI") to comply with the General Permit for the Petaluma
Facility on or about January 26, 2015.  The Facility was assigned the Waste Discharge
Identification ("WDID") Number 249I014770.

Notice of Violation and Intent to File Suit
October 21, 2022
Page 2

per day per violation for all Clean Water Act violations occurring after November 2, 2015.

In addition to civil penalties, CATs will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)) permits prevailing parties to recover costs and fees, including attorneys' fees.

The Clean Water Act requires that sixty (60) days prior to the initiation of a citizen-enforcement action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen enforcer must give notice of its intent to file suit.  Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the Chief Administrative Officer of the water pollution control agency for the State in which the violations occur.  *See* 40 C.F.R. § 135.2.  As required by the Act, this letter provides statutory notice of the violations that have occurred, and continue to occur, at the Facility.  40 C.F.R. § 135.3(a).  At the expiration of sixty (60) days from the date of this letter, CATs intends to file suit under Section 505(a) of the Act in federal court against RDF for violations of the Clean Water Act and the Permit.

## I.    Background.

### A.    Californians for Alternatives to Toxics

CATs is a non-profit association dedicated to the preservation, protection and defense of the environment, wildlife and natural resources of California waters, including the waters into which RDF discharges polluted storm water.  Members of CATs enjoy the waters that the Facility discharges into, including Laguna Lake, Chileno Creek, Walker Creek, Tomales Bay and the Pacific Ocean ("Impacted Waters").  Members of CATs use and enjoy the Impacted Waters for fishing, estuarine habitat and the rare, threatened and endangered species it supports, the wildlife habitat, marine habitat, and other designated beneficial uses.  The discharge of pollutants from the Facility into the Impacted Waters impairs each of these uses.  Further, discharges of polluted storm water from the Facility are ongoing and continuous.  Thus, the interests of CATs' members have been, are being, and will continue to be adversely affected by RDF's failure to comply with the Clean Water Act and the General Permit.

### B.    The Clean Water Act.

Congress enacted the CWA in 1972 in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251.  The Act prohibits the discharge of pollutants into United States waters except as authorized by the statute.  33 U.S.C. § 1311; *San Francisco Bay Keeper, Inc. v. Tosco Corp*., 309 F.3d 1153, 1156 (9th Cir. 2002).  The Act is administered largely through the NPDES permit program.  33 U.S.C. § 1342. In 1987, the Act was amended to establish a framework for regulating storm water discharges through the NPDES system.  Water Quality Act of 1987, Pub. L. 100-4, § 405, 101 Stat. 7, 69 (1987) (codified at 33 U.S.C. § 1342(p)); *see also Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 840-41 (9th Cir. 2003) (describing the problem of storm water runoff and summarizing the Clean Water Act's permitting scheme).  The discharge of pollutants not specifically allowed by a

Notice of Violation and Intent to File Suit
October 21, 2022
Page 3

NPDES permit is illegal. *Ecological Rights Found. v. Pacific Lumber Co.*, 230 F.3d 1141, 1145 (9th Cir. 2000).

Much of the responsibility for administering the NPDES permitting system has been delegated to the states. *See* 33 U.S.C. § 1342(b); *see also* Cal. Water Code § 13370 (expressing California's intent to implement its own NPDES permit program). The CWA authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(b). Pursuant to Section 402 of the Act, the Administrator of EPA has authorized California's State Board to issue individual and general NPDES permits in California. 33 U.S.C. § 1342.

### C.   California's General Permit for Storm Water Discharges Associated with Industrial Activities

Facilities discharging, or having the potential to discharge, storm water associated with industrial activities that have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing a Notice of Intent to Comply ("NOI"). General Permit, Standard Condition XXI.A. These facilities must file their NOIs before the initiation of industrial operations. *Id.*

Facilities covered by the General Permit include concentrated animal feeding operations ("CAFO"). *Id.* at Attachment A. To be considered a CAFO, a facility must first be defined as an animal feeding operation ("AFO") and meet the criteria established in the CAFO regulation. An AFO is an agricultural operation where animals are kept and raised in confined situations where the following conditions are met: (1) animals have been, are, or will be stabled or confined and fed or maintained for a total of 45 days or more in any 12-month period; and, (2) crops, vegetation, forage growth, or post-harvest residues are not sustained in the normal growing season over any portion of the lot or facility. 40 C.F.R. § 122.23(b)(1). A CAFO is an AFO that is defined as a Large CAFO or as a Medium CAFO by the terms of 40 C.F.R. § 122.23. An operation that confines ducks is considered a Large CAFO is the above conditions are met, and there are at least 30,000 ducks (if the AFO uses other than a liquid manure handling system) or 5,000 ducks (if the AFO uses a liquid manure handling system). 40 C.F.R. § 122.23(b)(4)(xii) and (xiii).

Facilities must strictly comply with all of the terms and conditions of the General Permit. A violation of the General Permit is a violation of the CWA.

The General Permit contains three primary and interrelated categories of requirements: (1) discharge prohibitions, receiving water limitations and effluent limitations; (2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and (3) self-monitoring and reporting requirements.

### D.   RDF's Petaluma Facility

Information available to CATs indicates that RDF's industrial activities at the approximately 373-acre Facility include, but are not limited to: operations associated with a

Notice of Violation and Intent to File Suit
October 21, 2022
Page 4

concentrated animal feeding operation related to the raising and slaughtering of ducks.  Based on public reporting in the press about the Facility, CATs is informed, and on that basis, believes that the Facility contains approximately 200,000 to 300,000 ducks at any time, and therefore meets the definition of a Large CAFO.  Consequently, the Facility is required to maintain coverage under the General Permit.

The Facility includes rows of houses in which ducks are confined, wastewater processing, storage, and disposal facilities, dry litter and manure processing, storage, and disposal facilities, a fueling station, a shop and a network of roads that provide connectivity between the various industrial areas.  The industrial activities at the Facility fall under Standard Industrial Classification ("SIC") Code 2015 ("Poultry Slaughtering and Processing").

RDF collects and discharges storm water associated with industrial activities at the Facility through at least eight (8) discharge points into an unnamed creek, which drains to Laguna Lake.  Laguna Lake discharges to Chileno Creek, which is a tributary to Walker Creek, which ultimately discharges to Tomales Bay and the Pacific Ocean.  The Impacted Waters are waters of the United States within the meaning of the Clean Water Act.

