ANDREW L. PACKARD (State Bar No. 168690)
WILLIAM N. CARLON (State Bar No. 305739)
Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Tel: (707) 782-4060
Fax: (707) 782-4062
Email: andrew@packardlawoffices.com
        wncarlon@packardlawoffices.com

WILLIAM VERICK (State Bar No. 140972)
Klamath Environmental Law Center
1125 Sixteenth Street, Suite 204
Arcata, CA 95521
Tel. (707) 630-5061
Email: wverick@igc.org

Attorneys for Plaintiff
CALIFORNIANS FOR
ALTERNATIVES TO TOXICS

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIANS FOR ALTERNATIVES TO TOXICS,<br><br>        Plaintiff,<br><br>    vs.<br><br>REICHARDT DUCK FARM, INC., AND JOHN REICHARDT<br><br>        Defendants. | Case No. 3:22-cv-09065-AGT<br><br>**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387)** |

CALIFORNIANS FOR ALTERNATIVES TO TOXICS ("CATs"), by and through its counsel, hereby alleges:

## I.    JURISDICTION AND VENUE

1.    This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 (the "Clean Water Act", the "CWA" or "the Act") against Reichardt Duck Farm, Inc. and John Reichardt ("Defendants").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section

505(a)(1) of the Act, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  Specifically, this action arises under Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A) (citizen suit to enforce effluent standard or limitation).  The relief requested is authorized pursuant to 33 U.S.C. § 1365(a) (injunctive relief), 33 U.S.C. §§ 1365(a), 1319(d) (civil penalties), and 28 U.S.C. §§ 2201–2202 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

2.      On or about October 21, 2022, Plaintiff provided written notice to Defendants, via certified mail, of Defendants' violations of the Act ("CWA Notice Letter"), and of their intention to file suit against Defendants, as required by the Act.  *See* 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. § 135.2(a)(1) (1991).  Plaintiff mailed a copy of the CWA Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"), pursuant to 40 C.F.R. § 135.2(a)(1) (1991).  A true and correct copy of CATs' CWA Notice Letter is attached hereto as **Exhibit 1**, and is incorporated by reference.

3.      On December 21, 2022, after sixty days had passed since Plaintiff served its CWA Notice Letter, Plaintiff filed its Complaint, ECF. No. 1, and initiated this lawsuit.

4.      On or about March 17, 2023, Plaintiff provided supplemental written notice to Defendants, via certified mail, of Defendants' violations of the Act ("Supplemental CWA Notice Letter"), and of their intention to file suit against Defendants, as required by the Act.  Plaintiff mailed a copy of the Supplemental CWA Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"), pursuant to 40 C.F.R. § 135.2(a)(1) (1991).  A true and correct copy of Plaintiff's Supplemental CWA Notice Letter is attached hereto as **Exhibit 2**, and is incorporated by reference.

5.      More than sixty days have passed since Plaintiff served its Supplemental CWA Notice Letter on Defendants and the agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this Amended Complaint.  This action's claims for

1  civil penalties are not barred by any prior administrative penalty under Section 309(g) of the Act, 33

2  U.S.C. § 1319(g).

3        6.      Venue is proper in the Northern District of California pursuant to Section 505(c)(1)

4  of the Act, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this

5  District.  Venue is also proper under 28 U.S.C. § 1391(b) because Defendants reside in this District

6  and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this

7  District.  Intra-district venue is proper in San Francisco, California, because the sources of the

8  violations are located within Sonoma County, California.  Civil Local Rule 3-2(d).

9  **II.**     **<u>INTRODUCTION</u>**

10        7.      This Amended Complaint seeks relief for Defendants' violations of the CWA at the

11  approximately 373-acre facility owned and/or operated by Defendants ("Facility").  The Facility is

12  located at 3770 Middle Two Rock Road, just outside Petaluma, California.

13        8.      Defendants discharge pollutant-contaminated storm water, liquid manure, and waste

14  water from the Facility into an unnamed creek, which drains to Laguna Lake.  Laguna Lake

15  discharges to Chileno Creek, which is a tributary to Walker Creek, which ultimately discharges to

16  Tomales Bay and into the Pacific Ocean.

17        9.      The unnamed creek, Laguna Lake, Chileno Creek, Walker Creek, Tomales Bay and

18  the Pacific Ocean (collectively the "Impacted Waters") are waters of the United States within the

19  meaning of the CWA.

20       10.     Defendants are violating both the substantive and procedural requirements of the

21  CWA.

22       11.     Defendants' discharges of liquid manure to the Impacted Waters without a National

23  Pollutant Discharge Elimination System ("NPDES") Permit violate section 301(a) of the Act, 33

24  U.S.C. § 1311(a).

25       12.     Defendants' discharges of pollutant-contaminated storm water from the Facility

26  violate the Act and the State of California's General Industrial Permit for storm water discharges,

27  State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as

28  amended by Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ, and

1   Water Quality Order No. 2014-0057-DWQ, NPDES General Permit No. CAS000001 (hereinafter

2   "General Permit" or "Permit").

3        13.     Defendants' violations of the filing, monitoring, reporting, discharge and

4   management practice requirements, and other procedural and substantive requirements of the

5   General Permit and the Act are ongoing and continuous.

6        14.     The failure on the part of industrial facility operators such as Defendants to comply

7   with the General Permit is recognized as a significant cause of the continuing decline in water

8   quality of receiving waters, such as Tomales Bay and its tributaries.  The general consensus among

9   regulatory agencies and water quality specialists is that storm water pollution amounts to more than

10  half the total pollution entering the marine environment each year.

11  **III.**    <u>**PARTIES**</u>

12       15.     CATs is a non-profit public benefit corporation organized under the laws of

13  California, based in Arcata, California.  CATs is dedicated to the defense of the environment from

14  the effects of toxic chemicals, and the preservation and protection of the wildlife and natural

15  resources of California waters, including the waters into which Defendants discharge polluted storm

16  water, liquid manure, and waste water.  To further its goals, CATs actively seeks federal and state

17  agency implementation of state and federal water quality laws, including the CWA, and as

18  necessary, directly initiates enforcement actions on behalf of itself and its members.

