ANDREW L. PACKARD (State Bar No. 168690)
WILLIAM N. CARLON (State Bar No. 305739)
Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Tel: (707) 782-4060
Fax: (707) 782-4062
E-mail: andrew@packardlawoffices.com
wncarlon@packardlawoffices.com

WILLIAM VERICK (State Bar No. 140972)
Klamath Environmental Law Center
1125 Sixteenth Street, Suite 204
Arcata, CA 95521
Tel: (707) 630-5061
Email: wverick@igc.org

Attorneys for Plaintiff
CALIFORNIANS FOR
ALTERNATIVES TO TOXICS

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CALIFORNIANS FOR ALTERNATIVES TO TOXICS, a non-profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>REICHARDT DUCK FARM, INC., and JOHN REICHARDT,<br><br>Defendants. | Case No: 3:22-CV-09065-AGT<br><br>**SECOND JOINT STATEMENT RE DISCOVERY DISAGREEMENT NO. 1** (Biosecurity at Inspections)<br><br>**Hon. Magistrate Judge Alex G. Tse** |

As required by Local Rule 37-1 and the Civil Standing Order for Magistrate Judge Alex G. Tse, the parties hereinafter briefly set forth their jointly held view on discovery issues raised by Plaintiff, unless otherwise specifically noted as being a view held separately by one or more of the respective parties.

**I.    ATTESTATION RE PARTIES' MEET AND CONFER EFFORTS**

The Parties met and conferred by Zoom on March 6, 2023 and by telephone on April 13, 2023 to address the disputed discovery herein. The Parties also continued to meet and confer by email before coming to the impasse presented herein.

1

## II. PARTIES' POSITIONS CONCERNING THE DISPUTE

### A. Plaintiff's Statement

This is a citizen suit enforcement action for alleged violations of California's General Industrial Storm Water Permit ("General Permit"). Consequently, Plaintiff seeks to inspect Defendants' facility during periods of rainfall to collect evidence relevant to Plaintiff's claims. Plaintiff propounded its Second Request for Inspection of Land and Property Pursuant to Federal Rule of Civil Procedure 34 ("Request") on January 27, 2023. A true and correct copy of which was attached as Exhibit 3 to the Declaration of Glen Hansen, ECF No. 22:8. Defendants objected, the Parties met and conferred, and on March 31, 2023, the Court heard the Parties' dispute. Plaintiff has, since the outset of this dispute, acknowledged that biosecurity concerns warrant placing extra protocols and precautions on this site inspection, and have, from the beginning, asked Defendants what those protocols might be so that Plaintiff can safely navigate Defendants' facility while collecting the evidence it requires.

The Court resolved the initial dispute, except with respect to conditions 6 and 7 that Defendants seek to impose on Plaintiff's inspection:

6. Any inspection of a biosecure area will be made from inside the van.

7. If Plaintiff requests sampling within the biosecure areas, then during the site inspection of the biosecure areas the Facility's expert QISP, Travis Peterson, who has satisfied the biosecurity measures and precautions for the Facility will take such samples for Plaintiff in the biosecure areas of the Facility and immediately provide such samples to Plaintiff's representatives during the inspection.

With respect to conditions 6 and 7, the Court ruled:

> As to conditions 6 and 7, the Court won't impose or reject these conditions at this time. Defendants must first produce their biosecurity plan. After plaintiff has reviewed the biosecurity plan, the parties must meet and confer to discuss whether plaintiff can comply with the plan such that one or more of plaintiff's agents can exit defendants' van to inspect biosecure areas at the duck farm. If the parties are unable to reach an agreement as to these conditions after meeting and conferring, they may file another joint statement with the Court.

ECF No. 26 at 2.

**1. Defendants' Biosecurity Plan Does Not Contain Any Provisions or Restrictions that Would Prohibit Plaintiff's Agents from Leaving the Vehicle During a Site Inspection.**

Defendants provided the biosecurity plan, a true and correct copy[1] of which is attached as Exhibit 1 to the Declaration of William Carlon in Support of the Second Joint Statement Re Discovery Dispute No. 1 ("Carlon Declaration").

