Diane G. Kindermann Henderson (SBN 144426)
dkindermann@aklandlaw.com
Glen C. Hansen (SBN 166923)
ghansen@aklandlaw.com
ABBOTT & KINDERMANN, INC.
2100 21st Street
Sacramento, California 95818
Telephone:     (916) 456-9595
Facsimile:     (916) 456-9599

Attorneys for Defendants
REICHARDT DUCK FARM, INC., and
JOHN REICHARDT

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIANS FOR ALTERNATIVES TO TOXICS, a non-profit corporation, | Case No: 3:22-CV-09065-AGT |
| Plaintiff, | **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS** |
| v. | |
| REICHARDT DUCK FARM, INC., and JOHN REICHARDT, | **Date:** **February 16, 2024** |
| Defendants. | **Time:** **10:00 a.m.** **Location:** **Courtroom A – 15th Fl.** **Judge:** **Alex G. Tse** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

I.      INTRODUCTION. ............................................................................................... 4

II.     THE MOTION SHOULD BE DENIED. CAT IS NOT A PREVAILING PARTY. ........... 4

III.    ALTERNATIVELY, THIS COURT SHOULD AWARD SIGNIFICANTLY LESS FEES
        AND COSTS THAN CAT IS SEEKING IN THIS MOTION. .......................................... 5

        A.      CAT Pursued Largely Meritless Claims In This Lawsuit. ....................................... 5

        B.      CAT Wrongly Seeks Fees For Its Own Bad Faith Settlement Tactics. .................. 9

        C.      CAT Seeks Fees For Its Own Improper Discovery Tactics, Including Fees For
                Discovery Motions It Lost. ..................................................................................... 13

        D.      The Billing Records Include Unnecessary Work And Lack Of Specificity. ......... 14

        E.      The Hourly Rates Sought By CAT Are Unreasonable. ......................................... 15

        F.      The 59.2 Hours Incurred By CAT For This Motion Are Unreasonable. ............... 16

        G.      The Costs Sought By CAT Are Unreasonable. ...................................................... 16

        H.      The Financial Burden That CAT Seeks To Impose On Reichardt Is Unreasonable.
                ................................................................................................................................ 17

IV.     CONCLUSION. ................................................................................................................ 18

**OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS**

# TABLE OF AUTHORITIES

## CASES

*Cf. Thomas v. Sec'y of HHS*, 2023 U.S. Claims LEXIS 153 at *8, 2023 WL 2155057 (Ct. Fed. Cl. 2023).................................................................17

*Christiansburg Garment Co. v. Equal Employment Opportunity Comm.*, 434 U.S. 412, 420 (1978) ...........................................................................6

*Eckweiler v. Nisource, Inc.*, 2019 U.S. Dist. LEXIS 51115 at *8, 2019 WL 1375774 (N.D.Ind. 2019) ................................................................13

*In re Yosemite National Park Hantavirus Litigation*, 2016 U.S. Dist. LEXIS 130706, 2016 WL 5335550, at *21-*23 (N.D.Cal.2016) ....................14

*Middlebrooks v. Teva Pharms. USA, Inc.*, 2019 U.S. Dist. LEXIS 30530 at *2, 2019 WL 936645 (E.D.Pa., Feb. 26, 2019, Civil Case no. 17-412) ..................15

*Saint John's Organic Farm v. Gem County Mosquito*, 574 F.3d 1054, 1059, 1061 (9th Cir. 2009).................................................................5

*Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792 (1989)...................5

## STATUTES

33 U.S.C. § 1311(a) ..................................................................................7

33 U.S.C. § 1365(d) ..................................................................................5

**OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS**

## I.    INTRODUCTION.

Plaintiff Californians For Alternatives To Toxics ("CAT"), along with other environmental groups, are upset that the State and Federal governments refuse to apply Concentrate Animal Feeding Operations ("CAFO") regulations to poultry producers in the area of Petaluma, California.  Unable to force the governments' hands, CAT brought this lawsuit to force the multi-generational, 65-year-old Reichardt Duck Farm to comply with CAFO requirements that the applicable regulatory agencies repeatedly stated do not apply.  Defendants Reichardt Duck Farm, Inc., and John Reichardt (collectively, "Reichardt") repeatedly explained that to CAT throughout this litigation, but CAT refused (and still refuses) to accept the governments' position, and improperly pursued their larger agenda through this extortionate lawsuit anyway.

In this case, CAT wants to make Reichardt pay nearly $1 million in total settlement funds and fess/costs ($431,346.67 of which is sought in the instant Motion), which is in addition to the hundreds of thousands of dollars Reichardt was already spending on water quality measures, as well as the fees and costs Reichardt incurred to defend this largely meritless lawsuit.  And all that is happening when Reichardt has no income for over half a year because the Avian Influenza was brought to the duck farm in November 2023, resulting in the destruction of 170,000 ducks.  That is exactly what Reichardt warned about in this case, but CAT incessantly ridiculed that potential.