The Tomales Bay watershed in western Marin County is one of the major estuaries on the west coast of the United States. It has a diverse ecosystem and several notable tributaries, including Lagunitas Creek, which has one of the few remaining viable coho salmon runs in central California.  *Water Quality Control Plan for the San Francisco Bay Basin* ("Basin Plan") Section 4.1.3.3.  The Water Board identified Tomales Bay as an area where commercial shellfishery is threatened and authorized the formation of a technical advisory committee to investigate and develop a remediation strategy.  California Regional Water Quality Control Board San Francisco Bay Region Resolution 94-018.  On February 8, 2007, the U.S. EPA approved the Total Maximum Daily Load ("TMDL") for pathogens in the Tomales Bay and the Basin Plan has been amended to incorporate the TMDL along with an implementation plan to achieve the TMDL.  Basin Plan Section 7.3.1.  "The overall goal of the Tomales Bay Watershed Pathogens Total Maximum Daily Load (TMDL) is to ensure protection of water contact recreational uses and Bay shellfish harvesting, thereby minimizing human exposure to disease-causing pathogens."  *Id.*

According to the 2018 303(d) List of Impaired Water Bodies, Tomales Bay and its tributaries, including Walker Creek, downstream of the Facility are impaired for: Mercury, Nutrients, Sedimentation/Siltation, and Pathogens.[2]  Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already impaired surface waters and aquatic-dependent wildlife.

---

[2] 2018 Integrated Report – All Assessed Waters, *available at* https://gispublic.waterboards.ca.gov/portal/apps/webappviewer/index.html?id=e2def63ccef54eed bee4ad726ab1552c (last accessed September 20, 2022).

Notice of Violation and Intent to File Suit
October 21, 2022
Page 5

The areas of industrial activity at the Facility are sources of pollutants.  The General Permit requires RDF to analyze storm water samples for TSS, pH, and Oil and Grease.  General Permit, Section XI.B.6.  The General Permit also requires facilities to analyze storm water samples for pollutants that are likely to be present in a particular facility's discharge, and any additional applicable industrial parameters related to receiving waters with 303(d) listed impairments.  *Id.*  Given that the Facility generates a significant amount of manure from ducks, nutrients and pathogens are pollutants that are likely to be present in the Facility's storm water discharges, and because they are related to the receiving waters 303(d) listed impairment, RDF is required to analyze their storm water samples for those pollutants.

## II.    RDF's Violations of the Act and Permit.

Based on its review of available public documents, CATs is informed and believes that RDF, through its operation of the Facility, is in ongoing violation of both the substantive and procedural requirements of the CWA and the General Permit.  These violations are ongoing and continuous.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, RDF is subject to penalties for violations of the Act since October 21, 2017.

### A.    RDF Discharges Storm Water Containing Pollutants in Violation of the General Permit's Discharge Prohibitions, Receiving Water Limitations and Effluent Limitations.

RDF's storm water sampling results provide conclusive evidence of RDF's failure to comply with the General Permit's discharge prohibitions, receiving water limitations and effluent limitations at its Facility.  Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation."  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

### 1.    Applicable Water Quality Standards.

The General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.  General Permit, Discharge Prohibition III.C.  The General Permit also prohibits discharges that violate any discharge prohibition contained in the applicable Regional Water Board's Basin Plan or statewide water quality control plans and policies.  General Permit, Discharge Prohibition III.D.  Furthermore, storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in any affected receiving water.  General Permit, Receiving Water Limitations VI.A, VI.B.

Dischargers are also required to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of the General Permit's Receiving Water Limitations.  General Permit, Special Condition XX.B.  The documentation must describe changes the discharger will make to its current storm water best management

Notice of Violation and Intent to File Suit
October 21, 2022
Page 6

practices ("BMPs") in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards. *Id.*

The Basin Plan sets forth water quality standards and prohibitions applicable to RDF's storm water discharges from its Facility.  The Basin Plan identifies present and potential beneficial uses for the Impacted Waters, which include shellfish harvesting (SHELL), warm freshwater habitat (WARM), wildlife habitat (WILD), water contact recreation (REC-1), noncontact water recreation (REC-2), cold freshwater habitat (COLD), fish migration (MIGR), preservation of rare and endangered species (RARE), commercial, and sport fishing (COMM), navigation (NAV), marine habitat (MAR), and fish spawning (SPWN).

## 2.      Applicable Effluent Limitations.

Dischargers are required to reduce or prevent pollutants in their storm water discharges through implementation of best available technology economically achievable ("BAT") for toxic and nonconventional pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants.  General Permit, Effluent Limitation V.A.  Conventional pollutants include Total Suspended Solids, Oil & Grease, pH, Biochemical Oxygen Demand and Fecal Coliform.  40 C.F.R. § 401.16.  All other pollutants are either toxic or nonconventional.  40 C.F.R. §§ 401.15-16.

Under the General Permit, benchmark levels established by the EPA ("EPA benchmarks") serve as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT.  *Santa Monica Baykeeper v. Kramer Metals,* 619 F. Supp. 2d 914, 920, 923 (C.D. Cal 2009); General Permit, Exceedance Response Action XII.A.

The following EPA benchmarks have been established for pollutants discharged by RDF: Total Suspended Solids – 100 mg/L; Oil & Grease – 15.0 mg/L; pH – 6.0-9.0 s.u., Nitrate plus Nitrite Nitrogen – 0.68 mg/L, and Phosphorus – 2.0 mg/L.

## 3.      RDF's Storm Water Sample Results

The following discharges of pollutants from the Facility have violated the discharge prohibitions, receiving water limitations and effluent limitations of the Permit:

### a.      Discharge of Storm Water Containing Total Suspended Solids (TSS) at Concentrations in Excess of Applicable EPA Benchmark Value

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|------|-----------------|-----------|-----------------------------------|----------------------------|
| 11/29/2018 | Unnamed Creek | TSS | 400 | 100 |

Notice of Violation and Intent to File Suit
October 21, 2022
Page 7

**b.** **Discharge of Storm Water Containing Nitrite and Nitrate at Concentrations in Excess of Applicable EPA Benchmark Values**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 12/13/2021 | C Pond Creek | N+N | 0.77 (Nitrite); 13 (Nitrate) | 0.68 |
| 12/27/2021 | C Pond Creek | N+N | 11 (Nitrate) | 0.68 |
| 1/4/2022 | C Pond Creek | N+N | 10 (Nitrate) | 0.68 |
| 3/10/2021 | C Pond Creek | N+N | 120 (Nitrate) | 0.68 |
| 1/27/2021 | C Pond Creek | N+N | 20 (Nitrate) | 0.68 |
| 12/23/2019 | Unnamed Creek | N+N | 18 (Nitrate) | 0.68 |
| 12/2/2019 | Unnamed Creek | N+N | 0.79 (Nitrite); 11 (Nitrate) | 0.68 |
| 1/25/2018 | Unnamed Creek | N+N | 30 (Nitrate) | 0.68 |
| 11/29/2018 | Unnamed Creek | N+N | 13 (Nitrate) | 0.68 |
| 1/7/2019 | Unnamed Creek | N+N | 13 (Nitrate) | 0.68 |
| 2/4/2019 | Unnamed Creek | N+N | 3.5 (Nitrate) | 0.68 |