19       16.     Members of CATs, including citizens, taxpayers, property owners, and residents, live,

20  work, travel and recreate on and near the Impacted Waters, into which Defendants cause pollutants

21  to be discharged.  These CATs members use and enjoy the impacted waters for cultural, recreational,

22  educational, scientific, conservation, aesthetic and spiritual purposes.  Defendants' discharge of

23  storm water containing pollutants impairs each of those uses.  Thus, the interests of CATs' members

24  have been, are being, and will continue to be adversely affected by Defendants' failure to comply

25  with the Clean Water Act and the General Permit.

26       17.     Members of CATs reside in California and use and enjoy California's numerous

27  rivers for recreation and other activities.  Members of CATs use and enjoy the Impacted Waters, into

28  which Defendants have caused, are causing, and will continue to cause, pollutants to be discharged.

Members of CATs use these areas to fish, boat, kayak, swim, bird watch, view wildlife, and engage in scientific study, including monitoring activities, among other things.  Defendants' discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of CATs' members have been, are being, and will continue to be adversely affected by Defendants' ongoing failure to comply with the Clean Water Act.  The relief sought herein will redress the harms to Plaintiff caused by Defendants' activities.

18.     Defendant Reichardt Duck Farm, Inc. is a corporation organized under the laws of California.

19.     Defendant John Reichardt is the Chief Executive Officer of Reichardt Duck Farm, Inc.

20.     Defendant John Reichardt is the General Manager of Reichardt Duck Farm, Inc.

21.     Plaintiff is informed and believes, and thereupon alleges that Defendants own and/or operate the Facility, and are subject to the terms of the General Permit.

22.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy or adequate remedy at law.

## IV.     <u>LEGAL BACKGROUND</u>

### A.  Clean Water Act

23.     Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  The CWA establishes an "interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water . . . ."  33 U.S.C. § 1251(a)(2).  To these ends, Congress developed both a water quality-based and technology-based approach to regulating discharges of pollutants from point sources into waters of the United States.

24.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant from a point source into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to

Section 402 of the Act, 33 U.S.C. § 1342.

25.     The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).  Pollutants are defined to include, among other examples, industrial waste, chemical wastes, biological materials, heat, rock, and sand discharged into water.  33 U.S.C. § 1362(6).

26.     A "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation ["CAFO"], landfill leachate collection system . . . from which pollutants are or may be discharged."  33 U.S.C. § 1362(14); 40 C.F.R. § 122.2.

27.     "Navigable waters" means "the waters of the United States."  33 U.S.C. § 1362(7). Waters of the United States includes, among others things, waters that are, were, or are susceptible to use in interstate commerce, and tributaries to such waters.  40 C.F.R. § 230.3 (2015).

28.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program, 33 U.S.C. § 1342(p), and, specifically, requires an NPDES permit for storm water discharges associated with industrial activity.  *Id.* § 1342(p)(2)(B).

29.     Section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, 33 U.S.C. § 1362(5), for violations of NPDES permit requirements and for unpermitted discharges of pollutants.  33 U.S.C. § 1365(a)(1) (authorizing actions against any person alleged to be in violation of an effluent standard or limitation); *id.* § 1365(f) (defining "effluent limitation" broadly to include "a permit or condition thereof issued under [section 402] of this title," and "any unlawful act under subsection (a) of [section 301] of this title").

30.     An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $64,618 per day for violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. §§ 19.1–19.4 (2008).

//

**B.  State Regulations**

31.      The Tomales Bay watershed in western Marin County is one of the major estuaries on the west coast of the United States.  It has a diverse ecosystem and several notable tributaries, including Lagunitas Creek, which has one of the few remaining viable coho salmon runs in central California.  *Water Quality Control Plan for the San Francisco Bay Basin* ("Basin Plan") Section 4.1.3.3.  The Water Board identified Tomales Bay as an area where commercial shellfishery is threatened and authorized the formation of a technical advisory committee to investigate and develop a remediation strategy. California Regional Water Quality Control Board San Francisco Bay Region Resolution 94-018.  On February 8, 2007, the U.S. EPA approved the Total Maximum Daily Load ("TMDL") for pathogens in the Tomales Bay and the Basin Plan has been amended to incorporate the TMDL along with an implementation plan to achieve the TMDL.  Basin Plan Section 7.3.1.  "The overall goal of the Tomales Bay Watershed Pathogens Total Maximum Daily Load (TMDL) is to ensure protection of water contact recreational uses and Bay shellfish harvesting, thereby minimizing human exposure to disease-causing pathogens."  *Id.* According to the 2020-2022 303(d) List of Impaired Water Bodies, Tomales Bay and its tributaries, including Walker Creek, downstream of the Facility are impaired for: Mercury, Nutrients, Sedimentation/Siltation, and Pathogens.  2020-2022 Integrated Report – All Assessed Waters, *available at* https://gispublic.waterboards.ca.gov/portal/apps/webappviewer/index.html?id=e2def63ccef54eedbee4ad 726ab1552c (last accessed May 17, 2023).

32.      The Basin Plan recognizes that wastes from animal confinement operations such as Defendants' Facility contain significant amounts of pathogens, oxygen-depleting organic matter, nitrogen compounds, and other suspended and dissolved solids.

33.      Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already impaired surface waters and aquatic-dependent wildlife.

**C.  California's General Industrial Storm Water Permit**

34.      Section 402 authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33

1    U.S.C. § 1342(b).

2          35.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of EPA has

3    authorized California's State Board to issue NPDES permits including general NPDES permits in

4    California.

5          36.     The State Board elected to issue a statewide general permit for industrial

6    discharges.  The State Board issued the General Permit on or about November 19, 1991, modified

7    the General Permit on or about September 17, 1992, and reissued the General Permit on April 17,

8    1997 and again on April 1, 2014 (effective July 1, 2015), pursuant to Section 402(p) of the Clean

9    Water Act, 33 U.S.C. § 1342(p).

10         37.     Facilities discharging, or having the potential to discharge, storm water associated

11   with industrial activity that have not obtained an individual NPDES permit must apply for coverage

12   under the State's General Permit by filing a Notice of Intent ("NOI").  The General Permit requires

13   facilities to file their NOIs before the initiation of industrial operations.