Plaintiff has reviewed the biosecurity plan and determined that it does not contain any provisions or restrictions that would prohibit Plaintiff's representatives from leaving the vehicle, including to collect samples. The relevant section, entitled "Biosecurity for Guests at Reichardt Duck Farm," contains the following three provisions:

1. All guests are to sign in at the office, the green building across the street from the mailbox.
2. Office staff will sign the guest in and have them fill out the Biosecurity Statement. We need to determine if the guest has been to a farm or exposed to something we wouldn't want to bring into the farm.
3. Most guests will require an escort.

The "Biosecurity Statement" asks for the following information:

1. Name, company, city, country;
2. Purpose of visit;
3. Whether the visitor has been in contact with any live birds in the last 72 hours;
4. If the answer to 3 is yes, then the questionnaire asks what type of birds;
5. Whether the visitor has visited any hatchery, feed mill or processing plant in the last 72 hours;
6. Whether the visitor has visited any pet store, lab, zoo, park, fair, school project, 4H/FFA project, wildlife preserve, lake or other areas where animals, especially birds are present; and,

---

[1] Defendants designated the biosecurity plan as "confidential," and therefore Plaintiff has filed the document under seal, and filed an Administrative Motion to Consider Whether Another Party's Material Should be Sealed pursuant to Civil Local Rule 79-5.

7. Whether the visitor has had any gastrointestinal problems in the last 72 hours.

Plaintiff's agents can comply with the requirements set forth in the section that governs visitors to the duck farm.

### 2. The Biosecurity Protocols for Guests Should Apply to Plaintiff's Agents.

Defendants contend that Plaintiff's agents cannot comply with the requirements, though the rationale for why not continues to change. At the outset of this dispute, Defendants took the position that the conditions they seek to impose on Plaintiff's inspection "are based on the requirements in the biosecurity plan." ECF No. 20 at 4:7. Now that they've been forced to share that biosecurity plan, and the plan has clear protocols for visits such as the one at the heart of this dispute, Defendants argue that those protocols don't apply to Plaintiff and instead rely on Dr. Bland's *interpretation* of the biosecurity plan, which is based on, in part, a subjective definition of who a "guest" is – that is, whether potential guests are "aligned with the overall success of the farm" or whether they are "antagonistic to the ranch." (Bland Letter April 11, 2023). Now they attempt to distinguish a "guest" from a mere "visitor" by requiring that a "guest" be invited, despite both terms being used in the biosecurity plan (the Biosecurity Statement states "we ask all *visitors* who come into contact with our birds to answer the following questions" (emphasis added)). The biosecurity plan does not include the definition of "guest" that Dr. Bland is using, so this appears to be a definition of convenience to prevent Plaintiff from gathering the evidence it needs. Moreover, Federal Rule of Civil Procedure 34 is not contingent on whether a party seeking inspection is "aligned with the success" of, or invited by, the responding party. In fact, no opposing party in litigation could ever meet Dr. Bland's criteria, because, by definition, they are "antagonistic" to the responding party by virtue of their opposing roles in the litigation, and the fact that they are not likely to be invited to the facility.

Dr. Bland also seeks to apply the biosecurity protocols of employees – who have prolonged and sustained contacts with the ducks at the farm – on Plaintiff's agents who will be in the biosecure areas for just a few hours. Defendants' own biosecurity plan recognizes the differing threat levels by imposing greater restrictions on employees than on temporary visitors. Plaintiff's agents fall into the latter category and should only have to comply with the protocols set forth in

the biosecurity plan for visitors, not the more stringent protocols set forth for employees.

While Defendants argue below that Plaintiff is not a "guest" at the facility, and therefore the section on "Guest Biosecurity" should not apply, they do not provide an alternative section with which Plaintiff *can* comply. They also argue that the protocols that Plaintiff propose are "woefully inadequate," despite the protocols being lifted directly from Defendants' own biosecurity plan. To that end, they seek to add additional requirements not found in the plan, such as the requirement to carry insurance and indemnify Defendants.

Plaintiff has worked hard to try and meet Defendants in the middle on this – offering, prior to learning of the existence of a section addressing "guests,"[2] to comply with the biosecurity requirements imposed on employees. Once Plaintiff learned that there was a section on guests – which Plaintiff took to mean "temporary visitor" – Plaintiff agreed to comply with that section. Defendants denied both suggestions, and continues to take the unreasonable position that Plaintiff must allow Defendants to collect its evidence.