This Court should deny CAT's motion for fees and costs because CAT was not the prevailing party - despite the enforceable Consent Decree that was the result of the financial and emotional toll inflicted on Reichardt from this litigation.  CAT did not obtain the relief sought in its Complaint.  Alternatively, this Court should only award a very small portion of the fees and costs sought in the Motion because many billing entries are unnecessary and insufficiently specific; CAT's bad faith settlement tactics unreasonably extended this litigation; CAT unreasonably seeks fees for discovery disputes it *lost*; the hourly rates are much higher than what it declared at the outset; and the financial burden that CAT seeks to impose is unreasonable.

## II.    THE MOTION SHOULD BE DENIED. CAT IS NOT A PREVAILING PARTY.

The Clean Water Act provides that in any citizen suit brought pursuant to its provisions, the Court "*may* award costs of litigation (including reasonable attorney and expert witness fees)

**OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS**

to any prevailing or substantially prevailing party, whenever the court determines such an award is *appropriate*." 33 U.S.C. § 1365(d) (emphasis added).  Here, it's not appropriate.  Even with a judicially enforceable settlement agreement in the form of the Consent Decree, CAT is not the "prevailing party" entitled to its fees and costs.  To be considered a prevailing party, a plaintiff must receive "at least some relief on the merits of his claim." *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist*., 489 U.S. 782, 792 (1989).  *See Saint John's Organic Farm v. Gem County Mosquito*, 574 F.3d 1054, 1059, 1061 (9th Cir. 2009).  Here, the Consent Decree does not provide the relief that CAT requested in its Complaint.  There is no declaration of Reichardt's violation of the CWA; no declaration of Reichardt's discharge of pollutants without a NPDES permits, or from the Facility at all; no declaration that Reichardt failed to comply with the requirements of the General Permit or the CWA; no injunction enjoining Reichardt from discharging pollutants from the Facility and to the surface waters surrounding and downstream from the Facility in violation of the Act and the General Permit, or from further violating the substantive and procedural requirements of the General Permit (and no determination that Reichardt ever did); no order for Reichardt to pay civil penalties; and no order for Reichardt to take appropriate actions to restore the quality of navigable waters, because there is no evidence in this case that Reichardt ever did impair such waters by their activities at the duck farm.  Accordingly, this motion should be denied in its entirety.

### III.   ALTERNATIVELY, THIS COURT SHOULD AWARD SIGNIFICANTLY LESS FEES AND COSTS THAN CAT IS SEEKING IN THIS MOTION.

Reichardt was compelled to agree to the terms of the Consent Decree due to the financial attrition and stress caused by this lawsuit.  (Indeed, John Reichardt has now been diagnosed with cancer, likely due to stress.)  Even if this Court finds that CAT achieved a degree of the relief it sought in the Complaint, this Court should not award fees or costs that are anywhere close to the amount that CAT seeks in this motion, for each of the reasons explained below.

### A.   CAT Pursued Largely Meritless Claims In This Lawsuit.

"Environmental citizen suits enable and empower citizens to *enforce* environmental legislation."  (Kerry D. Florio, *Attorneys' Fees In Environmental Citizen Suits:  Should Prevailing*

**OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS**

*Defendants Recover,*" 27 ENVIRONMENTAL AFFAIRS 707 (2000) ("Florio") (emphasis added).)  But here CAT's primary goal was not to *enforce* the Clean Water Act; it was designed to circumvent the government's position regarding the application of CAFO regulations.  CAT pursued this case against Reichardt because CAT and its other allies in the environmental community have been unsuccessful in forcing state and federal agencies from imposing CAFO regulations on poultry facilities in the Petaluma area.  Significant portions of both the Complaint and the Amended Complaint, as well as the parties' communications during the lawsuit, focus on the CAFO regulation issue.  (See Declaration of Andrew Packard In Support Of Plaintiff's Motion For Attorneys' Fees And Costs ("Packard Decl.")(Docket no. 73), ¶¶30, 31, Exhibits 9, 10 (Docket nos. 82, 83).)  Reichardt's counsel explicitly and frequently informed CAT:

> As you are well aware, there are no CAFO regulations that the State of California has applied to this Facility.  (Thus, contrary implications in paragraphs 36 and 37 of the Complaint, and the contrary express allegation in paragraph 59 of the Complaint, are simply untrue.)  The State's CAFO regulations simply do not apply to this Facility.  [Docket no. 82.]

That fact was affirmed by state and federal regulators who confirmed that CAFO regulations do not apply here.  (Declaration of Diane Kindermann In Opposition To CAT's Motion For Attorneys' Fees And Costs ("Kindermann Decl."), ¶5; Declaration of Travis Peterson In Opposition To CAT's Motion For Attorneys' Fees And Costs ("Peterson Decl."), ¶6.)

But CAT disagrees with the government's position.  Therefore, CAT intended this case to be the vehicle to circumvent the government's position.  No doubt, CAT and other environmental groups will seek to use the Consent Decree in this case as a model to accomplish a backdoor, implied application of CAFO regulations, which they are not able to achieve directly through governmental regulators.  Indeed, one of CAT's supporting attorneys conceded as much.  (Decl. of Daniel Cooper, ¶20 (Docket No. 88).)  That likely explains CAT's lengthy refusal to provide Reichardt with its injunctive demands, as discussed below.  This lawsuit was designed to serve an improper purpose.  Commentators note that attorneys' fee awards should also "protect defendants from burdensome litigation having no legal or factual basis."  (Florio, at 723 (citing *Christiansburg Garment Co. v. Equal Employment Opportunity Comm.*, 434 U.S. 412, 420 (1978).)