**c.** **Discharge of Storm Water Containing Phosphorus (P) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 12/13/2021 | C Pond Creek | P | 3.7 | 2.00 |
| 12/27/2021 | C Pond Creek | P | 3.1 | 2.00 |
| 1/4/2022 | C Pond Creek | P | 2.7 | 2.00 |
| 1/27/2021 | C Pond Creek | P | 3.7 | 2.00 |
| 12/23/2019 | Unnamed Creek | P | 2.8 | 2.00 |
| 11/29/2018 | Unnamed Creek | P | 2.9 | 2.00 |

**d.** **Discharge of Storm Water Containing pH at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (s.u.) | EPA Benchmark Value (s.u.) |
|---|---|---|---|---|
| 3/10/2021 | C Pond Creek | pH | 2.71 | Greater than 6.0, less than 9.0 |

Notice of Violation and Intent to File Suit
October 21, 2022
Page 8

> **e.    RDF 's Sample Results Are Evidence of Violations of the General Permit**

RDF's sample results demonstrate violations of the Permit's discharge prohibitions, receiving water limitations and effluent limitations set forth above.  CATs is informed and believes that RDF has known that its storm water contains pollutants at levels exceeding General Permit standards since at least October 21, 2017.

CATs alleges that such violations occur each time storm water discharges from the Facility.  Attachment A hereto, sets forth the specific rain dates on which CATs alleges that RDF has discharged storm water containing impermissible levels of TSS, N+N, P, and pH in violation of the General Permit.  General Permit, Discharge Prohibitions III.C and III.D, Receiving Water Limitations VI.A, VI.B.  CATs further alleges that RDF violates the Basin Plan's water quality objectives each time it discharges storm water with *E. coli* and fecal coliforms in excess of the water quality standards set therein.

> **4.    RDF Has Failed to Implement BAT and BCT**

Dischargers must implement BMPs that fulfill the BAT/BCT requirements of the CWA and the General Permit to reduce or prevent discharges of pollutants in their storm water discharges.  General Permit, Effluent Limitation V.A.  To meet the BAT/BCT standard, dischargers must implement minimum BMPs and any advanced BMPs set forth in the General Permit's SWPPP Requirements provisions where necessary to reduce or prevent pollutants in discharges.  *See* General Permit, Sections V, X.H.1-2.

RDF has failed to implement and maintain the minimum BMPs required by the General Permit as evidenced by the exceedances identified above.  Specifically, RDF has failed to comply with the following: good housekeeping requirements; preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping.  Permit, Section X.H.1(a-g).

RDF has further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the General Permit's effluent limitations.  General Permit, Sections X.H.2.

Each day that RDF  have failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  RDF has been in violation of the BAT and BCT requirements at its Facility every day since at least October 21, 2017.

Notice of Violation and Intent to File Suit
October 21, 2022
Page 9

5.      **RDF Has Failed to Comply with the Monitoring Requirements of the General Permit.**

The General Permit requires dischargers to implement a Monitoring Implementation Plan.  General Permit, Section X.I.  As part of their monitoring plan, dischargers must identify all storm water discharge locations.  Permit, Section X.I.2.  Dischargers must then conduct monthly visual observations of each drainage area, as well as visual observations during discharge sampling events.  General Permit, Section XI.A.1 and 2.

Dischargers must collect and analyze storm water samples from two (2) storm events within the first half of each reporting year (July 1 to December 31) and two (2) storm events during the second half of each reporting year (January 1 to June 3).  General Permit, Section XI.B.  Section XI.B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS") and oil and grease ("O&G"), certain industry-specific parameters set forth in Table 2 of the General Permit, and other pollutants likely to be in the storm water discharged from the facility based on the pollutant source assessment.  General Permit, Section XI.B.6.  Dischargers must submit all sampling and analytical results via SMARTS within thirty (30) days of obtaining all results for each sampling event.  General Permit, Section XI.B.11.

RDF has failed to develop and implement an adequate Monitoring Implementation Plan for its Facility, and has thus violated the monitoring requirements of the General Permit.  For example, RDF has failed to monitor for every potential pollutant that is likely to be present at its Facility, including nutrients and pathogens.  In addition, RDF has failed to collect the required number of samples for each reporting period.  RDF has also failed to monitor every discharge location of storm water associated with industrial activities at its Facility.  Each day that RDF has failed to develop and implement an adequate Monitoring Implementation Plan is a separate and distinct violation of the Act and Permit.  RDF has been in violation of the Monitoring requirements every day since at least October 21, 2017.

6.      **RDF Has Failed to Develop and Implement an Adequate Storm Water Pollution Prevention Plan.**

The General Permit requires dischargers to develop and implement a site-specific SWPPP.  General Permit, Section X.A.  The SWPPP must include, among other elements: (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable.  *See id.*

Dischargers must revise their SWPPP whenever necessary and certify and submit via the Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS for any non-significant revisions not more than once every three (3)

Notice of Violation and Intent to File Suit
October 21, 2022
Page 10

months in the reporting year.  General Permit, Section X.B.

CATs' investigation indicates that RDF has been operating with an inadequately developed and implemented SWPPP in violation of General Permit requirements.  RDF has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary, resulting in the Facility's numerous continuing effluent limitation violations.

Each day RDF failed to develop and implement an adequate SWPPP at its Facility is a violation of the General Permit.  The SWPPP violations described above were at all times in violation of Section X of the General Permit.  RDF has been in violation of these requirements at its Facility every day since at least October 21, 2017.

### 7.   RDF Has Failed to Submit Timely, True and Correct Reports.

Section XVI of the Permit requires dischargers to submit an Annual Report by July 15th of each reporting year to the Regional Board.  The Annual Report must be signed and certified by a discharger's Legally Responsible Person, or Duly Authorized Representative. General Permit, Sections XVI.A, XXI.K.  The Annual Report must include a compliance checklist, certifying compliance with the General Permit and an explanation of any non-compliance. General Permit, Section XVI.B.

CATs' investigations indicate that RDF has submitted incomplete Annual Reports and purported to comply with the Permit despite significant noncompliance at its Facility.  Each day RDF failed to submit timely, true and correct reports is a separate violation of the Clean Water Act.  RDF has been in violation of these requirements at its Facility every day since at least October 21, 2017.