14         38.     Facilities covered by the General Permit include concentrated animal feeding

15   operations ("CAFO").  General Permit, Attachment A.

16         39.     To be considered a CAFO, a facility must first be defined as an animal feeding

17   operation ("AFO") and meet the criteria established in the CAFO regulation.  An AFO is an

18   agricultural operation where animals are kept and raised in confined situations where the following

19   conditions are met: (1) animals have been, are, or will be stabled or confined and fed or maintained

20   for a total of 45 days or more in any 12-month period; and, (2) crops, vegetation, forage growth, or

21   post-harvest residues are not sustained in the normal growing season over any portion of the lot or

22   facility.  40 C.F.R. § 122.23(b)(1).

23         40.     A CAFO is an AFO that is defined as a Large CAFO or as a Medium CAFO by the

24   terms of 40 C.F.R. § 122.23.  An operation that confines ducks is considered a Large CAFO if the

25   above conditions are met, and there are at least 30,000 ducks (if the AFO uses other than a liquid

26   manure handling system) or 5,000 ducks (if the AFO uses a liquid manure handling system).  40

27   C.F.R. § 122.23(b)(4)(xii) and (xiii).

28         41.     Once regulated by an NPDES permit, facilities must strictly comply with all of the

terms and conditions of that permit.  A violation of the General Permit is a violation of the Act.  *See* General Permit, Section XXI.A.

42.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.

43.     The General Permit contains three primary and interrelated categories of requirements: 1) discharge prohibitions; 2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and 3) monitoring and reporting requirements, including the requirement to prepare an annual report.

44.     Discharge Prohibition III.B of the General Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to the waters of the United States.  Discharge Prohibition III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination or nuisance as defined in section 13050 of the California Water Code.  Receiving Water Limitation VI.A of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards in any affected receiving water.  Receiving Water Limitation VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.

45.     Effluent Limitation V.A of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

46.     EPA has established Benchmark Levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT standards. 65 Fed. Reg. 64746, 64767 (Oct. 30, 2000).  The following benchmarks have been established for pollutants discharged by Defendants: Total Suspended Solids – 100 mg/L; Oil & Grease – 15 mg/L; pH 6.0-9.0 s.u., Nitrate plus Nitrite Nitrogen – 0.68 mg/L, and Phosphorus – 2.0 mg/L.

47.     The Regional Board has established water quality standards for the Impacted Waters in the Basin Plan.

48.     The Basin Plan identifies present and potential beneficial uses for the Impacted Waters, which include shellfish harvesting (SHELL), warm freshwater habitat (WARM), wildlife habitat (WILD), water contact recreation (REC-1), noncontact water recreation (REC-2), cold freshwater habitat (COLD), fish migration (MIGR), preservation of rare and endangered species (RARE), commercial, and sport fishing (COMM), navigation (NAV), marine habitat (MAR), and fish spawning (SPWN).

49.     The Basin Plan also establishes Water Quality Objectives ("WQO") for surface waters in the region.  Basin Plan at 3.3.

50.     The Basin Plan establishes the following WQOs for bacteria:

## Table 3-1: Water Quality Objectives for Coliform Bacteria[a]

| Beneficial Use | Fecal Coliform (MPN/100ml) | Total Coliform (MPN/100ml |
|---|---|---|
| Water Contact Recreation | geometric mean < 200<br>90th percentile < 400 | median < 240<br>no sample > 10,000 |
| Shellfish Harvesting[b] | median < 14<br>90th percentile < 43 | median < 70<br>90th percentile < 230[c] |
| Non-contact Water Recreation[d] | mean < 2000<br>90th percentile < 4000 | |
| Municipal Supply: | | |
| - Surface Water[e] | geometric mean < 20 | geometric mean < 100 |
| - Groundwater | | < 1.1[f] |

NOTES:

a. Based on a minimum of five consecutive samples equally spaced over a 30-day period.

b. Source: National Shellfish Sanitation Program.

c. Based on a five-tube decimal dilution test or 300 MPN/100 ml when a three-tube decimal dilution test is used.

d. Source: Report of the Committee on Water Quality Criteria, National Technical Advisory Committee, 1968.

e. Source: DOHS recommendation.

f. Based on multiple tube fermentation technique; equivalent test results based on other analytical techniques, as specified in the National Primary Drinking Water Regulation, 40 CFR, Part 141.21(f), revised June 10, 1992, are acceptable.

51.     The General Permit requires dischargers to develop and implement a site-specific SWPPP.  General Permit, Section X.A.  The SWPPP must include, among other elements:  (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) an annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable.

52.     Dischargers must revise their SWPPP whenever necessary and certify and submit via the Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS their SWPPP not more than once every three (3) months in the reporting year for any non-significant revisions.  General Permit, Section X.B.

53.     Dischargers must implement the minimum BMPs identified in Section X.H.1. of the General Permit.  In addition to the minimum BMPs identified in Section X.H.1, advanced BMPs must be implemented if necessary to reduce or prevent discharges of pollutants in storm water dischargers in a manner that reflects best industry practice.  General Permit, Section X.H.2.

54.     Special Conditions Section XX.B of the General Permit require a discharger to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of Receiving Water Limitations, Section VI.  The documentation must describe changes the discharger will make to its current BMPs in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  General Permit, Section XX.B.

55.     Section XV of the General Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities within 90 days of the annual evaluation.

56.     The General Permit requires dischargers to eliminate all non-storm water discharges to storm water conveyance systems other than those specifically set forth in Section IV of

1    the General Permit unless authorized by another NPDES permit.  General Permit, Section III. B.