### 3. Defendants Proposal to Require Plaintiff to Indemnify Defendants Against Loss Is Unreasonable.

With regard to Dr. Bland's novel suggestion that Plaintiff indemnify Defendants and carry an insurance policy specifically for this inspection, this, again, comes not from the biosecurity plan, but from Dr. Bland's adverse reaction to this litigation. These are not procedures commonly imposed – as evidenced by the fact that it's not found in the biosecurity plan, and by the fact that Defendants can provide no authority that supports such a measure. More importantly, the idea is antithetical to the purpose of the Federal Rules of Civil Procedure. Imposing such a drastic measure would immensely chill Plaintiff's ability to collect the evidence to which it is entitled. This measure is simply not reasonable.

---

[2] Defendants belatedly provided the key section on "Guest Biosecurity" on April 19, 2023, after the parties had met and conferred extensively and after a first draft of this joint statement had been provided to Defendants. Carlon Decl. ¶ 16. In light of the new section, that Plaintiff assumed was directly on point, Plaintiff modified its position to better reflect the protocols imposed on guests (thinking that Plaintiff's agents more closely resembled guests than, say, employees of the facility). Now Defendants disingenuously argue below that Plaintiff will not agree to the stricter protocols imposed on employees, when in fact Plaintiff has already proposed those very protocols before it was made aware of a section that dealt with guests.

1    Dr. Bland's hearsay statement recounting a conversation he had with a colleague after class
2 is not sufficient basis to impose the restrictions that Defendants seek, nor is it sufficient to support
3 Defendants' statement that "it has become standard biosecurity practice within the states."

### 4. By Complying with the Protocols Found in the Biosecurity Plan, Plaintiff Adequately Addresses Defendants' Concerns.

Defendants attempt to use Plaintiff's allegations of standing as a basis for denying access to the biosecure areas. This is absurd. Plaintiff is a member organization. That Plaintiff's members use and enjoy waterways where birds may be present is entirely unrelated to an inspection, because those members will not be present at a site inspection. Even in the case of Plaintiff's counsel, the protocols that Plaintiff propose address this issue by requiring all attendees to attest that they have not been in contact with birds, etc. in the past 72 hours – protocols created by Defendants, presumably, to address this very concern.

Defendants continue to move the proverbial goalposts and obstruct Plaintiff's discovery efforts. While the dangers of avian flu and the threats to Defendants' ducks are serious, Defendants have not proposed a reasonable solution, and continue to stick to their unworkable conditions without compromise.

### B. Defendants' Statement

#### 1. Plaintiff Fails To Appreciate The Severity Of The Risk And Catastrophic Consequences Of The Avian Influenza Threat Created By The Inspection Of The Biosecurity Areas That Plaintiff Seeks In This Case.

Plaintiff largely ignores the fact that the inspection of the biosecurity areas of the RDF Facility creates severs risk of Avian Influenza and sever consequences resulting from such an infection. (*See generally*, Dinah Voyles Pulver, "Avian Influenza is killing endangered California condors at alarming rate, federal data suggests," USA TODAY (April 12, 2023) (found at https://www.usatoday.com/story/news/nation/2023/04/12/avian-flu-killing-california-condors-fish-and-wildlife-service-says/11646325002/ (last visited April 19, 2023) ["The avian influenza stalking wild and domestic bird flocks across the country has killed at least six endangered California condors since March and is suspected of killing another dozen." "H5N1 has exploded across the U.S. since its first detection here in wild birds in January 2022."]) *If* the flu was found

on the Facility, as Dr. Bland points out, the result would be a complete depopulation of the Facility, and probably other similar poultry farms in the area as well. That would likely be the end of this 100-year old family business. The consequences are that severe. Dr. Bland explains:

> Should High Path Avian influenza (HPAI) be introduced onto the Reichardt Farm, the disease will most likely cause extensive mortality in commercial broiler ducklings (0 – 5 weeks of age). Hatching egg production would decline rapidly from breeders ducks along with elevated mortality in adult breeder ducks. USDA would step in and rapidly euthanize all duck breeders, commercial broiler ducks as well as destroy hatching eggs in the hatchery. This "stamping out policy" would go into effect to preserve the health and integrity of the nearby commercial poultry industry which includes two commercial layer companies and a commercial broiler company, in the greater Petaluma area. [Supplemental Declaration Of Glen Hansen Regarding Plaintiff's Inspection Of Biosecurity Areas, ("Supp. Hansen Decl."), ¶9, Ex. 4.]