In addition, CAT's evidence-barren assertion that Reichardt's activities "has caused

**OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS**

unpermitted discharges of manure-laden wastes to the creek bisecting the Facility," Motion 1:10-13, is false.  (Peterson Decl., ¶5.)  Many of CAT's claims are similarly meritless:

- Defendants RDF and John Reichardt ("Defendants") did not (and do not) discharge pollutant-contaminated storm water, liquid manure, and wastewater from the Facility into an unnamed Creek that runs through the Facility, or into any "Water of the United States."

- There is no evidence: (1) that there is any seepage of any water from the ponds on the Facility into the groundwater; (2) that there is seepage of any water from any spraying into the groundwater; or (3) that the groundwater in the vicinity of the Creek is hydrologically connected to the Creek.

- There is no evidence: (1) that there is seepage of any water from any spraying into the unnamed Creek; or (2) that "manure wastewater" is discharged into the unnamed Creek.

- There is no evidence that, during significant rain events, storm water laden with pollutants discharges from the Facility's storm water conveyances into the unnamed Creek.

- There is no evidence that storm water containing pollutants harmful to fish, plant and bird life, and human health are being discharged from the Facility directly or indirectly to the unnamed Creek during each significant rain event.

- There is no evidence whatsoever that Defendants discharge water containing liquid or solid animal wastes into the unnamed Creek or groundwater.

- The storage ponds at the Facility are not undersized, and the operational duck houses at the Facility are not in disrepair.

- Because Defendants do not discharge liquid manure to any Impacted Waters, they do not require an individual National Pollutant Discharge Elimination System ("NPDES") Permit, and so they do not violate section 301(a) of the Act, 33 U.S.C. § 1311(a).

- There is no evidence that Defendants discharge pollutant-contaminated storm water from the Facility.  Therefore, Defendants do not violate the Act or the State of California's General Industrial Permit for storm water discharges, State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ, and Water Quality Order No. 2014-0057-DWQ, NPDES General Permit No. CAS000001 (hereinafter "General Permit" or "Permit").

- Defendants have not engaged in, and presently do not engage in, any violation of the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the General Permit and the Act.

- Although Defendants do not have written protocols for the management of duck mortalities at the Facility, for the use of water in production areas at

**OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS**

the Facility, or for the testing of manure, litter, process wastewater, or soil at the Facility, such written protocols are not required at the Facility, as a matter of law.

- Although Defendants did not have a nutrient management plan for the Facility, that is not required of the Facility, as a matter of law.

- Defendants' storm water controls at the Facility achieve both Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

- Contrary to Plaintiff's allegations, the Facility does not discharge storm water associated with its industrial activities from eight (8) discharge points into the unnamed Creek that runs through the Facility.

- The Facility regularly sampled storm water.  While the pollutants that were measured have exceeded EPA Benchmarks, the EPA Benchmarks are not the legal measure for this General Permit.  Also, Defendants have measured discharges containing levels of total suspended solids and phosphorus in excess of the EPA Benchmark values.  However, EPA benchmarks are not the same as Numeric Action Levels ("NALs"), and what actions are required in response to an EPA Benchmark exceedance has been identified as a problem by the Water Boards, industry, and environmental stakeholders.  Furthermore, exceedances of EPA Benchmarks do not indicate that Defendants have not implemented BAT and BCT at the Facility for its discharges of pH, total suspended solids, nitrate plus nitrite nitrogen, and phosphorus.  Therefore, Defendants have not violated the CWA or the General Permit.

- While Plaintiff complains about the format of the 2015 SWPPP, the format of the SWPPP is not prescribed in the General Permit, and that multi-part documents are commonly submitted by the regulated industries, so there is no violation of the CWA or the General Permit.

- While the 2015 SWPPP contains significant amounts of information, but not all of the information, that is required by General Permit Section X, the Facility cured any such defects by making modifications to relevant SWPPP elements that were certified on June 13, 2018, July 15, 2020, and March 11, 2021, and were uploaded to SMARTS.  For example, a Monitoring Implementation Plan was uploaded to SMARTS on July 15, 2020.

- The 2015 SWPPP contains substantial representations of the items that Plaintiff incorrectly alleges are missing from the 2015 SWPPP; and a 2018 Assessment with additional SWPPP elements was uploaded to SMARTS as additional information was made available that reflected the Defendants' developing understanding of the pollutants on-site.

- While the Facility did not analyze storm water samples for pathogens, the Facility is not explicitly required to do so under the General Permit (nor Basin Plan).

- While on only a few occasions all required data was not submitted to the RWQCB via SMARTS within the thirty (30)-day time frame, on most occasions it was submitted within that thirty (30)-day time frame.