### III.   Persons Responsible for the Violations.

CATs puts RDF on notice that they are the persons and entities responsible for the violations described above.  If additional persons are subsequently identified as also being responsible for the violations set forth above, CATs puts RDF on formal notice that it intends to include those persons in this action.

### IV.   Name and Address of Noticing Parties.

The name, address and telephone number of each of the noticing parties is as follows:

Patricia Clary, Executive Director
Californians for Alternatives to Toxics
600 F Street, Suite 3 #911
Eureka, CA 95521
(707) 834-4833

Notice of Violation and Intent to File Suit
October 21, 2022
Page 11

**V.      Counsel.**

CATs has retained legal counsel to represent it in this matter.  Please direct all communications to:

Andrew L. Packard
William N. Carlon
Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952
(707) 782-4060
andrew@packardlawoffices.com
wncarlon@packardlawoffices.com

**VI.     Conclusion**

CATs believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the CWA against RDF and their agents for the above-referenced violations upon the expiration of the 60-day notice period.  If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

William N. Carlon
Law Offices of Andrew L. Packard
Counsel for CALIFORNIANS FOR
ALTERNATIVES TO TOXICS

Notice of Violation and Intent to File Suit
October 21, 2022
Page 12

## **SERVICE LIST**

### **VIA CERTIFIED MAIL**

Michael Regan, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

Martha Guzman, Regional Administrator
U.S. Environmental Protection Agency, Region IX
75 Hawthorne Street
San Francisco, CA 94105

Merrick B. Garland, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Eileen Sobeck, Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812

Matthias St. John, Executive Officer
North Coast Regional Water Quality Control Board
5550 Skylane Boulevard Suite A
Santa Rosa, CA 95403

**ATTACHMENT A**
**Notice of Intent to File Suit, Reichardt Duck Farm**
**Significant Rain Events,\* October 20, 2017 – October 21, 2022**

| | | | |
|---|---|---|---|
| October 20, 2017 | November 29, 2018 | March 23, 2019 | April 5, 2020 |
| November 4, 2017 | November 30, 2018 | March 25, 2019 | April 6, 2020 |
| November 9, 2017 | December 1, 2018 | March 26, 2019 | April 7, 2020 |
| November 10, 2017 | December 5, 2018 | March 27, 2019 | May 12, 2020 |
| November 11, 2017 | December 15, 2018 | March 28, 2019 | May 14, 2020 |
| November 14, 2017 | December 17, 2018 | March 29, 2019 | May 17, 2020 |
| November 15, 2017 | December 19, 2018 | April 5, 2019 | May 18, 2020 |
| November 16, 2017 | December 21, 2018 | April 6, 2019 | November 14, 2020 |
| November 17, 2017 | December 24, 2018 | April 16, 2019 | November 18, 2020 |
| November 26, 2017 | December 25, 2018 | May 16, 2019 | December 12, 2020 |
| November 27, 2017 | January 5, 2019 | May 17, 2019 | December 13, 2020 |
| January 5, 2018 | January 6, 2019 | May 19, 2019 | December 14, 2020 |
| January 6, 2018 | January 7, 2019 | May 20, 2019 | December 17, 2020 |
| January 8, 2018 | January 9, 2019 | November 27, 2019 | December 26, 2020 |
| January 9, 2018 | January 10, 2019 | December 1, 2019 | December 31, 2020 |
| January 19, 2018 | January 12, 2019 | December 2, 2019 | January 2, 2021 |
| January 22, 2018 | January 15, 2019 | December 4, 2019 | January 5, 2021 |
| January 25, 2018 | January 16, 2019 | December 5, 2019 | January 7, 2021 |
| January 26, 2018 | January 17, 2019 | December 7, 2019 | January 8, 2021 |
| February 26, 2018 | January 18, 2019 | December 8, 2019 | January 23, 2021 |
| March 1, 2018 | January 20, 2019 | December 11, 2019 | January 25, 2021 |
| March 2, 2018 | January 21, 2019 | December 12, 2019 | January 27, 2021 |
| March 3, 2018 | January 31, 2019 | December 18, 2019 | January 28, 2021 |
| March 8, 2018 | February 2, 2019 | December 19, 2019 | January 29, 2021 |
| March 13, 2018 | February 3, 2019 | December 22, 2019 | February 2, 2021 |
| March 14, 2018 | February 4, 2019 | December 25, 2019 | February 12, 2021 |
| March 15, 2018 | February 5, 2019 | December 30, 2019 | February 15, 2021 |
| March 16, 2018 | February 9, 2019 | January 8, 2020 | February 19, 2021 |
| March 21, 2018 | February 10, 2019 | January 9, 2020 | March 6, 2021 |
| March 22, 2018 | February 13, 2019 | January 14, 2020 | March 9, 2021 |
| April 6, 2018 | February 14, 2019 | January 16, 2020 | March 10, 2021 |
| April 7, 2018 | February 15, 2019 | January 17, 2020 | March 15, 2021 |
| April 12, 2018 | February 16, 2019 | January 22, 2020 | March 19, 2021 |
| April 16, 2018 | February 26, 2019 | January 26, 2020 | April 26, 2021 |
| April 17, 2018 | February 27, 2019 | January 29, 2020 | September 19, 2021 |
| October 2, 2018 | March 2, 2019 | March 7, 2020 | October 18, 2021 |
| October 3, 2018 | March 6, 2019 | March 14, 2020 | October 20, 2021 |
| November 22, 2018 | March 7, 2019 | March 15, 2020 | October 21, 2021 |
| November 23, 2018 | March 10, 2019 | March 25, 2020 | October 22, 2021 |
| November 24, 2018 | March 20, 2019 | March 29, 2020 | October 24, 2021 |
| November 28, 2018 | March 21, 2019 | March 30, 2020 | October 25, 2021 |

\* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.

**ATTACHMENT A**
**Notice of Intent to File Suit, Reichardt Duck Farm**
**Significant Rain Events,* October 20, 2017 – October 21, 2022**

November 2, 2021
November 4, 2021
November 9, 2021
December 12, 2021
December 13, 2021
December 14, 2021
December 16, 2021
December 22, 2021
December 23, 2021
December 24, 2021
December 25, 2021
December 26, 2021
December 27, 2021
December 29, 2021
January 4, 2022
January 7, 2022
March 4, 2022
March 15, 2022
March 28, 2022
April 11, 2022
April 15, 2022
April 16, 2022
April 19, 2022
April 21, 2022
April 22, 2022
June 5, 2022
June 6, 2022
September 18, 2022
September 19, 2022

* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.