2         57.    The General Permit requires dischargers to implement a Monitoring

3    Implementation Plan.  General Permit, Section X.I.  As part of their monitoring plan, dischargers

4    must identify all storm water discharge locations.  General Permit, Section X.I.2.  Dischargers must

5    then conduct monthly visual observations of each drainage area, as well as visual observations

6    during discharge sampling events.  General Permit, Section XI.A.1 and 2.  Dischargers must also

7    collect and analyze storm water samples from two (2) storm events within the first half of each

8    reporting year (July 1 to December 31) and two (2) storm events during the second half of each

9    reporting year (January 1 to June 3).  General Permit, Section XI.B.  Section XI.B requires

10   dischargers to sample and analyze during the wet season for basic parameters such as pH, total

11   suspended solids ("TSS") and oil and grease ("O&G"), certain industry-specific parameters, and any

12   other pollutants likely to be in the storm water discharged from the facility base on the pollutant

13   source assessment.  General Permit, Section XI.B.6.

14        58.    Dischargers must submit all sampling and analytical results via SMARTS within

15   thirty (30) days of obtaining all results for each sampling event.  Section XI.B.11.  Sampling results

16   must be compared to the two types of Numeric Action Level ("NAL") values set forth at Table 2 of

17   the General Permit.  General Permit, Section XII.  An annual NAL exceedance occurs when the

18   average of the results for a parameter for all samples taken within a reporting year exceeds the

19   annual NAL value.  General Permit, Section XII.A.1.  An instantaneous NAL exceedance occurs

20   when two (2) or more results from samples taken for any single parameter within a reporting year

21   exceed the instantaneous maximum NAL value.  General Permit, Section XII.A.2.  If a discharger

22   has an NAL exceedance during a reporting year, the discharger's status changes to Level 1 status

23   under the General Permit and the discharger must comply with the requirements set forth for Level 1

24   status operators set forth at Section XII.C.  The discharger's status shall change to Level 2 status if

25   sampling results indicated an NAL exceedance for a parameter while the discharger is in Level 1

26   status.  If a discharger becomes Level 2 status it must comply with the obligations set forth at

27   Section XII.D of the General Permit.

28        59.    Dischargers must submit an Annual Report no later than July 15th following each

reporting year certifying compliance with the Permit and/or an explanation for any non-compliance. General Permit, Section XVI.

## V.   <u>STATEMENT OF FACTS</u>

### A.  The Facility

60.     Defendants own and/or operate the Facility, a duck farm located just outside Petaluma, California.

61.     Plaintiff is informed and believes, and on that basis alleges, that Defendants have operated the Facility since 1958.

62.     Plaintiff is informed and believes, and on that basis alleges, that the Facility confines at least 30,000 ducks for more than 45 days each year, and that the areas within which the animals are confined do not sustain any crops, vegetation, forage growth, or post-harvest residues in the normal growing season.

63.     Plaintiff is informed and believes, and on that basis alleges, that the Facility utilizes a liquid manure handling system.

64.     Plaintiff is informed and believes, and on that basis alleges, that the liquid manure handling system includes flushing liquid and solid animal wastes from the duck houses into a series of at least seven lagoons at the Facility.

65.     Plaintiff is informed and believes, and on that basis alleges, that liquid manure from the liquid manure handling system is sprayed onto land under the control of Defendants, whether that land is owned, rented, or leased by Defendants.

66.     Plaintiff is informed and believes, and on that basis alleges, that the groundwater in the vicinity of the unnamed creek that discharges to Laguna Lake ("Unnamed Creek") is hydrologically connected to the Unnamed Creek.

67.     Plaintiff is informed and believes, and on that basis alleges, that Defendants have never obtained a NPDES permit for its CAFO since it began operations approximately 65 years ago, and still has not received any individual NDPES permit for the current operation of its CAFO.

### B.  Defendants' Unpermitted Discharges

68.     Plaintiff is informed and believes, and on that basis alleges, that Defendants have

1    repeatedly discharged, and continue to discharge, pollutants into the Impacted Waters.

2        69.     Plaintiff is informed and believes, and on that basis alleges, that Defendants have

3    discharged and continue to discharge pollutants to the Impacted Waters in the following ways:

4            a.    Improper application of manure wastewater to land under the control of

5                Defendants, including over-application (that is, non-agronomic applications) and

6                application on days immediately preceding or during a precipitation event,

7                causing surface runoff into the Unnamed Creek, an example of which is shown in

8                the photograph below, taken March 15, 2023;



22            b.    Seepage of manure wastewater from lagoons and land application areas into and

23                onto ground which is hydrologically connected to the Unnamed Creek; and,

24            c.    Improper application of manure wastewater to fields with channels, ditches, or

25                discrete conveyances that collect the manure wastewater and discharge to the

26                Unnamed Creek.

27        70.     The pollutants in these discharges include, but are not limited to, liquid and solid

28    animal wastes.  The animal wastes contain, among other pollutants, fecal coliform, and *E. coli*

bacteria, numerous other pathogens, nitrogen, phosphorus, ammonia, and suspended solids, and can alter water quality indicator parameters such as biochemical oxygen demand and pH.  Such pollution, especially the pathogens associated with CAFO operations, presents threats to public health and the environment.

71.     Plaintiff is informed and believes, and on that basis alleges, that Defendants manure storage ponds are undersized and the duck houses are in such disrepair that the Facility is unable to retain a 25-year, 24-hour storm event.

72.     Plaintiff is informed and believes, and on that basis alleges, that Defendants dispose of liquid manure from their lagoons in anticipation of storm events in order to maintain freeboard, and not for agricultural purposes.

73.     Plaintiff is informed and believes, and on that basis alleges, that these discharges occur on a recurring basis and have occurred since at least March 17, 2018 as described in **Exhibit 2**.

74.     Plaintiff is informed and believes, and on that basis alleges, that the discharges Plaintiff alleges herein were not authorized by, and could not be authorized by, an applicable NPDES permit and were not due to or a direct result of a 25-year, 24-hour rainfall event.

75.     Plaintiff is informed and believes, and on that basis alleges, that Defendants have no written protocols for the storage of manure, litter, and process wastewater at the Facility.