Plaintiff's proposed criteria are woefully inadequate to address the risk their inspection of the biosecurity area poses to the Facility. As Dr. Bland writes:

> So, I would not characterize the Biosecurity Plan in any way as allowing Plaintiff's counsel and expert to exit a van to inspect biosecure areas of the facility if they only "attest to their exposure to other sources of the flu." As these individuals would in no way have personal knowledge of their previous risk of exposure to poultry diseases and attesting to such a fact without that knowledge may expose them to additional liability. [Supp. Hansen Decl., ¶9, Ex. 4.]

Plaintiff's flippant dismissal of Dr. Bland's concerns of the risk and potential consequences of the inspection is most evident by the omission in Plaintiff's arguments regarding this statement by Dr. Bland:

> If any of the Plaintiffs are allowed to enter the RDF biosecurity areas, there must be [] strict indemnity provisions with an insurance policy that would pay for the indemnity in the amount of the entire facility that would be lost in the event of a disease outbreak. [Supp. Hansen Decl., ¶9, Ex. 4.]

.Plaintiff refuses to follow those provisions. Plaintiff refuses to accept its potential responsibility for causing the entire Facility to be shut done (as well as other poultry facilities in the area) and the 100-year-old family farm goes out of business if the evidence establishes that Plaintiff's inspection caused an outbreak of the Avian Influenza at the Facility. Plaintiff argues that such an indemnity and insurance requirement is against the FRCP, would purportedly chill Plaintiff's ability to collect the evidence here, and is unreasonable. Not so. This situation is unique. Here, the very inspection that Plaintiff seeks carries the realistic risk that the inspection itself (under the terms

sought by Plaintiff) could result in a catastrophic closure of the entire Facility and neighboring poultry facilities, which would lead to end of this 100-year-old family duck farm. Such indemnity and insurance provisions are completely reasonable in this particular case, even if they are not normally required in an inspection under the FRCP.

**2. Plaintiff Wrongly Thinks It Is A "Guest" Of The Facility.**

a. Plaintiff is not a "guest."

Plaintiff takes the position that it is a "Guest" of the Facility, and therefore it has only a few simple procedures to follow. Plaintiff is mistaken. By definition, Plaintiff is not a "guest." A guest is generally defined, in relevant respect, as follows:

1 a: a person entertained in one's house

 b: a person to whom hospitality is extended

 c: a person who pays for the services of an establishment (such as a hotel or restaurant)

(https://www.merriam-webster.com/dictionary/guest?utm_campaign=sd&utm_medium=serp&utm_source=jsonld (last accessed April 19, 2023).) Plaintiff, its counsel, and its consultant are none of those. Indeed, Plaintiff admits as much when it states that Plaintiff's agents "are 'antognistic' to the responding party by virtue of their roles in the litigation." Therefore Plaintiff could not possibly come within the "Biosecurity for Guests at Reichardt Duck Farm" provisions of the Biosecurity Plan. The Biosecurity Plan's reference to "Guests" is only applicable to individuals who are invited onto the farm by RDF, and who, in the sole opinion of Reichardt Duck Farms, do not present a heightened risk of exposing the farm to Avian Influenza and other poultry diseases. Thus, Plaintiff's counsel and experts do not fit within the definition of "Guests" under the Biosecurity Plan.

Therefore, Plaintiff essentially makes up its own criteria to inspect the Facility by wrongly calling themselves "guests" of the Facility.