-8-

**OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS**

- The General Permit lays out the specific testing methods and NALs for potential pollutants in storm water, including those that are being analyzed by the Facility.  If NALs are exceeded, the General Permit also lays out the response requirements referred to as Level 1 or Level 2 status for each pollutant. Specific documents are produced to discuss the Facility's actions and include Level 1 Exceedance Response Action Report, Level 2 Exceedance Response Action Plan, and Level 2 Exceedance Response Action Technical Report.  The Facility has filed its Level 1 ERA Report for Total Suspended Solids and as a result of Facility actions, now qualifies to return to Baseline status (no further action).  The Facility has filed its Level 1 ERA Report for total phosphorus and a subsequent Level 2 ERA Action Plan for total phosphorus, which is currently being carried out.  The results of this Level 2 Action Plan was documented in the Level 2 Technical Report  and has been submitted in the SMARTS compliance system. Results from analytical testing from the 2022/2023 storm season just concluding has resulted in Level 1 status for nitrate plus nitrite as N and a Level 1 ERA report is underway and has been submitted in the SMARTS compliance system.

- A NAL exceedance level is not a violation of an EPA Benchmark value. The General Permit may base NAL levels on the EPA 2008 Multisector General Permit.

- NAL Exceedances are not violations of the General Permit or the CWA. The General Permit, Attachment C, Glossary, defines a NAL as follows: "Pollutant concentration levels used to evaluate if best management practices are effective and if additional measures are necessary to control pollutants.  NALs are not effluent limits.  The exceedance of a NAL is not a permit violation."  [Peterson Decl., ¶5.]

In light of the inappropriate basis for this lawsuit, the meritlessness in nearly all of CAT's claims (see also Docket no. 76, p. 20), and the complete lack of any evidence of any water quality problems created by Reichardt, the fees incurred by CAT in this litigation are unreasonable.

**B.      CAT Wrongly Seeks Fees For Its Own Bad Faith Settlement Tactics.**

While Reichardt attempted to engage in settlement communications throughout this litigation, CAT continued to pursue discovery ('dual-tracking'), thereby unnecessarily running up both the cost of the litigation to Reichardt (and the opportunity to recover more fees from this case).  For example, contrary to CAT's assertion that "settlement negotiations … reached an impasse" in December 2022 that CAT alleges caused it to file its Complaint (Packard Declaration, ¶11 (Docket no. 73)), the following is true:

On December 14, 2022, [counsel for Reichardt] sent to [Mr. Packard] Reichardt's thorough technical and factual responses to [CAT's] October 21, 2022 60-Day Notice Letter ("Response"). That Response included a 22-page letter from [Diane Kindermann], as well as a technical letter with exhibits from [Reichardt's] late expert, Wesley Greenwood, completed just days before his unexpected death on

**OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS**

December 9, 2022. There was a combined 307 pages of material for [Mr. Packard] and [CAT] to consider. Shortly thereafter [Ms. Kindermann] requested a call with the parties' attorneys and experts to discuss the Response in furtherance of settlement, but [Mr. Packard] refused to participate in any such call. [Mr. Packard] ha[s] yet to respond to [Reichardt's] analysis in that exhaustive correspondence. In spite of this significant and material effort on the part of the Reichardts, [Mr. Packard] ignored the Response and [Reichardt's] efforts to discuss settlement, and instead chose to file and serve the above lawsuit commencing on December 22, 2022.  [Kinderman Decl., ¶7, Ex. D.]

Also, while CAT alleges that "settlement discussion [were] at an impasse" in "January 2023" that led CAT to engage in a flood of discovery (Packard Declaration, ¶13 (Docket no. 73), in fact the following was true, as stated in a letter from Ms. Kindermann on February 14, 2023:

Since the beginning of this case, we have repeatedly emphasized that the parties should spend their efforts and costs on settlement, and not on pleadings and discovery, none of which will result in protecting water quality, the purported focus of your 60-Day Notice Letter and your rapidly filed lawsuit.
…
To facilitate settlement and to accommodate the unexpected death of our expert, we agreed to a site inspection at the Defendants' facility ("Facility"). You are referring to that as a "settlement-protected site meeting." We had also agreed that after such site visit, you would provide us with a draft Consent Decree containing the terms of settlement requested by your client to enable the settlement process to conclude before any more attorneys' time is spent on litigation. Indeed, your letter of February 10 recommends a settlement process for this case which appears entirely reasonable insofar as "the Defendants expect to provide a comprehensive settlement proposal, including all the injunctive and monetary terms to settle the case, within a few weeks after the February 22 Site inspection." Also reasonable is the expectation that Defendants shall "… respond to our settlement proposal comprehensively and in writing within twenty-one (21) days."

Unreasonable however, is your concurrent demand for (a) an Answer to the Complaint; (b) an additional wet weather inspection under the FRCP; (c) an additional dry weather inspection under the FRCP; (d) responses to a staggering 96 different Requests for Admission; (e) responses to numerous Document Production Demands; (f) responses to Interrogatories; and (g) a response to a deposition of our client's Person Most Knowledgeable. Most of these are due before the "settlement-protected site meeting" even takes place. Contrary to your statement in the January 25 letter, such discovery is certainly not necessary to engaging in "meaningful settlement discussions." Rather, such discovery demands at this point in the settlement process are unreasonable and unnecessary.