**EXHIBIT 2**

# Reichardt Duck Farm, Inc.

California Industrial Storm Water Permit

Storm Water Pollution Prevention Plan
SWPPP

6/23/15

# Industrial Facility

- WDID 249I014770
- Reichardt Duck Farm Inc.
- 3770 Middle Two Rock Road
- Petaluma CA 94952

- John Reichardt - General Manager
- 707 762-6314
- Normal Operating Hours M-F 8 am-4:30 pm.

# Table of Contents

- Facility Name and Contact Information – Slide 2

- Site Map – Slide 4

- List of Industrial Materials – Slide 6

- Description of Potential Pollution Sources – Slide 13

- Assessment of Potential Pollution Sources – Slide 16,32,38

- Minimum BMPs -  Slide 14

- Advanced BMPs – Slide 15

- Monitoring Implementation Plan – SWPPP page 3

Site Map



Industrial Activity
Duck Farm



N

Slide 5

©2015 Google   Google earth

# Industrial Materials

- Gasoline
- Diesel
- Oil
- Chlorine

- Gasoline, diesel and oil are stored at the gas station.
- Diesel is also stored at the hatchery generator, farm generator and the plant generator.
- Chlorine is stored about 50 feet south of the gas station in the Chlorine Containment.
- (See slide 44).



N

Wastewater Processing Area

Unnamed creek

Slide 7

©2015 Google    Google earth



Industrial Activity

Site Boundary

N

©2015 Google          Google earth

8



Site Boundary

Bodies of water on site

Fresh water

Wastewater

©2015 Google          Google earth

10

**Dry litter storage**



Site Boundary

N

©2015 Google    Google earth

11



# Possible Pollutants

- Nutrients

- Sediment

- Oil and Grease

- Chlorine

# Minimum BMPs

- Nutrient reduction
- Irrigation optimized for nutrient uptake in plants
- Erosion control
- Oil and grease collection points
- Chlorine Containment
- Spill contingencies

# Advanced BMPs

- Phytoremediation

- Aerobic bacteria generators for nutrient reduction

- NitroHammer for ammonia reduction and nitrification
  - See Dr. Daniel Wickham's Pond Remediation report in SWPPP

- Nutrient reduction
  - o Rotary screening for solids removal
  - o Removal of compostable materials.
  - o Settling of solids
    - o Saw tooth weirs
  - o Digestion
  - o Phytoremediation
  - o Aerobic bacteria generator
  - o Nitrification
  - o Roofs over manured areas





# Rotary Screens - Manure separators



BMP: Nutrient removal

Dry stack litter is removed from site at this bermed area.

Drainage

N

Drainage

Runoff from stored litter

Berm

Berm

Catch pond

Slide 20

©2015 Google        Google earth

# Duck trailer floors to prevent manure from polluting roadway.




# Dry stack litter removal



# Saw Tooth Weirs –
# Even out the flow for better settling






Process flow
Digestion Ponds
Recycled water
for flushing.

BMP: Nutrient removal

Slide 24



# Poplars for phytoremediation



4 Acres



10 Acres

# Advanced BMP: Aerobic Bacteria Generator



See Dr. Daniel Wickham's Pond Remediation Report

# Advanced BMP:ABG Tank 1



# Advanced BMP:ABG Tank 2



# Advanced BMP: NitroHammer for Nitrification / Ammonia Removal from Martin's Pond



Under Construction

# Irrigation optimized

**Traveling Irrigator**

**Adjustable to meet soil and plant conditions**





- Erosion control
  - Sediment traps
  - Rainwater diversion
  - Settling basin



Storm water discharge locations

Sediment traps

N

Slide 33

©2015 Google          Google earth



N

Sediment traps

BMP: Sediment Removal

©2015 Google    Google earth

34

# Erosion Control -
# Sediment traps where storm water enters the creek

 

# Rainwater catch pond/ Sediment basin




# Erosion Control
# Rainwater diversion



# Oil and Grease Collection and Chlorine Containment

- Shop drain

- Shop oil catch

- Gas station containment

- Chlorine containment



N

Shop

Gas Station

Chlorine Storage

Slide 39

©2015 Google   Google earth

# Shop and Gas Station and Chlorine Storage



# Oil and Grease
# Shop Drain



Oil catch

# Oil and Grease
# Shop oil catch



# Gas Station
## Concrete driveway slopes to containment.



# Chlorine Containment



# Spill Contingency



Gate opens to sewer



Rotating elbow "valve" allows storm water to be stored or released



N

©2015 Google     Google earth



Roofs over duck raising areas

N

Slide 47

©2015 Google          Google earth



Flow of wastewater from Processing Plant

N

Slide 48

©2015 Google   Google earth

# Repaired gutters






Roads

N

Slide 50

©2015 Google        Google earth



N

Roads

©2015 Google   Google earth



Upland runoff

©2015 Google

Google earth

# Storm Water Discharges to Laguna Lake.



# Storm Water Equipment

- Storm Water equipment:
  - Generators
  - Honda pumps
  - Spare Barnes pumps
  - Hoses
- Spill gates.
- Pumps can be reconfigured for a storm. See block diagram of "Heavy storm configuration"

# HEAVY STORM CONFIGURATION



Future BMP: Increase freeboard in storage ponds

Dry stack litter area reduced.

Drainage

N

Plant grass here

Drainage

Berm

Reduced water catch area

Berm

Berm

Catch pond

Slide 56

©2015 Google     Google earth

# Storm Water Team

- John Reichardt, General Manager
- Philip Reichardt, Assistant Manager (lives on site)
- Leland Trumbo, Wastewater operator (lives on site)
- Gary Cheda, Erosion control, phytoremediation
- Heriberto Calvillo, Sewer maintenance (weekend supervisor)
- Garry Mahrt, Rangeland manager, consultant
- Curtis Ashbeck – SludgeHammer representative, consultant
- Dr. Daniel Wickham –President SludgeHammer Group, consultant

- ©2015 Google      Google earth

**EXHIBIT 3**

# REICHARDT DUCK FARM, INC.

# STORM WATER POLLUTION PREVENTION PLAN

# June 23, 2015

# Storm Water Pollution Prevention Plan
# Reichardt Duck Farm, Inc.
# June 23, 2015

<u>Potential Pollution Sources</u>

Two basic types of potential storm water pollution exist at this facility: poultry waste from duck raising operation and sediment from unpaved farm roads and eroding streams and hillsides.

Poultry waste could pollute the waterways via a malfunction in the manure handling and storage operation. Some of the liquid manure produced is also used on site for the production of fodder crops. Inappropriate application of manure on these crops could also cause runoff into waterways.