76.     Plaintiff is informed and believes, and on that basis alleges, that Defendants have no written protocols for the management of duck mortalities at the Facility.

77.     Plaintiff is informed and believes, and on that basis alleges, that Defendants have no written protocols for the use of water in production areas at the Facility.

78.     Plaintiff is informed and believes, and on that basis alleges, that Defendants have no written protocols for the testing of manure, litter, process wastewater, or soil at the Facility.

79.     Plaintiff is informed and believes, and on that basis alleges, that Defendants have no written protocols for the application to land of manure, litter, or process wastewater at land application areas.

80.     Plaintiff is informed and believes, and on that basis alleges, that Defendants have no

documents evidencing the agricultural utilization of nutrients in manure, litter or process wastewater that is applied to land application areas at the Facility.

81.     Plaintiff is informed and believes, and on that basis alleges, that Defendants have no nutrient management plan for the Facility.

**C. Defendants' Storm Water Violations**

82.     The Facility is a Large CAFO and therefore is required to maintain coverage under the General Permit.

83.     Industrial activities associated with the operation of raising and slaughtering of ducks occur throughout the Facility.  The industrial activities at the Facility fall under Standard Industrial Classification Code 2015 ("Poultry Slaughtering and Processing").

84.     The industrial areas at the Facility include rows of houses in which ducks are confined, wastewater processing, storage, and disposal facilities, dry litter and manure processing, storage, and disposal facilities, a fueling station, a shop, and a network of roads that provide connectivity between the various industrial areas.

85.     The areas of industrial activity at the Facility are sources of pollutants.  Plaintiff is informed and believes that Defendants' storm water controls, to the extent any exist, fail to achieve BAT and BCT standards.

//

//

//

//

//

//

//

//

//

//

//

86.     The Facility discharges storm water associated with its industrial activities from at least eight (8) discharge points into an unnamed creek that runs through the Facility, as depicted below:



87.     On or about January 16, 2015, Defendants submitted a Notice of Intent to comply with the General Permit.  The Facility was assigned the Waste Discharge Identification number 2 49I014770.

88.     Since at least January 16, 2015, the Facility has operated under General Permit coverage.

89.     Under the General Permit, Defendants have sampled storm water discharges from the Facility and found level of pollutants in the samples that exceeded on various occasions EPA's benchmarks.  This information was reported to the Regional Board, as required by the General Permit.

90.     According to Defendants' self-monitoring reports submitted to the Regional Board, Defendants have measures discharges containing levels of pH, total suspended solids, nitrate plus nitrite nitrogen, and phosphorus in excess of the EPA Benchmark values on at least 19 occasions since October 21, 2017.

91.     The Facility's exceedances of EPA Benchmarks provided above indicate that

Defendants have not implemented BAT and BCT at the Facility for its discharges of pH, total suspended solids, nitrate plus nitrite nitrogen, and phosphorus.

92.     During Significant Rain Events, as defined in Attachment A to **Exhibit 1**, storm water laden with pollutants discharges from the Facility's storm water conveyances into the unnamed creek, which flows to Laguna Lake.  Laguna Lake discharges to Chileno Creek, which is a tributary to Walker Creek, which ultimately discharges to Tomales Bay and the Pacific Ocean.

93.     Information available to Plaintiff indicates that as a result of these practices, storm water containing pollutants harmful to fish, plant and bird life, and human health are being discharged from the Facility directly to these waters during each Significant Rain Event identified in **Exhibit 1**.

94.     Information available to Plaintiff indicates that Defendants have not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of significantly contaminated storm water.

**D.  The Facility's SWPPP**

95.     Defendants do not have a single document they rely on as their SWPPP, but rather a confusing collection of documents that Defendants continue to add to, rather than to revise any single document.  The result is an incomprehensible patchwork that fails to comply with the General Permit's requirements.

96.     Defendants have submitted to SMARTS two documents that they designate as the Facility's SWPPP – a Powerpoint presentation ("Powerpoint SWPPP"), a true and correct copy of which is included herein as **Exhibit 3**, and a Word document ("Word SWPPP"), a true and correct copy of which is included herein as **Exhibit 4**.  Both the Powerpoint SWPPP and the Word SWPPP are dated June 23, 2015.

97.     Neither the Powerpoint SWPPP nor the Word SWPPP, separately or together, contains the information required by General Permit Section X.

98.     Neither the Powerpoint SWPPP nor the Word SWPPP contains all the information in both June 23, 2015 SWPPPs together, and therefore no SWPPP is complete.

99.     Defendants have either not revised their SWPPP since June 23, 2015, or have failed

to certify and submit via SMARTS any revised SWPPP since June 23, 2015.

100.     The Word SWPPP does not identify a Pollution Prevention Team.

101.     The Powerpoint SWPPP identifies a "Storm Water Team," but the Powerpoint SWPPP does not identify the responsibilities, duties, and activities of each member of the Storm Water Team.

102.     The Powerpoint SWPPP does not include procedures to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

103.     The Word SWPPP does not identify the Facility's operating hours.

104.     The Word SWPPP does not include a site map of the Facility.

105.     The site maps contained in the Powerpoint SWPPP do not identify any storm water drainage areas within the Facility's boundary, and do not identify any flow directions of each drainage area.

106.     The site maps contained in the Powerpoint SWPPP do not provide enough information to determine the specific boundaries of surface water bodies located on-Facility.

107.     The site maps contained in the Powerpoint SWPPP do not identify areas of soil erosion at the Facility.

108.     The site maps contained in the Powerpoint SWPPP do not identify all locations of storm water collection and conveyance systems at the Facility.

109.     The site maps contained in the Powerpoint SWPPP do not include the locations and descriptions of all structural control measures that affect industrial storm water discharges.

110.     The site maps contained in the Powerpoint SWPPP do not identify all impervious areas of the Facility.

111.     The site maps contained in the Powerpoint SWPPP do not identify all locations where materials are directly exposed to precipitation.

112.     The site maps contained in the Powerpoint SWPPP do not identify all areas of industrial activity subject to the General Permit.