Even assuming, arguendo, that Plaintiff could be deemed a "guest" of the facility, Plaintiff appears to ignore the key statement in the "Biosecurity For Guests" provision, which states: "*We need to determine if the guest has been to a farm or exposed to something we wouldn't want to bring into the farm.*" (Declaration Of William N. Carlon In Support Of Second Joint Statement Re

Discovery Disagreement No 1, ¶16.)  That is the subjective analysis of risk that <u>Reichardt Duck Farm</u> must make regarding any "guest" – as <u>Defendant's counsel explicitly informed this Court about at the hearing on March 31, 2023</u>.  That subjective analysis is fully supported and properly applied by Dr. Bland when he stated this in paragraph 8 of his Declaration that was earlier filed with this Court:

> I do not know who the representatives and agents of Plaintiff Californians For Alternatives To Toxics are.  I do not know what their background or training is, or their knowledge or experience with poultry related biosecurity protocols.  I also have no assurance the the representatives and agents of Plaintiff Californians For Alternatives To Toxics have or do not have poultry, pet birds or reptile pets at their homes, which is highly relevant to the biosecurity risks of these individuals.  Without true assurance of those issues, and without making a house call to check the homes of these individuals, those individuals remain a risk and threat to Reichardt Duck Farm's overall biosecurity.  Furthermore, I also do not know if any of these individuals are part of or have any affiliations with Animal Rights Groups (such as DXE/PETA) or, frankly, agricultural terrorists. Such groups have overtly engaged in efforts to shut down Reichardt Duck Farm in the past, and so concerns about threats from such individuals and groups are legitimate.

That analysis by Dr. Bland is not only what the Biosecurity Plan was designed for in regards to "Guests," but is appropriate in this case.

Thus, for all the reasons explained herein, and for the reasons stated in the Declaration of Dr. Bland and the letter of Dr. Bland, dated April 11, 2023, RDF has determined that, in its subjective determination, Plaintiff's counsel and consultant has been "*exposed to something we wouldn't want to bring into the farm.*"  Therefore, even if the "guest" provisions did apply here (which they do not because Plaintiff is not a "guest"), RDF has the right under its own Biosecurity Plan to keep Plaintiff from entering the biosecurity areas of the Facility.  While Plaintiff alleges that it is complying with the protocols for guests in the Biosecurity Plan, Plaintiff completely ignores this subjective provision of the guest provision of the Biosecurity Plan, which Plaintiff does not comply with.  In short, Plaintiff's incomplete application of the Biosecurity Plan makes Plaintiff's argument false.  Plaintiff only wants to pick and choose those elements of the Biosecurity Plan that it likes, and reject those that it does not.

    b. <u>While Plaintiff is willing to satisfy the criteria of an "Employee" of the Facility,</u>

<u>it still inappropriately seeks to leave the van</u>.

While Plaintiff considers its agents "temporary visitors," it fails to discuss the fact that the actions of Plaintiff's agents during the planned hours-long inspection of the biosecurity areas will be more widespread, covering more locations within the Facility, and coming closer to the duck populations, than most RDF employees do. Plaintiff's agents should, at a minimum, have to adhere to more precautions than RDF employees. During this process of drafting a Joint Statement, Plaintiff conceded fulfilling the requirements of employees.

Plaintiff argues that the Biosecurity Plan does not contain any provisions or restrictions that would prohibit Plaintiff's agents from leaving the vehicle during a site inspection. However, Plaintiff ignores the testimony of John Reichardt, who stated: "In applying the biosecurity plan, visitors are not allowed into the biosecurity areas of RDF -- including the attorneys of RDF in this litigation -- unless they ride and stay inside a closed RDF company vehicle while in the biosecurity area." Declaration Of John Reichardt In Support Of Defendants' Motion For A Protective Order, ¶6 (ECF No. 20, Ex. 2). Thus, Plaintiff has no real interest in protecting the Facility from becoming infected with the Avian Influenza. That is not their purpose in this litigation. As Dr. Bland aptly states:

> As I've stated in my declaration, I would not characterize these individuals as aligned with the overall success of the farm and, therefore, additional biosecurity practices are warranted to prevent poultry diseases from intentionally or unintentionally entering the ranch due to these individuals being present on the site. [Supp. Hansen Decl., ¶9, Ex. 4.]

c. <u>Plaintiff is more like a government inspector, many of whom are not even physically inspecting poultry facilities because of the current heightened risks of inspection.</u>

If anything, Plaintiff's agents during the biosecurity area inspection are akin to government inspectors, not "guests." Even then, Plaintiff refuses to have its agents follow all of the protocols of government inspectors. (*See* letter of December 29, 2022, from Dr. Anette Jones of the California Department of Food & Agriculture, to "All Californias State/County/City Personnel," attached to the April 11, 2023, letter of Dr. Bland (Supp. Hansen Decl., ¶9, Ex. 4).)