…

As noted, we agree to the settlement process restated hereinabove from your letter of February 10, 2023, and due to your blunt denial of an extension, we are proceeding with the answer and discovery responses. … The costs of responding to the pleadings and discovery at this time are not reasonable. Such unnecessary efforts will certainly become an issue when attorneys' fees are discussed in our settlement process or in any post-settlement attorneys' fees motion.  [Kindermann Decl., ¶7, Ex. D.]

**OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS**

Even when Reichardt's counsel requested that CAT's expert(s) contact Reichardt's expert in order to discuss the facility and the water quality measures that CAT wanted the facility to take in order to settle the case (Kindermann Decl., ¶8), CAT either refused or did not have its expert(s) make that contact.  (Kindermann Decl., ¶8; Peterson Decl., ¶7.)

CAT argues that "settlement discussions stalled over whether Defendants are subject to the Concentrated Animal Feeding Operation ('CAFO') regulations."  (Packard Decl., ¶30.)  But even CAT's insistence on its erroneous CAFO claim should not have slowed settlement discussions.  As Reichardt's counsel told CAT's attorneys on March 7, 2023:

> While we may disagree on "the law and the facts" regarding CAFO requirements, a telephone call, and even an attempt to reach agreement on such requirements, will not be helpful or constructive.  Instead, we suggest that CAT simply put into its Consent Decree whatever it believes that RDF should do to protect water quality at its Facility, and we will give careful and serious consideration to CAT's demands, along with *every other element* of CAT's draft Consent Decree. [Declaration of Glen Hansen In Support Of Opposition To Plaintiff's Motion For Fees And Costs ("Hansen Decl."), ¶2 (emphasis added).]

But even that appeal from Reichardt's counsel did not stop CAT from insisting on expensive discovery here (as outlined in its billing records, Exhibit 12).  Financial attrition (i.e., 'dual-tracking') was the *modus operandi* here.  And when CAT finally did present its initial draft Consent Decree to Reichart on March 14, 2023, CAT did not provide "every other element*"* of the Consent Decree.  CAT "ommitt[ed] the key injunctive provisions" (Packard Decl, ¶29) and replaced those with the words:  "ADD MORE AS NEEDED."  (Kindermann Decl., ¶10.)

Meanwhile, CAT was wrongly using interrogatories to obtain the same information that Reichardt was already providing to CAT during the settlement discussions.  (*See* Joint Statement Re Discovery Disagreement No. 3, page 6, lines 17-23 (Docket no. 34).))

Then again, on May 19, 2023, when CAT's attorney claimed to be providing Reichardt with "CAT's *comprehensive*, proposed draft Consent Decree," which allegedly included "*all* of the injunctive and monetary terms under which CAT has authorized me to settle this case," the document still retained the provision "ADD MORE AS NEEDED" and still omitted the injunctive demands.  (Kindermann Decl., ¶11 (emphasis added).)  CAT was not seeking to settle this lawsuit in good faith.  With those huge omissions, CAT had no intention of participating in

**OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS**

good faith in the mandatory Settlement Conference that was scheduled for June 26, 2023.  Also, that was the first time CAT informed Reichardt of its intentions in the case to demand CAFO regulations as a part of any settlement.

While CAT audaciously complains that Reichardt's responsive draft Consent Decrees on July 24, 2023, and August 1, 2023, were somehow insufficient and/or late (Packard Decl., ¶37), CAT omits the truth that even the draft Consent Decree that CAT provided on August 4, 2023, "for discussion at the settlement conference on Tuesday, August 9th [sic]" <u>still</u> retained the provision "ADD MORE AS NEEDED" and <u>still</u> omitted the key injunctive demands. (Kindermann Decl., ¶12.)  Thus, Reichardt gave a *complete* settlement proposal at the Settlement Conference on August 8, 2023, as Magistrate Judge Hixson required of both parties, but CAT <u>continued</u> to withhold its key injunctive demands, and <u>continued</u> to retain the "ADD MORE AS NEEDED" language. (Kindermann Decl., ¶13.)   Indeed, during that entire Settlement Conference held on August 8, 2023, CAT concealed from Reichardt and Judge Hixson the key injunctive demands of CAT.  That bad faith tactic ran up the fees and costs for all sides and wasted the Court's time and efforts on August 8, 2023.

On August 10, 2023, CAT finally provided a revised Consent Decree that deleted the "ADD MORE AS NEEDED" language and revealed, *for the first time*, the multiple pages "Groundwater Monitoring", "Flow Metering" and "Soil Testing" provisions of injunctive relief that CAT was demanding of Reichardt.  (Kindermann Decl., ¶14.)  CAT even sent those new and extensive demands to Reichardt with the financial threat:  "CAT's demand for mitigation is increasing by $1,000 every day."  (Kindermann Decl., ¶14.)  Again, financial attrition was the *modus operandi*.  Recognizing the obvious need for Reichardt's experts to analyze the massive new injunctive demands that CAT dumped on Reichardt for the first time on August 10, Judge Hixson postponed the next Settlement Conference for an additional 4 weeks, to September 13, 2023.  (Docket nos. 56, 57, 58.)  But CAT never removed its extortionate threat during that delay.