<u>Overview of System</u>

All manure and litter in the dry stack area is sold and used off site. The dry stack storage area is contained and graded so all contaminants in runoff water is piped to the wastewater ponds.

The flush system uses about 100,000 gallons per day, five days a week. This water can be either fresh water, recycled wastewater or a combination of both. After flushing, the manure and water pass through two rotary screen separators, and then enter a one million gallon settling pond on the North side of Middle Two Rock Road.  A series of saw-toothed weirs in the settling pond allows the water to move forward, leaving the manure behind. The solids are transported by truck to the dry stack litter storage area. The remaining water is then pumped to the 10 million gallon anaerobic digestion pond on the south side of Middle Two rock Road. Wastewater from the digestion pond can then gravity flow to a 5 million gallon storage pond and then gravity flow to another 10 million gallon storage pond. The water can then be used in the flush system or applied to adjacent acreage (240 acres) plus neighboring 400 acres.

The liquid storage in the waste system is about 23 million gallons. This is applied to crop and pasture land at annual rates of 1-3" per year. The rate of application varies according to nutrient content of the water, soil tests, cropping history and current crop needs. The digestion pond creates about one million gallons of sludge per year. The sludge is sold to be used as fertilizer.

<u>Monitoring Implementation Plan</u>

The following monitoring procedures are currently being conducted:
1.  Required sampling from two Qualifying Storm Events between July 1 and December 31 and two QSEs between January 1 and June 30.

    A Qualifying Storm Event is a precipitation event that:
    1.  Produces a discharge for at least one drainage area; and,
    2.  Is preceded by 48 hours with no discharge from any drainage area.

2. Weekly assessment of waste water pond freeboard.

3. Soil testing for N, P, K and Na every 3 years in February.

4. Determine nitrogen concentration in waste water to be land applied.

Best Management Practices Development

Currently waste management meetings are held once per quarter. These are mainly strategic in nature at this point. Management practices in place at Reichardt Duck Farm are:

| PROBLEM | ACTION | SUCCESS CRITERIA |
|---|---|---|
| Sediment from roads.

7/1/99 | Use better gravel (i.e. blue shale) for roadway maintenance. | Observe turbidity of runoff water. |
| Sediment from eroding waterways.
7/1/99 | Re-vegetate riparian areas. | Observe turbidity of runoff water and stability of stream banks and bottoms. |
| High water table and nutrient loading of lower swale.
6/30/00 | Plant trees and hydrophilic plants in swale. Relocate irrigation system to another area.
          See Slides 25,26 | Soil tests and water tests for nutrient levels. |
| Nutrient loading of pasture.
6/30/00
6/22/05 | Expand area available for waste application. Improve irrigation system. Increase crop production and removal (i.e. harvest). | Soil testing. |
| Duck raising areas have exposed manured areas requiring runoff to be caught. 6/30/00 | Cover duck raising areas.

          See Slide 47 | Pond freeboard increased. |

4

| PROBLEM | ACTION | SUCCESS CRITERIA |
|---|---|---|
| Moving ducks in open bottom trailers gets manure on roadways. 6/30/00 | Installed manure catching floors under duck moving trailers.                    See Slide 21 | No nutrients in farm runoff water. Stormwater testing for N. |
| Nutrient loading of pasture is too high. 6/15/02 8/04 | Manure separators remove two truckloads of manure daily.                   See Slide 19 | Nutrient levels in field runoff within acceptable limits. Stormwater testing for N. |
| Nutrient loading of pasture is too high. 11/23/13 | Manure settling pond improved with weirs and cleaning of settling chambers.                  See Slide 23 | Nutrient levels in field runoff within acceptable limits. Stormwater testing for N. |
| Nutrient loading of pasture is too high. 4/27/06 | Increase acreage, irrigate additional pastures. | Nutrient levels in field runoff within acceptable limits. Stormwater testing for N. |
| Nutrient loading of pasture is too high. Irrigation rate is too high. 4/27/06 | Travelling irrigators reduce application rate.                   See Slide 31 | Nutrient levels in field runoff within acceptable limits. Stormwater testing for N. |
| Sediment from roadways. 7/02 | Sediment settling basin added.                   See Slide 36 | TSS levels within acceptable limits. |
| Sediment from roadways. 7/02 | Sediment traps added to locations where storm water enters the creek.             See Slides 33,34,35 | TSS levels within acceptable limits. |
| Nutrient loading of pasture is too high. 2/13 | Dry stack litter is removed from farm to be used as fertilizer.                   See Slide 22 | Nutrient levels in field runoff within acceptable limits. Stormwater testing for N. |
| Sediment from roadways. 4/15 | Rainwater diverted to sediment basin.                   See Slide 37 | TSS levels within acceptable limits. |

| PROBLEM | ACTION | SUCCESS CRITERIA |
|---|---|---|
| Sediment from roadways. 6/15 | Repair farm gutters as required to keep clean water away from roads. See Slide 49 | TSS levels within acceptable limits. |
| Nutrient loading of pasture is too high.<br><br>5/14 | Add bacteria generators to produce bacteria to reduce nutrients in irrigation water. See Dr. Dan Wickham Theory of Operation. See Slides 27,28,29 | Nutrient levels in field runoff within acceptable limits. |
| Road maintenance. 7/15 | Graveling and grading of roads. | TSS levels within acceptable limits. |
| Contaminated first flush Stormwater entering creek.<br><br>6/8/15 | Lower the culvert between the Stormwater sediment basin and the sewer system to catch contaminated runoff before it enters the creek. See Slide 45 | Test for N and TSS before releasing Stormwater. |
| Freeboard in ponds not sufficient.<br><br>6/28/15 | Decrease footprint of dry stack litter storage area. See Slide 56 | Additional water storage available in winter storage ponds. |

Reichardt Duck Farm's SWPPP was initially prepared 7/1/99.

Plan updated 6/24/10.

Plan resubmitted 6/23/15.

# Storm Water Pollution Prevention Plan
## Reichardt Duck Farm, Inc.

<u>Spill Prevention and Response</u>

Potential problem areas:

1. Clogged sewer line could cause spill of duck manure from duck growing area to creek.

BMPs
1. Sewers are maintained daily; any debris is removed and hauled to manure storage area. Heriberto Calvillo is responsible for this maintenance.
2. If a spill should occur, a diversion gate near L3 is open to the sewer during dry weather to catch the spill. In wet weather this gate is opened to catch the spill and cleanup.
3. If the spill were not caught at the L3 gate, it would be caught in the catch pond adjacent to the creek. An overflow culvert is in place to cause the spill to go into the surge pond if the volume is of considerable magnitude. This water is automatically pumped to the storage pond. An autostart generator is in place in case of a power failure. After correction of the sewer problem the catch pond is pumped and washed out.