113. The site maps contained in the Powerpoint SWPPP do not identify all shipping and receiving areas.

114. The site maps contained in the Powerpoint SWPPP do not identify all vehicle and equipment storage/maintenance areas.

115. The site maps contained in the Powerpoint SWPPP do not identify all material handling and processing areas.

116. The site maps contained in the Powerpoint SWPPP do not identify all dust or particulate generating areas.

117. The site maps contained in the Powerpoint SWPPP do not identify all cleaning and material reuse areas.

118. The site maps contained in the Powerpoint SWPPP do not identify all areas of industrial activity that may have potential pollutant sources.

119. Neither SWPPP includes a complete list of industrial materials handled at the facility, and the locations where each material is stored, received, shipped, and handled, as well as the typical quantities and handling frequency.

120. Neither SWPPP includes a complete description of potential pollutant sources at the Facility.

121. Neither SWPPP includes a complete assessment of potential pollutant sources at the Facility.

122. The Word SWPPP includes a chart labelled "Best Management Practices Development" which identifies "Problems," "Actions," and "Success Criteria."  The date of each Problem is identified, with the oldest arising on July 1, 1999, and the most recent post-dating the SWPPP on June 28, 2015.

123. The Word SWPPP summary table does not identify any BMPs developed or implemented after June 28, 2015.

124. The Powerpoint SWPPP does not contain a BMP summary table.

125. The Powerpoint SWPPP identifies only six practices that Defendants describe as Minimum BMPs: "nutrient reduction, irrigation optimized for nutrient uptake in plants, erosion

control, oil and grease collection points, chlorine containment, and spill contingencies.

126.     The Powerpoint SWPPP does not identify any other Minimum BMPs other than the six practices identified in ¶ 102 above.

127.     The six BMPs described in ¶ 102 above are only vaguely described in the Powerpoint SWPPP and do not contain enough detail to satisfy the requirements of the General Permit.  For example, the Powerpoint SWPPP does not: describe the pollutant or pollutants that each BMP is designed to reduce or prevent in industrial storm water discharges; describe the frequency, time(s) of day, or conditions when each BMP is scheduled for implementation; describe the procedures, including maintenance procedures, and/or instructions to implement the BMPs effectively; describe the equipment and tools necessary to implement the BMPs effectively; or, identify the BMPs that may require more frequent visual observations beyond the monthly visual observations required by General Permit Section XI.A.1.

128.     On or about June 13, 2018, Defendants uploaded to SMARTS a document titled "Assessment of Potential Pollutant Sources" ("2018 Assessment") a true and correct copy of which is attached hereto as **Exhibit 5**.

129.     Defendants did not certify or submit to SMARTS a revised SWPPP after submitting the 2018 Assessment.

130.     The stand-alone 2018 Assessment is wholly inadequate, even if it were to be considered part of either the Word SWPPP, the Powerpoint SWPPP or both.  For example, the 2018 Assessment identifies the areas of the facility that are likely sources of pollutants as simply the "duck raising areas," which is not only vague, considering the nature of the operation, but also ignores potential pollutant sources such as the equipment storage, maintenance, and fueling areas, the waste storage areas, and the wastewater storage basins.  The only pollutants identified by the 2018 Assessment are nitrogen and phosphorus, despite the Powerpoint SWPPP identifying sediment, oil and grease, and chlorine as other potential pollutants.  Furthermore, the Word SWPPP recognizes the potential for storm water to become contaminated with manure, and yet the 2018 Assessment does not recognize pollutants typically associated with manure, such as pathogens, oxygen-depleting organic matter, and ammonia.

131.     The Powerpoint SWPPP does not include a Monitoring Implementation Plan.

132.     The Word SWPPP does not include an adequate Monitoring Implementation Plan because it fails to identify the team members assigned to conduct the monitoring requirements, it lacks a description of all discharge locations at the Facility, it lacks a description of visual observation procedures, and it lacks a description of visual observation response procedures.

133.     The Monitoring Implementation Plan in the Word SWPPP also fails to identify any procedures for field instrument calibration instructions and it does not include an example chain of custody form used when handling and shipping water quality samples to the laboratory.

134.     The Monitoring Implementation Plan in the Word SWPPP also fails to include a justification for choosing an alternative discharge location.

135.     On or about July 15, 2020, a document titled "ERA Level 1 Evaluation and Report" was submitted to SMARTS in response to the Facility's exceedance of total suspended solids ("TSS ERA Report").  The TSS ERA Report includes sections 6.0-9.0 which discuss the evaluation of BMPs and modifications to the SWPPP.

136.     No revised SWPPP was certified and submitted via SMARTS that included the revisions described in section 6.0-9.0 of the TSS ERA Report.

137.     On or about March 11, 2021, a document titled "ERA Level 1 Evaluation and Report – Total Phosphorus as P" was submitted to SMARTS in response to the Facility's exceedance of total suspended solids ("P ERA Report").  The P ERA Report includes sections 6.0-9.0 which discuss the evaluation of BMPs and modifications to the SWPPP.

138.     No revised SWPPP was certified and submitted via SMARTS that included the revisions described in section 6.0-9.0 of the P ERA Report.

139.     Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to develop and implement an adequate Storm Water Pollution Prevention Plan at the Facility.

**E.  Storm Water Monitoring**

140.     CATs is informed and believes, and on that basis alleges, that duck manure contains pathogens and nutrients, which are related to the Facility's receiving water 303(d) listed impairments and approved TMDLs.

141.    Defendants do not analyze their storm water samples for pathogens.

142.    CATs is informed and believes, and on that basis alleges, that Defendants use incorrect test methods and method detection limits, and fail to comply with collection, preservation and handling procedures as required by the General Permit.

143.    CATs is informed and believes, and on that basis alleges, that Defendants have failed to submit all sampling and analytical results via SMARTS within 30 days of obtaining all results for each sampling event.

144.    CATs is informed and believes, and on that basis alleges, that Defendants improperly combine storm water samples, without having submitting a Qualified Combined Samples Justification, or otherwise fail to sample all discharge locations.