Even then, many government inspectors are suspending their inspections because of the

heightened risk of Avian Influenza at this time.  As Dr. Bland explains:

> It should be noted, that last Friday, April 7, 2023, Dr. Ryan Scholz, DVM, MPH, State Veterinarian, Oregon Department of Agriculture-Animal Health Program attended my Poultry Medicine Class held at the Oregon State School of Veterinary Medicine for third year veterinary students. At approximately 5:10 PM (end of class lecture) Dr. Scholz approached me for my opinion on a matter concerning Wild California Condors and High Path Avian Influenza.  In the ensuing conversation, Dr. Scholz informed me that he contacted FDA and informed the FDA auditing officials they would not be allowed to enter onto any commercial poultry farms in Oregon at this time due to the heighten risk of Avian Influenza on the west coast this past week.  The issue of unnecessary visitors entering a poultry farm during this time period needs to be taken seriously. [Supp. Hansen Decl, ¶9, Ex. 4.]

Thus, it has become standard biosecurity practice within the states to materially curtail physical access to poultry farms to even FDA auditing officials due to the currently heightened risk of Avian Influenza.  And while government inspectors are well-versed and trained in the risks and protocols to prevent Avian Influenza, Plaintiff's agents are not.

### 3. Plaintiff Fails To Account For The Unique And Hightened Exposures That Plaintiff And Its Agents Have To Very Sources Of Avian Influenza.

In paragraph 13 of its Complaint in this case, Plaintiff describes how the activities of its members take place in areas where waterfowl are located:

> Members of CATs, including citizens, taxpayers, property owners, and residents, live, work, travel and recreate on and near the Impacted Waters, into which Defendants cause pollutants to be discharged. These CATs members use and enjoy the impacted waters for cultural, recreational, educational, scientific, conservation, aesthetic and spiritual purposes. Defendants' discharge of storm water containing pollutants impairs each of those uses.  [ECF No. 1, at 4.]

Paragraph 14 adds that "*Members of CATs reside in California and use and enjoy California's numerous rivers for recreation and other activities*" and "*Members of CATs use these areas* to fish, boat, kayak, swim, *bird watch*, view wildlife, and engage in scientific study, including monitoring activities, among other things." ECF No. 1, at 4.  Thus, the very ground that Plaintiff asserts as basis for Plaintiff's standing in this case is that Plaintiff's members use and enjoy the very locations where Avian Influenza is found in natural waterfowl.

Also, Plaintiff's counsel represents clients in cases that routinely require Plaintiff's counsel to visit and inspect waterways where waterfowl exist.  For example, Plaintiff's counsel lists the

following selected clients on its website:   Aqualliance, Battle Creek Alliance, California Sportfishing Protection Alliance, California Water Impact Network, Deltakeeper, Friends of the Petaluma River, Klamath Riverkeeper, Restore the Delta, Russian Riverkeeper. (https://www.packardlawoffices.com/clients (last accessed April 19, 2023).)  Thus, Plaintiff's counsel is often present in those locations which are the very locations where Avian Influenza in found natural waterfowl.

Those waterways that are frequented by Plaintiff's members (to "bird watch") and by Plaintiff's counsel and consultant, are high-risk areas for Avian Influenza.  Indeed, Dr. Anette Jones, Director and State Veterinarian, Animal Health and Food Safgety Services, for the California Department of Food and Agriculture, personally stated to Dr. Bland the following in an email on April 10, 2023:

> Highly Pathogenic Avian Influenza continues to be a disease that must be taken seriously. It has not only killed millions of domestic chickens, turkeys and ducks, impacting the food supply and cost of eggs, but it is also taking a toll on wild animals. Recently, it resulted in the death of Mt Lions and a Bob Cat in California, and California Condors in Arizona. *Keeping populations of birds separate form each other to the extent possible is critical to stopping transmission.* <u>Humans tracking the virus around continues to pose a threat,</u> which thanks to strict biosecurity, has come to fruition less often than the outbreak of 2015. Because of strictly following biosecurity, only 15% of the cases in 2022/23 came from people tracking virus onto a farm.  [Supp. Hansen Decl., ¶9, Ex. 5, attachments.]