Thus, CAT engaged in significant bad faith settlement tactics that unnecessarily ran up the time and expenses.  Now CAT is attempting to financially capitalize on those bad faith tactics.

**OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS**

**C.      CAT Seeks Fees For Its Own Improper Discovery Tactics, Including Fees For Discovery Motions It Lost.**

The first and primary discovery dispute in this case involved CAT's intransigence in refusing to adhere to the reasonable biosecurity measures for site inspections of the facility that were advocated by Dr. Mark Bland, the expert veterinarian for the Reichardt Duck Farm, to prevent avian flu.  CAT admits that it was aware of Reichardt's biosecurity concerns in November 2022 and again on January 25, 2023.  (Packard Decl., ¶¶9, 28, Exhibit 8 (Docket no. 81).)  But CAT was completely dismissive of the reasonable biosecurity conditions advocated by Dr. Bland for site inspections in this case.  (See Docket no. 79.)  Even after being presented with a full explanation and documentation for those biosecurity concerns from Dr. Bland, counsel for CAT responded that Reichardt's discussion of those concerns "is plainly a ham-handed pretext to prevent us from getting samples during the wet season – for which we will be seeking sanctions." (Hansen Decl., ¶3.)  But this Court explicitly agreed with those biosecurity conditions.  Over CAT's repeated and vehement objections, this Court imposed those conditions in its Discovery Order of May 1, 2023 (Docket no. 37).  CAT's unreasonable position forced Reichart to incur in excess of 95 hours of attorney work, costing Reichardt in excess of $50,000, to pursue a protective order from this Court in order to overcome CAT's refusal to accept those reasonable biosecurity restrictions.  (Kindermann Decl., ¶15.)  The billing records provided by CAT (Exhibit 12) are ambiguous as to how much time was spent by CAT's attorneys for several months opposing Dr. Bland's reasonable biosecurity conditions; but none of that time should be awarded. An across-the-board reduction in CAT's fees is warranted.  *See e.g., Eckweiler v. Nisource, Inc.,* 2019 U.S. Dist. LEXIS 51115 at *8, 2019 WL 1375774 (N.D.Ind. 2019) [ ["lack of specificity makes it impossible to tell how much of the time was spent on each motion"].

Another discovery dispute brought by CAT (dispute number 3) involved Reichardt's responses to interrogatories.  That dispute was easily resolved by the parties, and therefore did not even need to involve the Court – but CAT pursued a motion anyway.  (*See* Discovery Order, issued May 12, 2023 (Docket no. 40).)  Furthermore, much of that dispute was *created by CAT* when it demanded up to 100 years of information regarding operations at the duck farm, and not

**OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS**

the 5 years relevant to this lawsuit.  As Reichardt pointed out to the Court:

> This case certainly appears to have morphed into (a) litigation by financial attrition; (b) a not-so-veiled effort designed by Plaintiff to threaten the financial viability of Defendants' family farm; and (c) a "dual track" effort by Plaintiff to rack up far more attorneys' fees that are reasonably needed to resolve this case. The interrogatories are a key element in that strategy.  That is simply wrong. Those truths are not ad hominem attacks, and they are accurate.  Seeking 100 years of information is definitely designed to harass Defendants and places an undue burden on Defendants.  Plaintiff only backed down during the latter part of this Joint Statement process – but the inappropriate motives are clearly demonstrated in the original discovery requests.

> The mere fact that Defendants had to incur substantial attorneys' fees to engage in this Meet and Confer and Joint Statement process to get Plaintiff to limit the interrogatories to only 5 years demonstrates the financial attrition that this litigation by Plaintiff continues to inflict on Defendants.   [Joint Statement Re Discovery Disagreement No. 3, page 6, line 24 – page 7, line 6 (Docket no. 34).]

While the disputes involving Defendants' tax returns did indeed require resolution by this Court (Docket nos. 38, 50), Reichardt's objections to the document demands were reasonable in light of the initial insufficient explanations by CAT (Docket no. 38), and what other courts have held in similar circumstances.  (*See In re Yosemite National Park Hantavirus Litigation*, 2016 U.S. Dist. LEXIS 130706, 2016 WL 5335550, at *21-*23 (N.D.Cal.2016).)

Thus, a huge portion of the 164.1 hours of attorney time incurred by CAT on discovery (Packard Decl., ¶¶67-68) was unreasonable and should not be compensated.

**D.     The Billing Records Include Unnecessary Work And Lack Of Specificity.**

A significant amount of work allegedly performed by CAT was unnecessary.  For example, why should Reichardt pay for the time spent by CAT's attorneys in advising CAT how to do "*press releases*" on October 25, 2023 (.3 hours) and on November 28, 2023 (.4 hours)?