SludgeHammer™ Group Ltd.
336 S. Division Road
Petoskey, MI  49770

Ph: 1.231.348.5866
Toll Free: 1.800.426.3349
Fax: 1.720.834.3102
www.SludgeHammer.net

nature called.  we answered.



## REICHARDT DUCK FARM
## POND BIOREMEDIATION
## REPORT TO WATER QUALITY BOARD

Introduction

Reichardt Duck Farm is a large scale animal holding facility that produces up to 2 million ducks per annum.  The liquid waste from the facility is captured and passes through a multi-pond system for reuse and disposal when necessary.  Washdown water from the duck impoundments passes into a primary pond adjacent to the sheds.  This pond captures solid wastes which are removed for producing compost.  The pond is completely cleaned when excessive solids build up.

Effluent from the primary pond crosses Middle Two Rock Rd. to a series of three large holding ponds.  Pond A has a 10 million gallon capacity, Pond B has a 5.6 million gallon capacity and Pond C is 10 million gallons.  Pond C generally is maintained with 6 feet of freeboard to provide equalization storage and thus is held to 5 MG capacity.  Liquid from Pond C is pumped back to an aerated pond referred to as Martin's pond.  Martin's pond has a capacity of 2.5 million gallons and is aerated with a venturi pump operating at 40 horsepower.

Aerated liquid from this pond is exposed to chlorine for disinfection prior to reuse as washdown water in the duck impoundments, where the runoff then runs back through the treatment cycle.  Approximately 100,000 gallons of liquid with a residual chlorine of 1 ppm is used for washdown 5 days a week.  The entire system has a hydraulic residence time of approximately 82 days.

Bioremediation

In response to the Reichardt Company's request we designed a system to inoculate the wastewater treatment ponds at the farm with cultures of beneficial spore-forming facultative bacteria to investigate whether the biological activity in the pond could be enhanced.

The primary component of the inoculation system is the SludgeHammer Aerobic Bacterial Generator.  This is a device that is designed to provide an environment for culturing specific strains of *Bacillus* species within a wastewater containment vessel.  In this instance a 1,000 gallon water tank was fitted with the SludgeHammer unit and placed adjacent to the primary solids pond.  The unit was inoculated with a packet of SludgeHammer Blend™ bacterial culture.  The SludgeHammer unit is a column 3 feet high with a diameter of 1 foot that has a micro-fine bubble diffuser at the base (see

slides).  The column has perforations at the base that allow water to enter the column as the bubble

stream rises.  This circulates 15,000-20,000 gallons of liquid through the column when powered with an 80 watt linear air pump.  Inside the unit is a coil of cuspated plastic that provides about 120 sq.ft. of surface area for bacterial attachment.  The bacterial inoculum is packaged in a porous bag that is set inside a 4" pipe inside the SludgeHammer column.  This provides a refuge for what becomes a "mother culture" of bacteria.  Since the liquid flow is highly aerobic inside the column, and contains an abundant food for the bacteria in the form of organic material from the waste, the bacteria can increase in numbers rapidly.

The system at Reichardt's was constructed so that the inoculator tank could be fed with effluent from the receiving waste pond at a rate that allowed the contents to overflow back into the solids pond with the maximal number of bacterial propagules.  This rate was chosen to provide a hydraulic residence time of about 2 days to provide adequate time for growth and reproduction.

Inoculation at the Reichardt ponds began on March 21, 2014.

Results

The historical data record for the Reichardt ponds is unfortunately incomplete but one can follow certain trends as they relate to the biological inoculum.  The February and March samples are just prior to the inoculation program and can be taken as a baseline.  These samples show some reduction in BOD as it passes on to Pond C (3300 mg/l to 710 mg/l), as well as some reduction in Total Nitrogen as it passes through Martin's pond (1100 mg/l to 520 mg/l).

The June samples show a substantial reduction in BOD in the settling pond from 3300 to 420 mg/l, but this increases again in November to 1100 mg/l, although this is still well below the original February sample.  Unfortunately no baseline BOD measurements for the aerated Martin's pond existed however the Total nitrogen data show a substantial reduction from 520 mg/l to 384 after inoculation.

Figure 1.  Grab samples from the Reichardt Duck treatment ponds.

| Date | Parameter | Sequential | data (mg/l) | | |
|------|-----------|-----------|-------------|--|--|
| | | Settling Pond out | Pond A out | Pond C out | Martin's Pond out |
| 2/20/2014 | BOD | 3300 | 3000 | | |
| | Total N | | | | |
| 3/18/2014 | BOD | | | 710 | |
| | Total N | 1100 | | | 520 |
| 6/16/2014 | BOD | 420 | | | |
| | Total N | 1200 | | | 480 |
| 11/11/2014 | BOD | 1100 | 670 | 300 | 170 |
| | Total N | 1100 | 910 | 840 | 384 |

An indirect measure of BOD reduction in the washdown water taken from Martin's Pond is the chlorine usage necessary to maintain the required 1 mg/l residual for use. Prior to inoculation the farm used 165 gallons of chlorine solution per week. Currently the farm is using only 50 gallons/week to achieve the same result. This is a 70% reduction. Given that chlorine is an oxidizing agent, the reduction in chlorine usage is a direct reflection of oxygen demand that the liquid possesses. The equivalent BOD reduction would be from an initial BOD in Martin's pond of 567 mg/l to the current 170 mg/l.

<u>Discussion</u>

The system installed at Reichardt's is obviously a minimalist approach involving just the simple inoculation with facultative bacteria without any infrastructure change. This is a widely used approach and the SludgeHammer system really only differs in that it sets up a chemostatic grow-out facility for the desirable organisms rather than requiring the continual purchase of new bacterial culture.

One of the desired outcomes relates to solids in the lower holding ponds. At the onset of treatment Pond A had an extensive scum layer. Within two weeks of inoculation the pond demonstrated increased fermentative activity, even though water temperatures were still relatively low. Figure 2 below is a photograph taken of the pond surface on March 24, 2014.



This scum layer had virtually disappeared by April 2, 2014 (Figure 3).