145.    Defendants' self-monitoring results indicate that from at least October 21, 2017 to November 16, 2017, Defendants failed to analyze samples of storm water for nitrate plus nitrite nitrogen, phosphorus, chemical oxygen demand, and pathogens.

146.    Defendants' self-monitoring results indicate that on January 25, 2018, nitrate was measured at 30 mg/L, over 44 times the annual Numeric Action Level ("NAL") set forth in the General Permit – 0.68 mg/L.

147.    As of July 1, 2019, the Facility entered Level 1 Status for nitrate plus nitrite nitrogen.

148.    Defendants did not complete a Level 1 ERA Evaluation for nitrate plus nitrite nitrogen by October 1, 2019.

149.    Defendants did not complete a Level 1 ERA Report for nitrate plus nitrite nitrogen by January 1, 2020.

150.    Defendants' self-monitoring results indicate that the Facility exceeded the annual NAL for nitrate plus nitrite nitrogen on each and every sampling event following the January 25, 2018 sampling event.

151.    As of July 1, 2020, the Facility entered Level 2 Status for nitrate plus nitrite nitrogen.

152.    Defendants did not complete a Level 2 ERA Action plan for nitrate plus nitrite nitrogen by January 1, 2021.

153.    Defendants did not complete a Level 2 ERA Technical Report for nitrate plus nitrite

nitrogen by January 1, 2022.

154.    Information available to Plaintiff indicates the continued existence of unlawful storm water discharges at the Facility.

155.    Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Discharges of Contaminated Storm Water from the Facility
in Violation of Permit Conditions and the Act
(Violations of 33 U.S.C. §§ 1311(a), 1342)**

156.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

157.    Receiving Water Limitations VI.A and VI.B of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in any affected receiving water.  Discharge Prohibition III.C of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.

158.    Plaintiff is informed and believes, and thereupon alleges, that since at least October 21, 2017[1], Defendants have been discharging polluted storm water from the Facility into the Impacted Waters, in violation of the General Permit.

159.    During every significant rain event, storm water flowing over and through materials at the Facility becomes contaminated with pollutants, flowing untreated from the Facility into the Impacted Waters.

160.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing pollution and contamination of waters of the United States in

---

[1] The five-year statute of limitations is tolled 60 days before filing of the complaint, to accommodate the statutorily-mandated 60-day notice period.  *Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1524 (9th Cir. 1987).

1   violation of Discharge Prohibition III.C of the General Permit.

2        161.    Plaintiff is informed and believes, and thereupon allege, that these discharges of

3   contaminated storm water are adversely affecting human health and the environment in violation of

4   Receiving Water Limitations VI.A and VI.B of the General Permit.

5        162.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of

6   contaminated storm water are contributing to the violation of the applicable water quality standards

7   in the Statewide Water Quality Control Plan, and/or the applicable Regional Board's Basin Plan, in

8   violation of Receiving Water Limitation VI.A of the General Permit.

9        163.    Plaintiff is informed and believes, and thereupon alleges, that every day since

10   October 21, 2017, Defendants have discharged and continue to discharge polluted storm water from

11   the Facility in violation of the General Permit.  These violations are ongoing and continuous.

12        164.    Every day Defendants have discharged and continue to discharge polluted storm

13   water from the Facility in violation of the General Permit is a separate and distinct violation of

14   Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each

15   and every violation of the Act since October 21, 2017.  See 33 U.S.C. §§ 1319 (d), 1365; 40 C.F.R.

16   § 19.4 (2008).

17                   **SECOND CLAIM FOR RELIEF**
               **Failure to Develop and Implement an Adequate**
          **Storm Water Pollution Prevention Plan for the Facility**

18        **(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

19        165.    Plaintiff incorporates the allegations contained in the above paragraphs as though

20   fully set forth herein.

21        166.    Section X of the General Permit require dischargers of storm water associated with

22   industrial activity to develop and implement an adequate SWPPP prior to commencement of

23   industrial activities.

24        167.    Defendants have failed to develop and implement an adequate SWPPP for the

25   Facility.  Defendants' ongoing failure to develop and implement an adequate SWPPP for the Facility

26   is evidenced by, inter alia, the allegations set forth in paragraphs 72 through 116 above.

27        168.    Defendants have further failed to update the Facility's SWPPP in response to the

28   analytical results of the Facility's storm water monitoring as required by the General Permit. General

Permit, Sections X.B.1 and X.C.1.b.  Defendants continue to be in violation of the Act each day that they fail to develop and fully implement an adequate SWPPP for the Facility.  These violations are ongoing and continuous.

169.    Each day that Defendants have failed to develop and implement an adequate SWPPP for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since October 21, 2017.  See 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. § 19.4 (2008).

### THIRD CLAIM FOR RELIEF
**Failure to Develop and Implement the Best Available**
**And Best Conventional Treatment Technologies at the Facility**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

170.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

171.    The General Permit's SWPPP requirements and Effluent Limitation D.32 require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

172.    Defendants have failed to implement BAT and BCT at the Facility for their discharges of TSS, phosphorus, and nitrate plus nitrite nitrogen in violation of Effluent Limitation D.32 of the General Permit.

173.    Each day that Defendants have failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

174.    Defendants continue to be in violation of the BAT and BCT requirements each day that it fails to develop and fully implement BMPs meeting the BAT and BCT standards. These violations are ongoing and continuous.

175.    Defendants have been in violation of the BAT and BCT requirements at the Facility every day since at least October 21, 2017.  Defendants are subject to civil penalties for each and every violation of the Act since October 21, 2017.  See 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

**FOURTH CLAIM FOR RELIEF**
**Failure to Implement an Adequate**
**Monitoring Implementation Plan for the Facility**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

176.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

177.    Section X.I and Section XI.A-D of the General Permit require dischargers of storm water associated with industrial activity to develop and implement a monitoring implementation plan (including, among other things, sampling and analysis of discharges) prior to commencement of industrial activities.