Furthermore, Dr. Jones sent out a statewide letter to poultry producers in December 2022 that similarly advocated separating domestic poultry flocks (such as RDF) from natural waterfowl, as follows:

> Based on current disease surveillance and epidemiology, *wild waterfowl and raptors remain the largest threat of Eurasian H5N1 introduction to domestic poultry in California*. The risk of disease entering domestic poultry flocks is always present but can be mitigated though actions that interrupt disease transmission (biosecurity). Enhanced biosecurity is critical in the face of ongoing disease outbreaks and wild bird carrier exposure.
>
> To protect your flocks, we continue to request that you *separate poultry from wild birds if you can*. This action is particularly important if there is ANY water in the vicinity that may attract and congregate wild waterfowl. We recommend housing poultry inside and discouraging any interaction with wild birds, particularly migrating or resident waterfowl and raptors. [Supp. Hansen Decl, ¶9, Ex. 5, attachments.]

Because of the frequent exposure of Plaintiff's members, counsel and consultant to areas with wild

waterfowl that have the Avian Influenza, the only reasonably way in which that admonition by the top agricultural official in California can be accomplished in this case is to NOT have Plaintiff, its counsel or its consultant walking around the biosecurity areas of RDF.

Thus, Plaintiff's members, counsel and consultant are among the highest risk people for transmission of the Avian Influenza to the duck population at RDF. Plaintiff has not, and cannot, demonstrate that it can qualify to enter the Facility under the applicable Biosecurity Plan.

Tellingly, Plaintiff's argument also does address the concerns of John Reichardt, who testified: "Strict adherence to the biosecurity plan of RDF is made even more critical by the additional threats to RDF from animal rights groups and even agricultural terrorists. In the recent past, people affiliated with an animal rights group, DXE, trespassed in the biosecure areas of RDF with the purpose of trying to shut down the entire RDF operation, requiring intervention by local law enforcement." Declaration Of John Reichardt In Support Of Defendants' Motion For A Protective Order, ¶7 (ECF No. 20, Ex. 2). Nowhere in Plaintiff's argument or supporting declaration is there any statement of whether or not Plaintiff's counsel are members of, affiliated with, or associated with, such groups that have sought the demise of the entire Facility. Dr. Bland was correct when he stated in paragraph 8 of his Declaration that "I also do not know if any of these individuals are part of or have any affiliations with Animal Rights Groups (such as DXE/PETA) or, frankly, agricultural terrorists." Such concerns are heightened by Plaintiff's silence on that issue. That alone validates the subjective determination by RDF under the guest provision of the Biosecurity Plan to exclude Plaintiff, its counsel and consultant from walking around the Biosecurity Area.
In short, Conditions 6 and 7 are entirely reasonable under the unique circumstances of this case, and must be followed here. The criteria suggested by Plaintiff is wholly insufficient to prevent an outbreak of Avian Influenza as a result of Plaintiff's inspection of the biosecurity areas. Plaintiff's right to inspect the Biosecurity Areas under the FRCP does not supersede the right of Reichardt Duck Farm to exist.

//

//

## III. PARTIES' FINAL PROPOSED COMPROMISE

### A. Plaintiff's Statement

Defendants' proposed conditions remain unreasonable and far too restrictive. Plaintiff has suggested reasonable compromises, and has asked Defendants to provide reasonable protocols with which Plaintiff's representatives could comply in order to minimize any risks. Defendants continue to refuse, and have adamantly insisted on their overly-restrictive terms.

Plaintiff, after reviewing the biosecurity plan, proposes that the following conditions be placed on Plaintiff's agents during any inspection at the duck farm:

1. Plaintiff's agents will sign in at the office upon arriving for the site inspection;
2. Plaintiff's agents will fill out the Biosecurity Statement; and,
3. Plaintiff will agree to have its agents escorted for the duration of the inspection.