Also, CAT never explained the necessity for "field investigation" allegedly performed by its attorneys on 3/6/2023 (.9), 3/8/2023 (.7), 3/12/2023 (.6), 3/13/2023 (1.1), 3/13/2023 (2.7), 3/14/2023 (.4), 3/15/2023 (.3), 3/16/2023 (.6), 3/17/2023 (.6), 3/18/2023 (.5), 3/19/2023 (.5), 3/20/2023 (.6), 3/21/2023 (.5), 3/22/2023 (.5), 3/23/2023 (.6), 3/24/2023 (.6), 3/27/2023 (.5), 3/28/2023 (.5), 3/29/2023 (.9), 4/3/2023 (.4), 4/4/2023 (.5), 4/5/2023 (.5) and 4/7/2023 (.5).  Why should Reichardt be forced to pay for a month's worth of daily field trips for CAT's attorneys to go take a look at the duck farm, when several formal site inspections were conducted by CAT in

**OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS**

this case?  Also, those entries of "field investigation" lack sufficient specificity.  "Lawyers need to contemporaneously describe their billed time with enough specificity to allow a reasonableness finding." *Middlebrooks v. Teva Pharms. USA, Inc*., 2019 U.S. Dist. LEXIS 30530 at *2, 2019 WL 936645 (E.D.Pa., Feb. 26, 2019, Civil Case no. 17-412).

Also, even though there were several formal site inspections, CAT has not explained the reasonableness of engaging in "droning" activities on 2/22/2023 (.3), 2/23/2023 (.3), 2/24/2023 (.3), 2/27/2023 (.2), 2/28/23 (.9), 3/1/2023 (2.5), 3/1/2023 (.2), 3/7/2023 (.6), and 3/9/2023 (.2). (Kindermann Decl., ¶9.)

Such unnecessary activities and lack of specificity is further evident in the billing entries for time prior to CAT's sending out its notice of violation, as the following entries demonstrate:

| ATTORNEY | DATE | BILLING ENTRY | HOURS |
|---|---|---|---|
| Will Carlon | 2/2/2022 | investigate facility | 2.6 |
| Will Carlon | 2/14/2022 | investigate facility, build case file | 3.7 |
| Will Carlon | 5/26/2022 | investigate facility | 1.1 |
| Will Carlon | 8/31/2022 | investigate facility | .4 |
| Will Carlon | 9/20/2022 | investigate facility and draft NOV | 2.2 |
| Will Carlon | 9/21/2022 | investigate facility and draft NOV | 1.3 |
| Will Carlon | 10/11/2022 | Investigate facility | .6 |

Nor has CAT explained the necessity of having two different attorneys in attendance on behalf of CAT at the site inspection on February 22, 2023:  A. Packard (3.4); W. Carlon (2.5).

This Court should reduce the lodestar amount for such unnecessary and unspecific entries.

**E.     The Hourly Rates Sought By CAT Are Unreasonable.**

Before the Complaint was even filed in this case, CAT's attorney, Andrew Packard, explicitly told Reichardt's counsel in a letter dated November 17, 2022, about the "monetary terms" that CAT would seek toward "reimbursing CATs for its reasonable costs of suit." (Packard Decl., ¶10 (Docket No. 73), Exhibit 2 (Docket No. 75), pp. 1-2.)  Mr. Packard unequivocally stated to Reichardt that **Will Carlon's** "**current billing rate in the Northern District is $475/hour**," and **Andrew Packard's** "**rate in the Northern District is currently $725/hour.**"  (Packard Decl., ¶10, Exhibit 2 (Docket No. 75), p. 2 fn. 1 (bold added).)

Now, Mr. Packard contradicts his earlier admission.  Mr. Packard states to this Court:  "I have set my hourly billing rate for purposes of this action at $975 per hour," and "I have set Mr.

**OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS**

1   Carlon's hourly billing rate for the purposes of this action at $700 per hour." (Packard Decl.,

2   ¶¶49, 42 (Docket No. 73).) And the Motion completely avoids his earlier admission. Even the

3   declarants who express their opinion about the range and applicability of prevailing market rates

4   (Declaration of Daniel Cooper, ¶¶28, 29 (Docket No. 88), Declaration of Christopher Sproul,

5   ¶¶20-25 (Docket No. 89)), completely avoid Mr. Packard's admission of November 17, 2022, of

6   his actual $725 hourly rate and Mr. Carlon's actual $475 hourly rate "in the Northern District."

7       This Court should not allow or reward CATs' deception of admitting its attorneys' rates at

8   the beginning of the case, and then reneging on that admission at the end of the case.

9       **F.      The 59.2 Hours Incurred By CAT For This Motion Are Unreasonable.**

10      CAT's incurring "59.2 hours of attorney time" to complete the instant motion (Packard

11  Decl., ¶74), is patently unreasonable and should not be compensated. The far majority of the

12  written briefing, at least half of all the declared time entries, and probably more than half of all

13  the fees used in drafting this motion, were incurred by CAT in trying to explain why the attorney

14  fee rates should be more than what Mr. Packard explicitly declared to Reichardt on November 17,

15  2022. This Court should hold Mr. Packard to his word, and deny the fees incurred by CAT

16  seeking to avoid his word in this Motion.

17      And this Court should also reject CAT's demand that Reichardt pay for the time incurred

18  by CAT (11/28-29/2023 (total 1.6)) requesting more time for CAT to prepare this Motion.!