<u>Proposed Activities</u>
Several aspects of the pilot project showed positive effects, however, the Reichardt management wanted to continue the improvements and expressed a willingness to work with us in certain innovative treatment options that could be of value to agricultural operations more broadly.  One of our primary focuses in wastewater management is reductions of nutrients, particularly nitrogen.  As can be seen from the data above the inoculation resulted in a reduction of total nitrogen in the wastewater as it moved through the treatment scheme.  The solids receiving pond has a consistent concentration of approximately 1100 mg/l.  At 100,000 gpd for five days a week this represents a load of 412.50 kg/day (910 lb/day) and an annual load of 107,250 kg (235,950 lb.).

After treatment nitrogen had reduced to 384 mg/l in the washdown water from Martin's pond.  This represents a 65% reduction in TN.  The annual load is now being reduced by 69,715 kg (153,350 lbs).  The sampling program did not elucidate the mechanism for this loss but the facultative bacteria in the blend, particularly the *Bacillus* species, are known denitrifying species.  Much of our work in the septic industry shows that these bacteria can denitrify even under highly aerobic conditions.  This counters much of the basic theory of denitrification that suggests this process is an anaerobic reaction.  While this is probably true for the denitrification of nitrate ($NO_3$) it does not follow for

denitrification of nitrite ($NO_2$).  We have seen that under high BOD conditions the heterotrophic facultative aerobes will dominate and exclude the autotrophic *Nitrosomonas*  and *Nitrobacter* species that oxidize ammonia to nitrate.  Nitrogen will remain as ammonia even under highly aerobic conditions.  However, there will always be some *Nitrosomonas* coming into the system from external sources so some level of oxidation of ammonia to nitrite ($NO_2$) will occur.  If there is a significant concentration of denitrifying Bacillus species in the blend a competition between them and the weaker *Nitrobacter* species will occur for the $NO_2$.  Nitrobacter will oxidize $NO_2$ to $NO_3$ which is relatively stable.  *Bacillus* will use the oxygen from $NO_2$ for its own oxidative metabolism but reduces it to $N_2$ gas, which can escape into the atmosphere.  It can do this even in the presence of aerobic $O_2$ for the simple reason that it can obtain the same number of oxygen atoms, two, with either source, but with $NO_2$ the organism does not have to break a double bond as it does with $O_2$ and will  preferentially use the oxygen from $NO_2$.

Part of the reason a more complete oxidation of ammonia does not occur at Reichardt's is that, given the competitive exclusion of *Nitrosomonas* by *Bacillus* there are simply not enough of them present.  We have experimented with a concept that allows us to grow ammonia oxidizers in conjunction with denitrifiers.  It involves creating a separate device within the system that allows a long enough hydraulic retention time that carbon becomes depleted, thus favoring the autotrophic *Nitrosomonas* over the heterotrophic *Bacillus.*

Floating Denitrification Device

At Reichardt's we propose to do this as follows:  A large containment vessel will be constructed that will float at the surface and close off a 24' x 16' x 7' deep section of Martin's pond,, with a volume of approximately 20,000 gallons.  This unit will be placed over the rising air stream from the venture aerator so the contents remain aerobic.  Liquid will be introduced from outside the unit at a rate of approximately 2,000 gpd so that the hydraulic retention time inside the containment is at least 10 days.  This will favor *Nitrosomonas* inside and each time this liquid is introduced a similar volume, enriched with *Nitrosomonas* will move out into the treatment pond where it can co-exist with *Bacillus* for the denitrification reaction.

Floating Pond Aerator

Reichardt's has another pond that is used to store potable water for the duck operation.  This pond receives runoff from adjacent pasture land and is subject to eutrophication because of this.  During the summer this pond develops serious algae blooms.  Because of this load it is difficult to maintain a residual chlorine level for safe consumption by the ducks.  The blooms also will contain high concentrations of blue-green algae which can be directly toxic.

A prototype unit was constructed in February of 2015 that incorporated the features of the Aerobic Bacterial Generator into a floating unit similar to the one described above for Martin's pond.  It differs, however, in that it contains its own aeration unit that is driven by solar power.  The unit floats in the pond and the flow of liquid through the unit passes through a fiber matrix that provides a vast surface area for a fixed bacterial film to develop.  The unit directs the flow out one side so that when anchored in the center

of the pond, the unit migrates in a circular pattern over the pond, increasing the mixing area by an enormous amount.



Reichardt's management has already noted that the pond did not develop any algae blooms this season.  In fact it has led to the establishment of rooted vegetation along the periphery of the pond that has never been seen.

Reichardt's are planning to introduce similar floating units in Pond A and will be installing these over this year.

Conclusion

Reichardt Farm has been proactive in pursuing improvements in their wastewater treatment and the pursuit has already paid off in unexpected manners.  The reduction in chlorine use was unanticipated but not only reduced cost but also reduced the risk potential in the use of this caustic compound.  It is hoped that the attempt to reduce ammonia in Martin's pond will have similar salutary effects in the duck growing facility, with improvements in the health of the flock.

More important will be demonstrations of methods that help reduce nutrient loading by animal holding facilities.  Nitrate contamination is a widespread problem throughout the world and improvements in the basic biology of processes that reduce nitrogen load can work synergistically with new methods for engineering systems which apply this biology.  Reichardt's is making a major contribution to this effort.


Submitted by:

President, SludgeHammer Group

**EXHIBIT 4**

6-11-18

Reichardt Duck Farm, Inc.


**Assessment of Potential Pollutant Sources**

i. The areas of the facility with likely sources of pollutants in industrial storm water discharges and authorized NSWDs are the duck raising areas.

ii. Pollutants likely to be present in storm water discharges and authorized NSWDs are nitrogen and phosphorus.

iii. Less than 500 cubic yards of used bedding containing manure is stored at any time. Water that runs off of raising areas is contained in storage ponds. We have about 20 million gallons of stored water at end of the winter storage season. This water is irrigated onto our fields to grow grass for dairy and beef operations. These fields are leased to neighboring farms.

iv. All water that becomes exposed to pollutants is contained in our storage ponds until irrigated. This water goes through a series of digesting ponds to decrease the nitrogen load before irrigation.

v. Exposed water that runs off the growing area is contained in our storage ponds as a part of the digesting system. This water is irrigated onto our fields for the purpose of growing grass.

vii. Our existing BMPs are being evaluated on a consistent basis. The digested water in our storage system is utilized as flush water. We strive to maintain a high quality flush water as it affects the health of the ducks we grow.

viii. We constantly look for improved ways to improve water quality of our flush water, as it affects the duck health. The irrigated water is improved at the same time. This is a win-win situation.

ix. Nitrogen levels are reduced in our digestion system to a degree that they grow grass efficiently and also allow us to use this water as flushing water. Pondbots have been successfully integrated in our system to reduce nitrogen readings to historically low levels. This benefits our process as well as the receiving waters.