178.    Defendants have failed to develop and implement an adequate monitoring implementation plan for the Facility.  Defendants' ongoing failures to develop and implement adequate monitoring and reporting programs are evidenced by, inter alia, their continuing failure to collect and analyze storm water samples from all discharge locations, and their continuing failure to analyze storm water samples for pollutants likely to be present in the Facility's storm water discharges in significant quantities and other pollutants, as the General Permit requires.

179.    Defendants have failed to develop and implement an adequate monitoring and reporting program for the Facility every day since at least October 21, 2017.  These violations are ongoing and continuous.

180.    Each day of violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since October 21, 2017.  See 33 U.S.C. §§ 1319 (d), 1365; 40 C.F.R. §19.4 (2008).

**FIFTH CLAIM FOR RELIEF**
**Failure to Complete Required Exceedance Response Actions**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

181.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

182.    Section XII.A of the General Permit requires dischargers to compare the results of their sampling to the two types of Numeric Action Level ("NAL") values in Table 2 of the General Permit to determine, for each applicable parameter, whether either type of NAL has been exceeded.

If sampling results indicate that a NAL is exceeded, the discharger enters "Level 1 status" for that parameter.  General Permit, Section XII.C.

183.    By October 1 following the commencement of Level 1 status for any parameter, the discharger shall complete an evaluation, with the assistance of a Qualified Industrial Storm Water Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s) and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances.  General Permit, Section XII.C.1.

184.    Based on the above evaluation, the discharger shall, no later than January 1 following the commencement of Level 1 status: revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation; certify and submit via SMARTS a Level 1 Exceedance Response Action ("ERA") Report, prepared by a QISP, that includes a summary of the evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL; and certify and submit via SMARTS the QISP's identification number, name, and contact information.  General Permit, Section XII.C.2.

185.    Defendants' violations of the Exceedance Response Action requirements of the General Permit are evidenced, *inter alia*, by the allegation set forth in paragraphs 123 through 130 above.

186.    Each day Defendants failed to properly complete the ERA Level 1 Evaluation is a violation of the General Permit.  Defendants have been in violation of this requirement every day since October 2, 2019.  In addition, each day Defendants failed to complete the Level 1 ERA Report is a violation of the General Permit.  Defendants have been in violation of this requirement every day since January 2, 2020.

187.    Each day Defendants failed to complete the Level 2 ERA Action Plan is a violation of the General Permit.  Defendants have been in violation of this requirement every day since July 2, 2020.

188.    Each day Defendants failed to complete the Level 2 ERA Technical Report is a violation of the General Permit.  Defendants have been in violation of this requirement every day

1   since January 2, 2021.

2        189.    Each day of violation of the General Permit is a separate and distinct violation of

3   Section 301(a) of the Act, 33 U.S.C. §1311(a).  Defendants are subject to civil penalties for each and

4   every violation of the Act since October 21, 2017.  See 33 U.S.C. §§ 1319 (d), 1365; 40 C.F.R. §

5   19.4 (2008).

### SIXTH CLAIM FOR RELIEF
**Discharge of Pollutants Without a NPDES Permit**
**(Violations of the Act, 33 U.S.C. §§ 1311, 1342)**

8        190.    Plaintiff incorporates the allegations contained in the above paragraphs as though

9   fully set forth herein.

10        191.    Section 301 of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants

11   unless pursuant to the terms of a valid NPDES permit issued pursuant to section 402 of the Act, 33

12   U.S.C. § 1342.

13        192.    The Impacted Waters are all "waters of the United States" subject to the Act or are

14   "point sources" from which pollutants are discharged to "waters of the United States."

15        193.    Defendants did not and do not have a NPDES permit authorizing discharges of

16   pollutants into the Impacted Waters from its CAFO operation, including from its land application

17   areas.

18        194.    Since at least March 17, 2018, Defendants have discharged, and continue to

19   discharge, pollutants associated with its CAFO operation in at least those ways identified in

20   paragraph 69 above.

21        195.    Each such discharge that Defendants have committed since commencing operations

22   constitutes a separate and distinct violation of the Act.  Defendants are subject to civil penalties for

23   each and every violation of the Act since March 17, 2018.  See 33 U.S.C. §§ 1319(d), 1365; 40

24   C.F.R. § 19.4 (2008).

25   **VII.    RELIEF REQUESTED**

26        Wherefore, CATs respectfully requests that this Court grant the following relief:

27            a.    Declare Defendants to have violated and to be in violation of CWA section 301(a),

28   33 U.S.C. § 1311(a), for discharging pollutants from its the Facility in violation of a permit issued

1    pursuant to CWA section 402, 33 U.S.C. § 1342 and for failing to comply with all substantive and

2    procedural requirements of the General Permit and the CWA as alleged herein;

3            b.   Declare Defendants to have discharged pollutants without a NPDES permit;

4            c.   Enjoin Defendants from discharging pollutants from the Facility and to the

5    surface waters surrounding and downstream from the Facility in violation of the Act and the

6    General Permit;

7            d.   Enjoin Defendants from further violating the substantive and procedural

8    requirements of the General Permit;

9            e.   Enjoin Defendants from discharging pollutants without a NPDES permit;

10           f.   Order Defendants to pay civil penalties of $64,618 per day per violation for all

11   violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505(a) of the Act, 33

12   U.S.C. §§ 1319(d) and 1365(a) and 40 C.F.R. §§ 19.1–19.4 (2008);

13           g.   Order Defendants to take appropriate actions to restore the quality of navigable

14   waters impaired by their activities;

15           h.   Award Plaintiff's costs and fees (including reasonable attorney, witness, and

16   consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

17           i.   Award any such other and further relief as this Court may deem appropriate.

18   Dated: May 17, 2023                    Respectfully Submitted,

19                                          LAW OFFICES OF ANDREW L. PACKARD

20                                          By:    /s/ William N. Carlon

21

22                                          William N. Carlon
                                            Attorneys for Plaintiff
23                                          CALIFORNIANS FOR
                                            ALTERNATIVES TO TOXICS

24

25

26

27

28