These conditions are taken directly from Defendants' biosecurity plan, and represent a reasonable compromise that will allow Plaintiff to collect the evidence to which it is entitled, and protect Defendants' biosecurity interests as spelled out in Defendants own biosecurity plan.

In addition, Plaintiff will agree to adhere to the following protocols imposed on Defendants' employees by the biosecurity plan:

4. Plaintiff's agents shall not drive their own vehicles on the ranch, and shall park their personal cars across the street at the office parking lot;
5. Plaintiff's agents shall not enter any building, except for the office;
6. Plaintiff's agents shall use foot pans to disinfect their footwear upon entering the office;
7. Plaintiff's agents shall wear clean, appropriately-fitted coveralls that are provided for their use by Defendants for the inspection of biosecure areas;
8. Plaintiff's agents shall attest that they do not keep poultry or birds of any kind at home, live on property with poultry or be involved with raising or associated with poultry of any kind; and,
9. Plaintiff's agents shall attest that they do not work for any other poultry-related business such as chicken or turkey farms, hatcheries, feed mills, pet store, poultry

processing plant, etc.

B. **Defendants' Statement**

In light of the extreme risk and disastrous consequences that would result from the introduction of the Avian Influenza into the Reichardt Duck Farm as a result of the biosecurity area inspection sought by Plaintiff here, the only reasonable solution is that the Court order the parties to adhere to Condition 6 and 7, described in the Court's Order of March 31, 2023. ECF No. 26 at 2. Specifically, that

> Any inspection of a biosecure area will be made from inside the van.
>
> If Plaintiff requests sampling within the biosecure areas, then during the site inspection of the biosecure areas the Facility's expert QISP, Travis Peterson, who has satisfied the biosecurity measures and precautions for the Facility will take such samples for Plaintiff in the biosecure areas of the Facility and immediately provide such samples to Plaintiff's representatives during the inspection.

These conditions do not require "Defendants to collect [Plaintiff's] evidence," as plaintiff contends. And even if that is deemed to be the case, it is warranted under the unique and high-risk inspection that Plaintiff seeks here. If, due to the unique security concerns in a jail in *Estate of Mazon v. County of Riverside*, 2014 U.S. Dist. LEXIS 206712, 2014 WL 12966419, at *16 (C.D.Ca. 2014), the inspecting party did not have attorney work-product protections during that inspection, so too having Travis Peterson collect samples here is warranted due to the unique risk of Avian Influenza from the inspection requested by Plaintiff.

If, alternatively, the Court allows Plaintiff's counsel and consultant to get out of the van within the biosecurity area of the Facility, then this Court should (1) require Plaintiff's counsel and consultant to follow all of the requirements of the employees of the Facility (described above, in the Biosecurity Plan, and in the April 11 Letter of Dr. Bland); AND (2) require Plaintiff to follow Dr. Bland's additional admonition as follows:

> If any of the Plaintiffs are allowed to enter the RDF biosecurity areas, there must be [] strict indemnity provisions with an insurance policy that would pay for the indemnity in the amount of the entire facility that would be lost in the event of a disease outbreak. [Supp. Hansen Decl., ¶9, Ex. 4.]

The extreme risk and catastrophic consequences from a disease outbreak resulting from Plaintiff's inspection of the biosecurity areas requires such indemnity and insurance provisions be in place before such an inspection.

Dated: April 25, 2023          **LAW OFFICES OF ANDREW L. PACKARD**

                                  By:  /s/ Andrew L. Packard
                                      ANDREW L. PACKARD
                                      Attorneys for Plaintiff
                                      CALIFORNIANS FOR ALTERNATIVES TO TOXICS

Dated:  April 25, 2023          **ABBOTT & KINDERMANN, INC.**

                                  By:     /s/ Glen C. Hansen
                                      DIANE G. KINDERMANN
                                      GLEN C. HANSEN
                                      Attorneys for Defendants
                                      REICHARDT DUCK FARM, INC., and
                                      JOHN REICHARDT

**ATTESTATION FOR E-FILING**

    I hereby attest pursuant to Civil L.R. 5-1(i) (3) that I have obtained concurrence in the filing of this document from the above Signatory prior to filing.

DATED: April 25 2023                              By: /s/ William N. Carlon