19      **G.      The Costs Sought By CAT Are Unreasonable.**

20      The costs sought by CAT (Motion: 4:4-7, Exhibit 13, Docket no, 86) includes $18,569 for

21  "expert" and "Lab Analysis" costs that are only described by reference to the dates and numbers

22  of five different "Inv" (invoices??). But none of those "Inv." are attached to the Motion; there is

23  no presentation of what those "Inv." say; there is no description of what expert work or lab

24  analysis was actually done; and now there is no opportunity for Reichardt to examine and discuss

25  those "Inv." Thus, there is no way for this Court to determine the reasonableness of those

26  "expert" and "Lab Analysis" costs in the amount of $18,569, and therefore they should all be

27  denied. As CAT admits: "Where a party fails to submit adequate evidence, the court may reduce

28  the amount awarded." (Motion 6:3-4.) *Cf. Thomas v. Sec'y of HHS*, 2023 U.S. Claims LEXIS

**OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS**

153 at *8, 2023 WL 2155057 (Ct. Fed. Cl. 2023) [time entries lacking in "specificity"

demonstrates that "the reasonableness of these activities" is not proven].

     Furthermore, this Court should not allow the "RT travel to facility for inspection" on

2/22/2023, 3/15/2023, 3/10/2023 and 4/25/2023.  There is no discussion of what "RT" is, why the

travel was necessary, why "64" miles is appropriate, or what authority warrants those costs.

     **H.**    **The Financial Burden That CAT Seeks To Impose On Reichardt Is Unreasonable.**

Defendant John Reichardt, the CEO Reichardt Duck Farm, Inc., Inc., explains:

> On or about November 14, 2023, animal rights extremists trespassed into the biosecurity areas of the RDF duck farm.  Those trespassers were subsequently arrested and are being prosecuted.  However, immediately after that trespass, the entire flock of ducks was infected by the Avian Influenza.

> On November 28 and 29, 2023, at the orders of the United States Department of Agriculture and the California Department of Food and Agriculture, the entire flock of ducks at RDF was depopulated pursuant federal and state Avian Influenza protocols. 170,000 ducks had to be terminated.  Federal and state agency representatives were on the Farm overseeing the depopulation mandate and subsequent decontamination of the entire RDF facility.  The facility has since been decontaminated, but we are still awaiting authorization from the United States Department of Agriculture before we can again raise ducks at the facility.

> In light of that catastrophic event, RDF is presently without any income. I, myself, have applied for and will begin Medicare on February 1, 2024 to save farm costs.  There is a high probability that I will retire or go on a partial salary to save farm costs. I have been diagnosed with cancer in the last month, I think as a result of high stress. My wife and I have discussed the idea of lending the farm money to help cover expenses.  The new excavator we purchased last September has been offered back to the dealership to help cover expenses. We are waiting for their response.

> We are no longer a meat producer, at least in the near future. Therefore, we do not have processing water or liquid manure system input in the same volumes as seen before. We will be raising egg laying ducks to have a product to market for our few remaining employees.

> We have recently spent $1,330,000 in November 2023; $843,000 in December 2023; and $953,000 in January 2024.  To date we have given $431,000 to Plaintiff CAT or Rose Foundation in settlement of this case.

> We do not expect any income until July 2024, which will be approximately $130,000 per month.

> We just laid off one-third (1/3) of our entire workforce at the facility, and we expect to let most of the other employees go by January 30, 2024.

**OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS**

1

In light of that catastrophic event and our desperate income situation, we requested in early December 2023 that plaintiff Californians For Alternatives To Toxics ("CAT") postpone the $250,000 payment to the Rose Foundation that we originally agreed to make under the Consent Decree signed in September 2023. But two weeks before Christmas, CAT flatly refused our request to postpone that payment.  CAT and its counsel, Andrew Packard, refused to make any accommodation whatsoever to our current situation, and so we went ahead and made that payment to Rose Foundation on December 8, 2023.

There is no possible way that we are able to pay an award of $431,346.67 in attorneys' fees and costs in light of the lack of income due to the depopulation of all our ducks.

If any award of attorneys' fees and costs is granted at all in this matter in favor of CAT, we request that any payment of such an award be delayed. [Declaration of John Reichardt In Support of Opposition to Plaintiff's Motion for Attorneys' Fees and Costs, ¶¶3-12

**IV.    CONCLUSION.**

This Court should deny CAT's motion for fees and costs because CAT did not obtain the relief sought in its Complaint.

Alternatively, this Court should only award a very small portion of the unreasonable lodestar attorneys' fees requested by CAT for the reasons explained above.  And any award issued by this Court must take into account the improper financial burden that CAT seeks to impose on Reichardt, as well as the realities of Reichardt's current financial condition due to the Avian Influenza's recent devastating impact on the duck farm operations.

Dated:  January 25, 2024                          ABBOTT & KINDERMANN, INC.

By: ___*/s/ Glen C. Hansen*_____
     DIANE G. KINDERMANN HENDERSON
     GLEN C. HANSEN
     Attorneys for Defendants
     REICHARDT DUCK FARM, INC., and
     JOHN REICHARDT

**OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS**