**EXHIBIT A**

ANDREW L. PACKARD (State Bar No. 168690)
WILLIAM N. CARLON (State Bar No. 305739)
Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (415) 763-9227
E-mail: andrew@packardlawoffices.com
        wncarlon@packardlawoffices.com

WILLIAM VERICK (State Bar No. 140972)
Klamath Environmental Law Center
1125 Sixteenth Street, Suite 204
Arcata, CA 95521
Tel. (707) 630-5061
Email: wverick@igc.org

Attorneys for Plaintiff
CALIFORNIANS FOR
ALTERNATIVES TO TOXICS

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIANS FOR ALTERNATIVES TO TOXICS, a non-profit corporation,<br><br>      Plaintiff,<br><br>v.<br><br>REICHARDT DUCK FARM, INC., and JOHN REICHARDT,<br><br>      Defendants. | Case No. 3:22-CV-09065-AGT<br><br>~~[PROPOSED]~~ CONSENT DECREE<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387)** |

      **WHEREAS**, Plaintiff Californians for Alternatives to Toxics (hereinafter "CAT") is a non-profit public benefit corporation organized under the laws of California, dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of California's waters, and based in Arcata, California;

      **WHEREAS**, Defendants REICHARDT DUCK FARM, INC., and JOHN REICHARDT ("Defendants") own and/or operate a 373-acre duck processing facility in Petaluma, California (hereinafter referred to as the "Facility");

- 1 -

**WHEREAS**, Defendants' primary industrial activity at the Facility is the raising and processing of ducks, and the storage of various industrial materials, including composting activities (the industrial activities at the Facility fall under Standard Industrial Classification Code 2015 ("Poultry Slaughtering and Processing");

**WHEREAS,** a site map of the Facility is attached hereto as **Exhibit A**, and incorporated herein by reference;

**WHEREAS,** CAT and Defendants collectively shall be referred to as the "Parties;"

**WHEREAS**, CAT alleges that the Defendants' Facility collects and discharges storm water into an unnamed creek, and alleges that it drains to Laguna Lake, discharges to Chileno Creek, a tributary to Walker Creek, and ultimately discharges to Tomales Bay and the Pacific Ocean;

**WHEREAS**, storm water discharges associated with industrial activity are regulated pursuant to the National Pollutant Discharge Elimination System ("NPDES"), General Permit No. CAS000001, State Water Resources Control Board ("State Board") Water Quality Order No. 14-57-DWQ, as amended by Water Quality Order 20XX-XXXX-DWQ, issued pursuant to Section 402(p) of the Clean Water Act ("Act"), 33 U.S.C. §1342(p), (hereinafter "General Permit");

**WHEREAS**, on October 21, 2022 Plaintiff provided notice of Defendants' alleged violations of the Act ("Clean Water Act Notice Letter"), and of its intention to file suit against Defendants to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the U.S. Attorney General; the Executive Director of the State Board; the Executive Officer of the Regional Water Quality Control Board, North Coast Regional Board; and to Defendants, as required by the Act, 33 U.S.C. § 1365(b)(1)(A) (a true and correct copy of CAT's Clean Water Act Notice Letter is attached hereto as **Exhibit B** and incorporated herein by reference);

**WHEREAS**, on December 22, 2022, CAT filed a complaint against Defendants in the United States District Court, Northern District of California (this matter is hereinafter referred to as "the Action");

**WHEREAS**, on March 17, 2023 Plaintiff provided supplemental notice of Defendants'

- 2 -

alleged violations of the Act ("Supplemental Notice Letter"), and of its intention to file suit against Defendants to the Administrator of the EPA; the Administrator of EPA Region IX; the U.S. Attorney General; the Executive Director of the State Board; the Executive Officer of the Regional Water Quality Control Board, San Francisco Bay Regional Board ("Regional Board"); and to Defendants, as required by the Act, 33 U.S.C. § 1365(b)(1)(A) (a true and correct copy of CAT's Supplemental Notice Letter is attached hereto as **Exhibit C** and incorporated herein by reference);

**WHEREAS**, on May 17, 2023, CAT filed an Amended Complaint pursuant to the Parties' stipulation;

**WHEREAS**, the Parties agree that it is in their mutual interest to resolve this matter as to all entities and persons named in the Clean Water Act Notice Letters without litigation and enter into this Decree;

**WHEREAS**, the parties agree that Defendants' entering into this Consent Decree ("Decree") is not any admission of liability by Defendants regarding the claims made by Plaintiff in the Action, and compliance with this Decree shall neither be deemed to be in compliance with the General Permit or the Clean Water Act, nor shall it be deemed any admission of non-compliance with either the General Permit or the Clean Water Act;

**WHEREAS**, Defendants deny the occurrence of the violations alleged in the Clean Water Act Notice Letters and maintain that they have complied at all times with the provisions of the General Permit and the Clean Water Act;

**WHEREAS**, within five (5) calendar days of mutual execution, this Decree shall be submitted to the United States Department of Justice for the 45-day statutory review period, pursuant to 33 U.S.C. § 1365(c);

**AND WHEREAS**, within ten (10) calendar days of expiration of the statutory review period, or the earlier receipt of non-objection from the United States Department of Justice, Plaintiff shall file with the Court a Request for Entry of Consent Decree (the date of entry of the Consent Decree shall be referred to herein as the "Court Entry Date").

**NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE PARTIES, AND ORDERED AND DECREED BY THE COURT AS FOLLOWS:**

For the purposes of this Decree, the Parties agree that:

(a) the Court has jurisdiction over the subject matter of this action pursuant to Section 505(a)(1)(A) of the Clean Water Act, 33 U.S.C. § 1365(a)(1)(A);

(b) venue is appropriate in the United States District Court for the Northern District of California pursuant to Section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because the Facility at which the alleged violations took place is located within this District;

(c) the Complaint states claims upon which relief may be granted against Defendants pursuant to Section 505 of the Clean Water Act, 33 U.S.C. § 1365;

(d) Plaintiff has standing to bring this action; and,

(e) the Court shall retain jurisdiction over this matter for purposes of interpreting, modifying, or enforcing the terms of this Decree for the life of the Decree, or as long thereafter as is necessary for the Court to resolve any motion to enforce this Decree.

## I.     COMMITMENTS OF DEFENDANTS

1.     **Compliance with General Permit and the Clean Water Act**.  Throughout the term of this Decree, Defendants shall comply with all the requirements of the General Permit and the Clean Water Act, subject to any defenses available under the law.

2.     **Implementation of Specific Storm Water Best Management Practices**.  Unless otherwise indicated below, on or before **November 15, 2023**, Defendants shall complete the implementation and incorporation into the Facility's Storm Water Pollution Prevention Plan ("SWPPP") of the following storm water source control measures and Best Management Practices ("BMPs") at the Facility:

(a)     **Mandatory Minimum Best Management Practices**.  Defendants shall implement all mandatory minimum BMPs set forth in Section X.H of the General Permit.

(b)     **Facility Site Map Improvements**.  Defendants shall develop a Facility site map that complies with all of the requirements of Section X.E.1-3 of the General Permit, including the

- 4 -

description and location of all industrial operations and buildings, storm water and wastewater flow paths, manure storage areas, and vehicular traffic sufficient to enable an accurate estimation of retention requirements for the Facility.

(c)  **Comprehensive Assessment of the Facility's Wastewater Generation & Storage Capacities**.  Defendants shall provide to Plaintiff a comprehensive written assessment of the Facility's wastewater generation and storage capacities including but not limited to measurements and calculations (not estimates) of the Facility's three (3) main storage ponds (Ponds A, B and C), as well as the six (6) ponds within the Facility north of Middle Two Rock Road.  This data shall be used by Defendants to inform Defendants' SWPPP, Waste Management Plan, Nutrient Management Plan and Monitoring and Reporting Plan (as further described below).

(d)  **Waste Management Plan ("WMP")**.  On or before **January 1, 2024**, Defendants shall provide to Plaintiff a draft a site-specific Waste Management Plan ("WMP"), for review and comment.  The WMP shall comply with the technical standards specified in Attachment C of the *General Waste Discharge Requirements for Confined Animal Facilities within the San Francisco Bay Region*, including but not limited to California Code of Regulations, Title 27, Sections 22562(a), which states: "Confined animal facilities shall be designed and constructed to retain all facility wastewater generated, together with all precipitation on, and drainage through, manured areas during a 25-year, 24-hour storm."  Plaintiff shall provide its comments and responses to the draft WMP to Defendants.  There is no deadline for Plaintiff to provide such comments and responses.   The parties shall meet and confer within 30 days of Defendants' receipt of Plaintiff's comments and responses to resolve any concerns regarding the sufficiency of the draft WMP, which meet and confer process may include, if the parties agree, participation of the Magistrate Judge in a conference between the Parties, and such meet and confer shall be completed within 30 days of Defendants' receipt of Plaintiff's comments and responses unless the Parties mutually agree otherwise.  If the meet and confer process does not resolve the dispute, then either Party may request the Court to resolve the dispute through a motion to enforce this Consent Decree.  The Final WMP shall be completed within 60 days of the latest of the following: (1) Defendants' receipt of Plaintiff's comments and responses; (2) completion of the 30-day meet and confer

- 5 -

process, if invoked; or (3) the Court's resolution of any motion to enforce this Consent Decree.  If, however, the comments received from Plaintiff or necessary third-party generated information received after the execution of the Consent Decree, and not known to Defendants before the execution of the Consent Decree, are such that Defendants cannot reasonably complete the Final WMP within 60 days, then the parties shall promptly meet and confer, as provided above, regarding additional time for Defendants to complete the Final WMP.  "Necessary third-party generated information" in the preceding sentence shall mean new, directly-measured, or collected data representative of activities at the facility required from third parties for the preparation of the WMP in accordance with this Consent Decree.  "Third parties" in the preceding sentence shall be limited to Natural Resources Conservation Service, Sonoma County, PG&E, chemists, soil engineers, waste water engineers, geologists, and laboratories.  If the meet and confer regarding additional time does not resolve the dispute, then either Party may request the Court to resolve the dispute and provide a deadline by which Defendants shall complete the Final WMP.

(e)  **Nutrient Management Plan ("NMP")**.  On or before **January 1, 2024**, Defendants shall provide to Plaintiff a draft Nutrient Management Plan ("NMP") for review and comment.  The NMP shall comply with the minimum requirements in Attachment D of the *General Waste Discharge Requirements for Confined Animal Facilities within the San Francisco Bay Region*. Plaintiff shall provide its comments and responses to the draft NMP to Defendants.  There is no deadline for Plaintiff to provide such comments and responses.  The Parties shall meet and confer within 30 days of Defendants' receipt of Plaintiff's comments and responses to resolve any concerns regarding the sufficiency of the draft NMP, which meet and confer process may include, if the parties agree, participation of the Magistrate Judge in a conference between the Parties, and such meet and confer shall be completed within 30 days of Defendants' receipt of Plaintiff's comments and responses unless the Parties mutually agree otherwise.  If the meet and confer process does not resolve the dispute, then either Party may request the Court to resolve the dispute through a motion to enforce this Consent Decree.  The Final NMP shall be completed within 60 days of the latest of the following: (1) Defendants' receipt of Plaintiff's comments and responses; (2) completion of the 30-day meet and confer process, if invoked; or (3) the Court's resolution of

- 6 -

any motion to enforce this Consent Decree. If, however, the comments received from Plaintiff or necessary third-party generated information received after the execution of the Consent Decree, and not known to Defendants before the execution of the Consent Decree are such that Defendants cannot reasonably complete the Final NMP within 60 days, then the parties shall promptly meet and confer, as provided above, regarding additional time for Defendants to complete the Final NMP. "Necessary third-party generated information" in the preceding sentence shall mean new, directly-measured, or collected data representative of activities at the facility required from third parties for the preparation of the NMP in accordance with this Consent Decree. "Third parties" in the preceding sentence shall be limited to Natural Resources Conservation Service, Sonoma County, PG&E, chemists, soil engineers, waste water engineers, geologists, and laboratories. If the meet and confer regarding additional time does not resolve the dispute, then either party may request the Court to resolve the dispute and provide a deadline by which Defendants shall complete the Final NMP.

Consistent with Attachment D of the *General Waste Discharge Requirements for Confined Animal Facilities within the San Francisco Bay Region*, Defendants shall implement measures to protect surface waters. All wastewater discharges to land, such as spray irrigation, must be conducted during non-rainy or non-saturated conditions, must not result in runoff to surface waters, and must infiltrate completely within 72 hours after application. For the purposes of this agreement, Defendants shall not apply wastewater to land during the months of January, February or March.

(f) **Monitoring and Reporting Plan for Land Application Areas ("MRP")**. On or before **January 1, 2024**, Defendants shall provide to Plaintiff a draft Monitoring and Reporting Plan ("MRP") for review and comment. The MRP shall comply with the minimum requirements in Attachment A of the *General Waste Discharge Requirements for Confined Animal Facilities within the San Francisco Bay Region*. Plaintiff shall provide its comments and responses to the draft MRP to Defendants. There is no deadline for Plaintiff to provide such comments and responses. The parties shall meet and confer within 30 days of Defendants' receipt of Plaintiff's comments and responses to resolve any concerns regarding the sufficiency of the MRP which meet and confer

- 7 -

process may include, if the parties agree, participation of the Magistrate Judge in a conference between the parties, and such meet and confer shall be completed within 30 days of Defendants' receipt of Plaintiff's comments and responses unless the parties mutually agree otherwise. If the meet and confer process does not resolve the dispute, then either party may request the Court to resolve the dispute through a motion to enforce this Consent Decree. The Final MRP shall be completed within 60 days of the latest of the following: (1) Defendants' receipt of Plaintiff's comments and responses; (2) completion of the 30-day meet and confer process, if invoked; or (3) the Court's resolution of any motion to enforce this Consent Decree. If, however, the comments received from Plaintiff or necessary third-party generated information received after the execution of the Consent Decree, and not known to Defendants before the execution of the Consent Decree, are such that Defendants cannot reasonably complete the Final MRP within 60 days, then the parties shall promptly meet and confer, as provided above, regarding additional time for Defendants to complete the Final MRP. "Necessary third-party generated information" in the preceding sentence shall mean new, directly-measured, or collected data representative of activities at the facility required from third parties for the preparation of the MRP in accordance with this Consent Decree. "Third parties" in the preceding sentence shall be limited to Natural Resources Conservation Service, Sonoma County, PG&E, chemists, soil engineers, waste water engineers, geologists, and laboratories. If the meet and confer process regarding additional time does not resolve the dispute, then either party may request the Court to resolve the dispute and provide a deadline by which Defendants shall complete the Final MRP.

Under the MRP, Defendants shall sample storm water discharges from land application areas to surface water through means detailed in the MRP; groundwater well monitoring shall be sampled through the means detailed in the MRP. The analytical results for those samples shall inform water quality conditions and management practices.

(g)     **IGP Monitoring Implementation Plan ("IGP-MIP").** To better characterize the sources of nutrient and bacteria loading from portions of the site, sampling must occur at representative discharge points, consistent with Section XI.B of the Industrial General Permit. The IGP-MIP in the SWPPP shall identify sampling locations for discharges including, but not limited

- 8 -

to, roof discharges, runoff of stormwater or non-stormwater discharges from the slaughterhouse, and the 'rainwater catch pond/ sediment basin.  On or before **December 1, 2023**, Defendants shall provide to Plaintiff a draft IGP-MIP for Plaintiff's review and comment.  The IGP-MIP shall comply with the requirements of Sections X.I and XI.A-C of the Industrial General Permit. Plaintiff shall provide its comments and responses to the draft IGP-MIP to Defendants.  There is no deadline for Plaintiff to provide such comments and responses.  The parties shall meet and confer within 30 days of Defendants' receipt of Plaintiff's comments and responses to resolve any concerns regarding the sufficiency of the IGP-MIP which meet and confer process may include, if the parties agree, participation of the Magistrate Judge in a conference between the parties, and such meet and confer shall be completed within 30 days of Defendants' receipt of Plaintiff's comments and responses unless the parties mutually agree otherwise. If the meet and confer process does not resolve the dispute, then either party may request the Court to resolve the dispute through a motion enforce this Consent Decree.  The Final IGP-MIP shall be completed within 60 days of the latest of the following: (1) Defendants' receipt of Plaintiff's comments and responses; (2) completion of the 30-day meet and confer process, if invoked; or (3) the Court's resolution of any motion to enforce this Consent Decree.  If, however, the comments received from Plaintiff or necessary third-party generated information received after the execution of the Consent Decree, and not known to Defendants before the execution of the Consent Decree are such that Defendants cannot reasonably complete the Final IGP-MIP within 60 days, then the parties shall promptly meet and confer, as provided above, regarding additional time for Defendants to complete the Final IGP-MIP.  "Necessary third-party generated information" in the preceding sentence shall mean new, directly-measured, or collected data representative of activities at the facility required from third parties for the preparation of the IGP-MIP in accordance with this Consent Decree.  "Third parties" in the preceding sentence shall be limited to Natural Resources Conservation Service, Sonoma County, PG&E, chemists, soil engineers, waste water engineers, geologists, and laboratories.  If the meet and confer process regarding additional time does not resolve the dispute, then the parties may request the Court to resolve the dispute and provide a deadline by which Defendants shall complete the Final IGP-MIP.

(h)     **Compliance Oversight.**  On or before **November 15, 2023**, Defendants shall provide to Plaintiff the revised Facility Site Map, and assessment required under Paragraphs I.2 (b) and (c) above (the "Planning Documents") for review.  In the event that Plaintiff believes any of the Planning Documents are incomplete or do not otherwise meet the requirements of this Consent Decree, the Parties shall promptly meet and confer pursuant to the meet and confer processes provided in Section I, subsections (d), (e), (f) and (g).

(i)     **General Permit Discharge Prohibitions**.  On or before **January 1, 2024**, Defendants shall undertake any Facility improvements required to manage all process water flow, and flows of storm water contacting manured areas, that are likely to accumulate up to and during a 25-year, 24-hour storm event.

(j)     **Waste Management Standards.**  On or before **October 15, 2023**, Defendants shall undertake all measures required to eliminate and prevent the discharge of wastewater or unauthorized discharge of storm water as described in the IGP from the Facility Production Area to the unnamed creek.  Defendants shall be prohibited from applying waste water to land owned, leased or otherwise controlled by them until they have implemented legally sufficient WDRs, a legally sufficient WMP, a legally sufficient NMP and a legally sufficient MRP.

(k)     **Increased Employee Training**. Defendants shall increase training for Defendants' Storm Water Pollution Prevention Team ("SWPPT"), including holding one training meeting in January and one training meeting in October of each year.  Defendants will incorporate the holding of these twice-annual meetings in its new SWPPP.  Defendants shall target training on identifying a Qualifying Storm Event ("QSE"), undertaking visual monitoring, and logging and properly reporting data in the Facility's SWPPP, Annual Report and the State's on-line reporting system ("SMARTS").  Defendants shall record these meetings with the date, materials covered, written agenda, and a list of attendees for each, and shall retain these records with each Facility's SWPPP. Defendants shall have at least one member of the SWPPT, that meets the certification qualifications, be formally certified as a Qualified Industrial Storm Water Practitioner ("QISP");

(l)     **Rain Data**.  Defendants shall install and maintain an automated rain gauge at the Facility; the Parties may also use publicly-available rain data to resolve any disputes under this Decree.

- 10 -

(m)     **Groundwater Monitoring.**  The Parties disagree about whether Defendants' land application of wastewater over the past sixty-five years has been conducted at agronomic rates, and whether these practices have impacted groundwater at or downstream of the Facility.  For the purposes of compromise, Defendants agree to incorporate into the MRP the requirement that Defendants monitor groundwater for Nitrate and Total Coliform Bacteria consistent with the minimum requirements in Attachment A of the *General Waste Discharge Requirements for Confined Animal Facilities within the San Francisco Bay Region*.  To that end, Defendants shall install eight (8) individual boreholes for the purposes of groundwater monitoring of the first water table encountered, which boreholes shall be permitted by the County of Sonoma, shall comply with the requirements for monitoring wells provided in California Department of Water Resources Standard Bulletin 74-90, and shall be drilled by a California C-57 licensed contractor.  Four will be placed immediately down-gradient of the wastewater treatment storage Ponds A, B, and C; four farther down-gradient; or at other locations to be mutually determined by the parties, to sample for the constituents above.  The parties understand that, for a variety of reasons, boreholes may not always function as intended, and that in such event, if any borehole location fails to serve the purposes of this Consent Decree, a replacement location will be mutually determined by the parties, promptly.  These eight boreholes shall remain fully operative for the full Term of this Consent Decree.

(n)     **Flow Metering and Moisture Measuring.**  For the Term of this Consent Decree, Defendants shall ensure that all application of the Facility's wastewater to land, whether part of the Facility or off-site, is measured by flow meters.  Any application to land shall be followed by daily moisture measurements using a portable moisture meter at multiple depths in each area of irrigation.  The NMP also shall define moisture levels for comparison to field readings that will indicate if a field is reaching saturation, and shall identify corrective actions if field saturation is reached.  All application areas shall be equipped with at least two (2) moisture sensor stations, each of which shall include a data logger with sensors at 1-foot, 2-foot and 3-foot depths. These moisture readings shall be considered against projected evapotranspiration and anticipated crop needs, and application recommendations shall be made accordingly, for each field weekly.  The

- 11 -

sensor system shall be outfitted with an alarm function to immediately notify Defendants if the moisture level in the third foot sensor reaches field capacity. If the moisture level in the third foot sensor reaches field capacity, then all application of wastewater to that field shall cease until remediated. Defendants agree to incorporate flow metering of irrigation water for the purpose of documenting irrigation water applied to specific fields. Defendants also agree to incorporate soil moisture data collection into the NMP as appropriate for site-specific conditions to be developed during the NMP process.

(o)     **Soil Testing to Ensure Safe Wastewater Application Practices.** Defendants shall conduct soil testing and the NMP shall evaluate the following criteria to ensure safe wastewater application practices: (i) wastewater application rates at the Facility shall be based on residual soil nitrogen and phosphorous levels to ensure that the Facility's wastewater is applied in agronomic quantities and rates as defined herein; (ii) for all lands to which the Facility's wastewater is applied (whether owned or leased, or whether part of the Facility or off-site, on nearby properties) Defendants shall conduct annual Summer soil sampling to determine (a) the average nitrate-nitrogen plus ammonium-nitrogen concentrations in each of the top two feet of the soil column; and (b) the average available phosphorous concentrations in each of the top two feet of the soil column; (iii) on or before September 1st of each year, Defendants shall provide this sampling data to Plaintiff; (iv) in the event that this sampling indicates average nitrate-nitrogen plus ammonium-nitrogen concentrations in the top two feet of the soil column above 15 mg N/kg (the "Nitrate-Nitrogen plus Ammonium-Nitrogen Action Level"), OR average available phosphorous concentrations in the top two feet of the soil column above 300 mg P/kg ppm (the "Phosphorous Action Level"); and (v) the Parties shall meet and confer under the meet-and-confer provisions herein in subsections 2(d), 2(e), 2(f), 2(g) and 2(h), above to agree upon all additional measures required to address high concentrations and reduce them to concentrations below the two Action Levels in the NMP. In the event that any fields exceed either of the two Action Levels for two consecutive years, land application of wastewater to these fields shall cease until further soil testing demonstrates concentrations below the two Action Levels. The NMP for these fields shall be modified to reduce these concentrations to below the two Action Levels. The Parties understand

- 12 -

that these two Action Levels reflect a settlement compromise intended to achieve significant reduction of ongoing impacts and may not represent the scientific standards that may be needed to provide full, long-term environmental remediation and protection.

3.      **SWPPP Amendments**.  On or before **November 15, 2023**, Defendants shall amend the Facility SWPPP to incorporate all of the relevant requirements of this Decree and the General Permit.  These revisions shall reflect all then-current site conditions and practices and identify potential contaminants of concern, identify the location of all pervious and impervious areas, drop inlets, BMPs, and storm water conveyance and direction.  These revisions shall also provide for required data logging; and required weekly monitoring and maintenance of all Facility collection and discharge points during the Wet Season; and the twice-annual storm water management training for Facility employees referenced above.

4.      **Sampling Frequency**.   For the 2023-2024, 2024-2025 and 2025-2026 reporting years ending June 30th (2024, 2025 and 2026), Defendants shall collect and analyze samples at the Facility from three (3) Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 to December 31), and three (3) QSEs within the second half of each reporting year (January 1 to June 30).  The storm water sample results shall be compared with the values set forth in Exhibit D, attached hereto, and incorporated herein by reference.  If the results of any such samples exceed the parameter values set forth in **Exhibit D,** Defendants shall comply with the "Action Memorandum" requirements set forth below.

5.      **Sampling Parameters**.  All six (6) samples in each reporting year shall be analyzed for each of the constituents listed in **Exhibit D**, including TMDLs, as applicable, by a laboratory accredited by the State of California.  All samples collected from the Facility shall be delivered to the laboratory as soon as possible to ensure that sample "hold time" is not exceeded.  Analytical methods used by the laboratory shall comply with General Permit requirements in regard to both test method and detection limit.  See General Permit, Table 2, at 43.  Sampling results shall be provided to CAT within ten (10) days of Defendants' receipt of the laboratory report from each sampling event, pursuant to the Notice provisions below.

6.     **"Action Memorandum" Trigger; CAT's Review of "Action Memorandum"; Meet-and-Confer.**  If any sample taken during the two (2) reporting years referenced in Paragraph 4 above exceeds the Evaluation Levels set forth in Exhibit D , or if Defendants fail to collect and analyze samples from six (6) QSEs, then Defendants shall prepare a written statement discussing the exceedance(s) and/or failure to collect and analyze samples from six (6) storm events, the possible cause and/or source of the exceedance(s), and any additional measures that will be taken to address and eliminate future exceedances and/or failures to collect required samples ("Action Memorandum").

The Action Memorandum shall be provided to CAT not later than July 15 following the conclusion of each reporting year, on July 15, 2024, July 15, 2025 and July 15, 2026.  Such additional BMPs may include, but are not limited to, further feasible material improvements to the storm water collection and discharge system, changing the type and frequency of Facility sweeping, changing the type and extent of storm water filtration media or modifying other industrial activities or management practices at the Facility as feasible.  Such additional measures, to the extent feasible, shall be implemented immediately and in no event later than sixty (60) days after the due date of the Action Memorandum.  Within thirty (30) days of implementing BMP modifications, the Facility SWPPP shall be amended to include all additional BMP measures designated in the Action Memorandum.  CAT may review and comment on an Action Memorandum and suggest any additional pollution prevention measures it believes are appropriate; however, CAT's failure to do so shall not be deemed to constitute agreement with the proposals set forth in the Action Memorandum.  Upon request by CAT, Defendants agree to meet and confer in good faith (at the Facility, if requested by Plaintiff) regarding the contents and sufficiency of the Action Memorandum.

7.     **Inspections During the Term of this Decree**.  Subject to any limitations imposed on-site inspections by any Court order(s) herein, and in addition to any site inspections conducted as part of the settlement process and the meet-and-confer process concerning an Action Memorandum as set forth above, or any site visits to implement the terms of this agreement, such as the groundwater monitoring plan implementation, CAT may perform up to four (4) physical

- 14 -

inspections of the Facility during the term of this Decree. These inspections would be performed by CAT's counsel and consultants in accordance with all court restrictions imposed in the Discovery Order issued on May 1, 2023 (Docket No. 35), or any other orders of the Court herein and may include sampling, photographing, and/or videotaping. Those restrictions are as follows: Defendants shall provide CAT with a copy of all sampling reports, photographs and/or video taken by Defendants and/or their representatives during the inspections. CAT shall provide at least seventy-two (72) hours' advance notice of such physical inspection, and Defendants shall have the right to deny access if circumstances would make the inspection unduly burdensome and pose significant interference with business operations or any party/attorney, or the safety of individuals. In such case, Defendants shall specify at least three (3) dates within the two (2) weeks thereafter upon which a physical inspection by CAT may proceed. Defendants shall not make any alterations to Facility conditions during the period between receiving CAT's initial seventy-two (72) hour advance notice and the start of CAT's inspection that Defendants would not otherwise have made but for receiving notice of CAT's request to conduct a physical inspection of the Facility, excepting any actions taken in compliance with any applicable laws or regulations. Nothing herein shall be construed to prevent Defendants from continuing to implement any BMPs identified in the SWPPP or any WDRs during the period prior to an inspection by CAT or at any time.

8.     **Communications to/from Regional and State Water Boards**. During the term of this Decree, Defendants shall provide CAT with courtesy copies of all documents submitted to, or received from, the Regional Water Board or the State Water Board concerning storm water discharges from the Facilities, including, but not limited to, all documents and reports submitted to the Regional Water Board and/or State Water Board as required by the current General Permit. Such documents and reports shall be provided to CAT via email pursuant to the Notice provisions set forth below and contemporaneously with Defendants' submission(s) to, or, receipt from, such agencies.

9.     **SWPPP Amendments**.  Pursuant to the Notice provisions set forth below, Defendants shall provide CAT with a copy of any amendments to the Facility SWPPP made during the term of the Decree within fourteen (14) days of such amendment.

## II.     MITIGATION, COMPLIANCE MONITORING, AND FEES AND COSTS

10.     **Environmental Mitigation Project**.  As mitigation to address any potential harms from the Clean Water Act violations alleged in the Action, Defendants agree to pay the sum of $250,000 to the Rose Foundation for Communities and the Environment for projects to improve water quality in the impacted watersheds.  Such mitigation payment shall be remitted directly to the Rose Foundation at: Rose Foundation, Attn: Tim Little, 201 4th Street, Suite 102, Oakland, CA 94607-4369 within ten (10) days after the Court Entry Date.

11.     **Compliance Monitoring Funding**.  To defray CAT's reasonable investigative, expert, consultant and attorneys' fees and costs associated with monitoring Defendants' compliance with this Decree, Defendants agree to pay the sum of $70,000 to a compliance monitoring fund maintained by counsel for CAT as described below.  Payment shall be made payable to the "Law Offices of Andrew L. Packard Attorney Client Trust Account" and remitted to Plaintiff's counsel by ACH or wire transfer within ten (10) days after the Court Entry Date.

On the date one year from Court Entry Date, and each year thereafter, Plaintiff's counsel shall submit an annual statement to Defendants summarizing their hours spent on compliance monitoring activities and costs.  Plaintiff shall only withdraw from the compliance monitoring fund an amount for the time and costs that Plaintiff actually incurred pursuant to this Consent Decree.  If there is a balance remaining after the Termination Date, Plaintiff shall so indicate on the final annual statement and shall remit such unused balance to Defendants.

Compliance monitoring activities may include, but shall not be limited to, site inspections, review of water quality sampling reports, review of annual reports, and discussions with Defendants concerning the ERA reporting requirements of the General Permit as specifically set forth herein.  Compliance monitoring funds shall not be used to pay attorneys' fees and costs associated with negotiating any amendments to this Decree; the recovery of any such fees or costs shall be addressed in the amendment to this Decree.

12. **Reimbursement of Fees & Costs**. Defendants agree to reimburse CAT in the amount to be decided upon Plaintiff's application to the Court, which shall be filed after the submission of this Consent Decree to the United States Department of Justice for review pursuant to 33 U.S.C. § 1365(c) and the entry of this Consent Decree by this Court.

## III. <u>DISPUTE RESOLUTION, ENFORCEMENT, WAIVERS AND RELEASES</u>

13. Unless as provided in Section I.2, subsections (d), (e), (f), (g), (h) and (o), if a dispute under this Decree arises, or either Party believes that a breach of this Decree has occurred, the Parties shall meet and confer within seven (7) days of receiving written notification from the other Party of a request for a meeting to determine whether a breach has occurred and to develop a mutually agreed upon plan, including implementation dates, to resolve the dispute, which meet and confer process may include, if the parties agree, participation of the Magistrate Judge in a conference between the parties. If the Parties fail to meet and confer, or the meet-and-confer does not resolve the issue, after at least seven (7) days have passed after the meet-and-confer occurred or should have occurred, either Party shall be entitled to all rights and remedies under the law, including filing a motion with the United States District Court of California, Northern District, which shall retain jurisdiction over the Action until the Termination Date for the limited purposes of enforcement of the terms of this Decree. The Parties shall be entitled to seek fees and costs incurred in any such motion, and such fees and costs shall be awarded, pursuant to the provisions set forth in the then-applicable federal Clean Water Act and Rule 11 of the Federal Rules of Civil Procedure, and applicable case law interpreting such provisions.

14. **CAT's Waiver and Release**. Upon the Court Entry Date of this Decree, CAT, on its own behalf and on behalf of its members, subsidiaries, successors, assigns, directors, officers, agents, attorneys, representatives, and employees, releases Defendants and its officers, directors, employees, shareholders, parents, subsidiaries, and affiliates, and each of its predecessors, successors and assigns, and each of their agents, attorneys, consultants, and other representatives (each a "Released Defendant Party") from, and waives all claims arising from or pertaining to the Notice Letters and this Action, including, without limitation, all claims for injunctive relief, damages, penalties, fines, sanctions, mitigation (excluding all fees of attorneys, experts, and

- 17 -

others, and costs per Section II above), or any other sum incurred or claimed or which could have been claimed under the Clean Water Act in this Action, for the alleged failure of Defendants to comply with the Clean Water Act at the Facility, up to the Court Entry Date.

15.     **Defendants' Waiver and Release**.   Upon the Court Entry Date of this Decree Defendants, on their own behalf and on behalf of any Released Defendant Party under its control, release CAT (and its officers, directors, employees, members, parents, subsidiaries, and affiliates, and each of their successors and assigns, and its agents, attorneys, and other representative) from, and waives all claims which arise from or pertain to the Action, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or timely claimed or which could have been timely claimed for matters associated with or related to the Action.

## IV.     <u>MISCELLANEOUS PROVISIONS</u>

16.     The Parties enter into this Decree for the purpose of avoiding prolonged and costly litigation of the Clean Water Act claims in the Action.  Nothing in this Decree shall be construed as, and Defendants expressly do not intend to imply, an admission as to any fact, finding, issue of law, or violation of law, nor shall compliance with this Decree constitute or be construed as an admission by Defendants of any fact, finding, conclusion, issue of law, or violation of law, nor deemed to be compliance with the General Permit or the Clean Water Act.  However, this paragraph shall not diminish or otherwise affect the obligation, responsibilities, and duties of the Parties under this Decree.

17.     The Decree shall be effective upon mutual execution by all Parties.  The Decree shall terminate on the "Termination Date," which shall be **November 1, 2026**.

18.     The Decree may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document.  An executed copy of this Decree shall be valid as an original.

19.     In the event that any one of the provisions of this Decree is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

20.     The language in all parts of this Decree, unless otherwise stated, shall be construed according to its plain and ordinary meaning.  This Decree shall be construed pursuant to the law of the United States, without regard to choice of law principles.

21.     The undersigned are authorized to execute this Decree on behalf of their respective Parties and have read, understood and agreed to be bound by all of the terms and conditions of this Decree.

22.     All agreements, covenants, representations and warranties, express or implied, oral or written, of the Parties concerning the subject matter of this Decree are contained herein.  This Decree and its attachments are made for the sole benefit of the Parties, and no other person or entity shall have any rights or remedies under or by reason of this Decree, unless otherwise expressly provided for therein.

23.     **Notices**.  Any notices or documents required or provided for by this Decree or related thereto that are to be provided to CAT pursuant to this Decree shall be sent by electronic mail transmission to the email addresses listed below:

Patricia Clary, Executive Director
E-mail: patty@alt2tox.org

With copies sent to:
William Verick
Email: wverick@igc.org

And to:
Andrew L. Packard
E-mail: andrew@packardlawoffices.com

And
William Carlon
E-mail: wncarlon@packardlawoffices.com

Any notices or documents required or provided for by this Decree or related thereto that are to be provided to Defendants pursuant to this Decree shall be sent by electronic mail transmission to the email addresses listed below:

John Reichardt
Email:  john.reichardt@gmail.com

With copies sent to:

- 19 -

Diane G. Kindermann
Email: dkindermann@aklandlaw.com

Each Party shall promptly notify the other of any change in the above listed contact information.

24. Signatures of the Parties transmitted by facsimile or email shall be deemed binding.

25. If for any reason the Court should decline to approve this Decree in the form presented, the Parties shall use their best efforts to work together to modify the Decree within thirty (30) days so that it is acceptable to the Court. If the Parties are unable to modify this Decree in a mutually acceptable manner, this Decree shall become null and void.

26. This Decree shall be deemed to have been drafted equally by the Parties, and shall not be interpreted for or against any Settling Party on the ground that any such party drafted it.

27. This Decree and the attachments contain all of the terms and conditions agreed upon by the Parties relating to the matters covered by the Decree, and supersede any and all prior and contemporaneous agreements, negotiations, correspondence, understandings, and communications of the Parties, whether oral or written, respecting the matters covered by this Decree. This Decree may be amended or modified only by a writing signed by the Parties or their authorized representatives. Any amendments to this Decree shall be subject to the United States Department of Justice's 45-day statutory review as set forth in 33 U.S.C. § 1365(c).

The Parties hereto enter into this Decree and respectfully submit it to the Court for its entry.

APPROVED AS TO CONTENT:

Dated: _September 26_, 2023   CALIFORNIANS FOR ALTERNATIVES TO TOXICS

           By: _Patricia M Clary_
           Patricia Clary, Executive Director

Dated: _____, 2023   REICHARDT DUCK FARM, INC.

           By: _____
           John Reichardt, General Manager

Dated: _____, 2023   JOHN REICHARDT

- 20 -

[PROPOSED] CONSENT DECREE

Case No: 3:22-CV-09065-AGT

Diane G. Kindermann
Email: dkindermann@aklandlaw.com

Each Party shall promptly notify the other of any change in the above listed contact information.

24.     Signatures of the Parties transmitted by facsimile or email shall be deemed binding.

25.     If for any reason the Court should decline to approve this Decree in the form presented, the Parties shall use their best efforts to work together to modify the Decree within thirty (30) days so that it is acceptable to the Court. If the Parties are unable to modify this Decree in a mutually acceptable manner, this Decree shall become null and void.

26.     This Decree shall be deemed to have been drafted equally by the Parties, and shall not be interpreted for or against any Settling Party on the ground that any such party drafted it.

27.     This Decree and the attachments contain all of the terms and conditions agreed upon by the Parties relating to the matters covered by the Decree, and supersede any and all prior and contemporaneous agreements, negotiations, correspondence, understandings, and communications of the Parties, whether oral or written, respecting the matters covered by this Decree. This Decree may be amended or modified only by a writing signed by the Parties or their authorized representatives. Any amendments to this Decree shall be subject to the United States Department of Justice's 45-day statutory review as set forth in 33 U.S.C. § 1365(c).

The Parties hereto enter into this Decree and respectfully submit it to the Court for its entry.

APPROVED AS TO CONTENT:

Dated: _____, 2023          CALIFORNIANS FOR ALTERNATIVES TO TOXICS

By: _____
Patricia Clary, Executive Director

Dated: _9/26/2023_, 2023          REICHARDT DUCK FARM, INC.

By: _John Reichardt_
John Reichardt, General Manager

Dated: _9/26/2023_, 2023          JOHN REICHARDT

- 20 -

[PROPOSED] CONSENT DECREE

Case No: 3:22-CV-09065-AGT

By: _____
JOHN REICHARDT

APPROVED AS TO FORM:

Dated: _____, 2023        LAW OFFICES OF ANDREW L. PACKARD


By:_____
Andrew L. Packard
Attorneys for Plaintiff
CALIFORNIANS FOR ALTERNATIVES TO
TOXICS

Dated: _____9-26___, 2023        ABBOTT & KINDERMANN, INC.

By: _____
Diane G. Kindermann
Attorney for Defendants
REICHARDT DUCK FARM and JOHN
REICHARDT

Good cause appearing, IT IS SO ORDERED.

Dated: _____, 2023        By:_____
Hon. Magistrate Judge Alex G. Tse
Unites Stated District Court
Northern District of California

- 21 -

1

2          By: _____

3                    JOHN REICHARDT

4

5   APPROVED AS TO FORM:

6   Dated: _September 26_, 2023        LAW OFFICES OF ANDREW L. PACKARD

7

8          By: _____

9          Andrew L. Packard
           Attorneys for Plaintiff

10         CALIFORNIANS FOR ALTERNATIVES TO
           TOXICS

11

12  Dated: _____, 2023       ABBOTT & KINDERMANN, INC.

13

14         By:_____
           Diane G. Kindermann

15         Attorney for Defendants
           REICHARDT DUCK FARM and JOHN

16         REICHARDT

17

18  Good cause appearing, IT IS SO ORDERED.

19

20  Dated: _____November 22_, 2023      By:_____
                                        Hon. Magistrate Judge Alex G. Tse

21                                      Unites Stated District Court
                                        Northern District of California

22

23

24

25

26

27

28

- 21 -

[PROPOSED] CONSENT DECREE

Case No: 3:22-CV-09065-AGT

1

**EXHIBIT A – Facility Site Map**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] CONSENT DECREE

**EXHIBIT B – CWA Notice of Violation and Intent to Sue Letter**

Law Offices Of

# ANDREW L. PACKARD

245 Kentucky Street, Suite B3, Petaluma, CA 94952
Phone (707) 782-4060   Fax (707) 782-4062
Info@PackardLawOffices.com

October 21, 2022

**VIA CERTIFIED MAIL**

John Reichardt                          John Reichardt
Reichardt Duck Farm                     185 Mystic Mountain Drive
3770 Middle Two Rock Road               Sparks, NV 89441
Petaluma, CA 94952


Re:    **NOTICE OF VIOLATIONS AND INTENT TO FILE SUIT UNDER THE FEDERAL WATER POLLUTION CONTROL ACT ("CLEAN WATER ACT") (33 U.S.C. §§ 1251 *et seq.*)**

Dear John Reichardt:

    This firm represents Californians for Alternatives to Toxics ("CATs") in regard to violations of the Clean Water Act ("the Act") occurring at Reichardt Duck Farm Inc.'s ("RDF") duck farm located at 3770 Middle Two Rock Road, in Petaluma, California ("Facility"). This letter is being sent to you as the responsible owner and operator of the enterprise, and as the registered agent for this entity. Unless otherwise noted, John Reichardt and Reichardt Duck Farm Inc. shall hereinafter be collectively referred to as "RDF." The purpose of this letter is to provide RDF with notice of the violations of the Industrial General Permit occurring at the Petaluma Facility, including, but not limited to, noncompliant discharges of polluted storm water associated with industrial activities from the Facility into local surface waters.

    RDF is in ongoing violation of the substantive and procedural requirements of the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 14-57-DWQ ("General Permit" or "Permit").[1]

    Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Act subjects RDF to a penalty for all violations occurring during the period commencing five years prior to the date of the Notice Letter. These provisions of law authorize civil penalties of up to $59,973

---

[1] RDF submitted a Notice of Intent ("NOI") to comply with the General Permit for the Petaluma Facility on or about January 26, 2015. The Facility was assigned the Waste Discharge Identification ("WDID") Number 249I014770.

per day per violation for all Clean Water Act violations occurring after November 2, 2015.

In addition to civil penalties, CATs will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law. Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)) permits prevailing parties to recover costs and fees, including attorneys' fees.

The Clean Water Act requires that sixty (60) days prior to the initiation of a citizen-enforcement action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen enforcer must give notice of its intent to file suit. Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the Chief Administrative Officer of the water pollution control agency for the State in which the violations occur. *See* 40 C.F.R. § 135.2. As required by the Act, this letter provides statutory notice of the violations that have occurred, and continue to occur, at the Facility. 40 C.F.R. § 135.3(a). At the expiration of sixty (60) days from the date of this letter, CATs intends to file suit under Section 505(a) of the Act in federal court against RDF for violations of the Clean Water Act and the Permit.

## I. Background.

### A. Californians for Alternatives to Toxics

CATs is a non-profit association dedicated to the preservation, protection and defense of the environment, wildlife and natural resources of California waters, including the waters into which RDF discharges polluted storm water. Members of CATs enjoy the waters that the Facility discharges into, including Laguna Lake, Chileno Creek, Walker Creek, Tomales Bay and the Pacific Ocean ("Impacted Waters"). Members of CATs use and enjoy the Impacted Waters for fishing, estuarine habitat and the rare, threatened and endangered species it supports, the wildlife habitat, marine habitat, and other designated beneficial uses. The discharge of pollutants from the Facility into the Impacted Waters impairs each of these uses. Further, discharges of polluted storm water from the Facility are ongoing and continuous. Thus, the interests of CATs' members have been, are being, and will continue to be adversely affected by RDF's failure to comply with the Clean Water Act and the General Permit.

### B. The Clean Water Act.

Congress enacted the CWA in 1972 in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The Act prohibits the discharge of pollutants into United States waters except as authorized by the statute. 33 U.S.C. § 1311; *San Francisco Bay Keeper, Inc. v. Tosco Corp*., 309 F.3d 1153, 1156 (9th Cir. 2002). The Act is administered largely through the NPDES permit program. 33 U.S.C. § 1342. In 1987, the Act was amended to establish a framework for regulating storm water discharges through the NPDES system. Water Quality Act of 1987, Pub. L. 100-4, § 405, 101 Stat. 7, 69 (1987) (codified at 33 U.S.C. § 1342(p)); *see also Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 840-41 (9th Cir. 2003) (describing the problem of storm water runoff and summarizing the Clean Water Act's permitting scheme). The discharge of pollutants not specifically allowed by a

NPDES permit is illegal. *Ecological Rights Found. v. Pacific Lumber Co.*, 230 F.3d 1141, 1145 (9th Cir. 2000).

Much of the responsibility for administering the NPDES permitting system has been delegated to the states. *See* 33 U.S.C. § 1342(b); *see also* Cal. Water Code § 13370 (expressing California's intent to implement its own NPDES permit program). The CWA authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(b). Pursuant to Section 402 of the Act, the Administrator of EPA has authorized California's State Board to issue individual and general NPDES permits in California. 33 U.S.C. § 1342.

### C.     California's General Permit for Storm Water Discharges Associated with Industrial Activities

Facilities discharging, or having the potential to discharge, storm water associated with industrial activities that have not obtained an industrial NPDES permit must apply for coverage under the General Permit by filing a Notice of Intent to Comply ("NOI"). General Permit, Standard Condition XXI.A. These facilities must file their NOIs before the initiation of industrial operations. *Id.*

Facilities covered by the General Permit include concentrated animal feeding operations ("CAFO"). *Id.* at Attachment A. To be considered a CAFO, a facility must first be defined as an animal feeding operation ("AFO") and meet the criteria established in the CAFO regulation. An AFO is an agricultural operation where animals are kept and raised in confined situations where the following conditions are met: (1) animals have been, are, or will be stabled or confined and fed or maintained for a total of 45 days or more in any 12-month period; and, (2) crops, vegetation, forage growth, or post-harvest residues are not sustained in the normal growing season over any portion of the lot or facility. 40 C.F.R. § 122.23(b)(1). A CAFO is an AFO that is defined as a Large CAFO or as a Medium CAFO by the terms of 40 C.F.R. § 122.23. An operation that confines ducks is considered a Large CAFO is the above conditions are met, and there are at least 30,000 ducks (if the AFO uses other than a liquid manure handling system) or 5,000 ducks (if the AFO uses a liquid manure handling system). 40 C.F.R. § 122.23(b)(4)(xii) and (xiii).

Facilities must strictly comply with all of the terms and conditions of the General Permit. A violation of the General Permit is a violation of the CWA.

The General Permit contains three primary and interrelated categories of requirements: (1) discharge prohibitions, receiving water limitations and effluent limitations; (2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and (3) self-monitoring and reporting requirements.

### D.     RDF's Petaluma Facility

Information available to CATs indicates that RDF's industrial activities at the approximately 373-acre Facility include, but are not limited to: operations associated with a

Notice of Violation and Intent to File Suit
October 21, 2022
Page 4

concentrated animal feeding operation related to the raising and slaughtering of ducks. Based on public reporting in the press about the Facility, CATs is informed, and on that basis, believes that the Facility contains approximately 200,000 to 300,000 ducks at any time, and therefore meets the definition of a Large CAFO. Consequently, the Facility is required to maintain coverage under the General Permit.

The Facility includes rows of houses in which ducks are confined, wastewater processing, storage, and disposal facilities, dry litter and manure processing, storage, and disposal facilities, a fueling station, a shop and a network of roads that provide connectivity between the various industrial areas. The industrial activities at the Facility fall under Standard Industrial Classification ("SIC") Code 2015 ("Poultry Slaughtering and Processing").

RDF collects and discharges storm water associated with industrial activities at the Facility through at least eight (8) discharge points into an unnamed creek, which drains to Laguna Lake. Laguna Lake discharges to Chileno Creek, which is a tributary to Walker Creek, which ultimately discharges to Tomales Bay and the Pacific Ocean. The Impacted Waters are waters of the United States within the meaning of the Clean Water Act.

The Tomales Bay watershed in western Marin County is one of the major estuaries on the west coast of the United States. It has a diverse ecosystem and several notable tributaries, including Lagunitas Creek, which has one of the few remaining viable coho salmon runs in central California. *Water Quality Control Plan for the San Francisco Bay Basin* ("Basin Plan") Section 4.1.3.3. The Water Board identified Tomales Bay as an area where commercial shellfishery is threatened and authorized the formation of a technical advisory committee to investigate and develop a remediation strategy. California Regional Water Quality Control Board San Francisco Bay Region Resolution 94-018. On February 8, 2007, the U.S. EPA approved the Total Maximum Daily Load ("TMDL") for pathogens in the Tomales Bay and the Basin Plan has been amended to incorporate the TMDL along with an implementation plan to achieve the TMDL. Basin Plan Section 7.3.1. "The overall goal of the Tomales Bay Watershed Pathogens Total Maximum Daily Load (TMDL) is to ensure protection of water contact recreational uses and Bay shellfish harvesting, thereby minimizing human exposure to disease-causing pathogens." *Id.*

According to the 2018 303(d) List of Impaired Water Bodies, Tomales Bay and its tributaries, including Walker Creek, downstream of the Facility are impaired for: Mercury, Nutrients, Sedimentation/Siltation, and Pathogens.[2] Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already impaired surface waters and aquatic-dependent wildlife.

---

[2] 2018 Integrated Report – All Assessed Waters, *available at* https://gispublic.waterboards.ca.gov/portal/apps/webappviewer/index.html?id=e2def63ccef54eed bee4ad726ab1552c (last accessed September 20, 2022).

The areas of industrial activity at the Facility are sources of pollutants.  The General Permit requires RDF to analyze storm water samples for TSS, pH, and Oil and Grease.  General Permit, Section XI.B.6.  The General Permit also requires facilities to analyze storm water samples for pollutants that are likely to be present in a particular facility's discharge, and any additional applicable industrial parameters related to receiving waters with 303(d) listed impairments.  *Id.*  Given that the Facility generates a significant amount of manure from ducks, nutrients and pathogens are pollutants that are likely to be present in the Facility's storm water discharges, and because they are related to the receiving waters 303(d) listed impairment, RDF is required to analyze their storm water samples for those pollutants.

## II.    RDF's Violations of the Act and Permit.

Based on its review of available public documents, CATs is informed and believes that RDF, through its operation of the Facility, is in ongoing violation of both the substantive and procedural requirements of the CWA and the General Permit.  These violations are ongoing and continuous.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, RDF is subject to penalties for violations of the Act since October 21, 2017.

### A.    RDF Discharges Storm Water Containing Pollutants in Violation of the General Permit's Discharge Prohibitions, Receiving Water Limitations and Effluent Limitations.

RDF's storm water sampling results provide conclusive evidence of RDF's failure to comply with the General Permit's discharge prohibitions, receiving water limitations and effluent limitations at its Facility.  Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation."  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

### 1.    Applicable Water Quality Standards.

The General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.  General Permit, Discharge Prohibition III.C.  The General Permit also prohibits discharges that violate any discharge prohibition contained in the applicable Regional Water Board's Basin Plan or statewide water quality control plans and policies.  General Permit, Discharge Prohibition III.D.  Furthermore, storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in any affected receiving water.  General Permit, Receiving Water Limitations VI.A, VI.B.

Dischargers are also required to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of the General Permit's Receiving Water Limitations.  General Permit, Special Condition XX.B.  The documentation must describe changes the discharger will make to its current storm water best management

Notice of Violation and Intent to File Suit
October 21, 2022
Page 6

practices ("BMPs") in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards. *Id.*

The Basin Plan sets forth water quality standards and prohibitions applicable to RDF's storm water discharges from its Facility. The Basin Plan identifies present and potential beneficial uses for the Impacted Waters, which include shellfish harvesting (SHELL), warm freshwater habitat (WARM), wildlife habitat (WILD), water contact recreation (REC-1), noncontact water recreation (REC-2), cold freshwater habitat (COLD), fish migration (MIGR), preservation of rare and endangered species (RARE), commercial, and sport fishing (COMM), navigation (NAV), marine habitat (MAR), and fish spawning (SPWN).

## 2. Applicable Effluent Limitations.

Dischargers are required to reduce or prevent pollutants in their storm water discharges through implementation of best available technology economically achievable ("BAT") for toxic and nonconventional pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants. General Permit, Effluent Limitation V.A. Conventional pollutants include Total Suspended Solids, Oil & Grease, pH, Biochemical Oxygen Demand and Fecal Coliform. 40 C.F.R. § 401.16. All other pollutants are either toxic or nonconventional. 40 C.F.R. §§ 401.15-16.

Under the General Permit, benchmark levels established by the EPA ("EPA benchmarks") serve as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. *Santa Monica Baykeeper v. Kramer Metals,* 619 F. Supp. 2d 914, 920, 923 (C.D. Cal 2009); General Permit, Exceedance Response Action XII.A.

The following EPA benchmarks have been established for pollutants discharged by RDF: Total Suspended Solids – 100 mg/L; Oil & Grease – 15.0 mg/L; pH – 6.0-9.0 s.u., Nitrate plus Nitrite Nitrogen – 0.68 mg/L, and Phosphorus – 2.0 mg/L.

## 3. RDF's Storm Water Sample Results

The following discharges of pollutants from the Facility have violated the discharge prohibitions, receiving water limitations and effluent limitations of the Permit:

### a. Discharge of Storm Water Containing Total Suspended Solids (TSS) at Concentrations in Excess of Applicable EPA Benchmark Value

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 11/29/2018 | Unnamed Creek | TSS | 400 | 100 |

Notice of Violation and Intent to File Suit
October 21, 2022
Page 7

      **b.**     **Discharge of Storm Water Containing Nitrite and Nitrate at Concentrations in Excess of Applicable EPA Benchmark Values**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 12/13/2021 | C Pond Creek | N+N | 0.77 (Nitrite); 13 (Nitrate) | 0.68 |
| 12/27/2021 | C Pond Creek | N+N | 11 (Nitrate) | 0.68 |
| 1/4/2022 | C Pond Creek | N+N | 10 (Nitrate) | 0.68 |
| 3/10/2021 | C Pond Creek | N+N | 120 (Nitrate) | 0.68 |
| 1/27/2021 | C Pond Creek | N+N | 20 (Nitrate) | 0.68 |
| 12/23/2019 | Unnamed Creek | N+N | 18 (Nitrate) | 0.68 |
| 12/2/2019 | Unnamed Creek | N+N | 0.79 (Nitrite); 11 (Nitrate) | 0.68 |
| 1/25/2018 | Unnamed Creek | N+N | 30 (Nitrate) | 0.68 |
| 11/29/2018 | Unnamed Creek | N+N | 13 (Nitrate) | 0.68 |
| 1/7/2019 | Unnamed Creek | N+N | 13 (Nitrate) | 0.68 |
| 2/4/2019 | Unnamed Creek | N+N | 3.5 (Nitrate) | 0.68 |

      **c.**     **Discharge of Storm Water Containing Phosphorus (P) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 12/13/2021 | C Pond Creek | P | 3.7 | 2.00 |
| 12/27/2021 | C Pond Creek | P | 3.1 | 2.00 |
| 1/4/2022 | C Pond Creek | P | 2.7 | 2.00 |
| 1/27/2021 | C Pond Creek | P | 3.7 | 2.00 |
| 12/23/2019 | Unnamed Creek | P | 2.8 | 2.00 |
| 11/29/2018 | Unnamed Creek | P | 2.9 | 2.00 |

      **d.**     **Discharge of Storm Water Containing pH at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (s.u.) | EPA Benchmark Value (s.u.) |
|---|---|---|---|---|
| 3/10/2021 | C Pond Creek | pH | 2.71 | Greater than 6.0, less than 9.0 |

> **e.** **RDF 's Sample Results Are Evidence of Violations of the General Permit**

RDF's sample results demonstrate violations of the Permit's discharge prohibitions, receiving water limitations and effluent limitations set forth above. CATs is informed and believes that RDF has known that its storm water contains pollutants at levels exceeding General Permit standards since at least October 21, 2017.

CATs alleges that such violations occur each time storm water discharges from the Facility. Attachment A hereto, sets forth the specific rain dates on which CATs alleges that RDF has discharged storm water containing impermissible levels of TSS, N+N, P, and pH in violation of the General Permit. General Permit, Discharge Prohibitions III.C and III.D, Receiving Water Limitations VI.A, VI.B. CATs further alleges that RDF violates the Basin Plan's water quality objectives each time it discharges storm water with *E. coli* and fecal coliforms in excess of the water quality standards set therein.

> **4.** **RDF Has Failed to Implement BAT and BCT**

Dischargers must implement BMPs that fulfill the BAT/BCT requirements of the CWA and the General Permit to reduce or prevent discharges of pollutants in their storm water discharges. General Permit, Effluent Limitation V.A. To meet the BAT/BCT standard, dischargers must implement minimum BMPs and any advanced BMPs set forth in the General Permit's SWPPP Requirements provisions where necessary to reduce or prevent pollutants in discharges. *See* General Permit, Sections V, X.H.1-2.

RDF has failed to implement and maintain the minimum BMPs required by the General Permit as evidenced by the exceedances identified above. Specifically, RDF has failed to comply with the following: good housekeeping requirements, preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping. Permit, Section X.H.1(a-g).

RDF has further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the General Permit's effluent limitations. General Permit, Sections X.H.2.

Each day that RDF  have failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). RDF has been in violation of the BAT and BCT requirements at its Facility every day since at least October 21, 2017.

     **5.     RDF Has Failed to Comply with the Monitoring Requirements of the General Permit.**

     The General Permit requires dischargers to implement a Monitoring Implementation Plan.  General Permit, Section X.I.  As part of their monitoring plan, dischargers must identify all storm water discharge locations.  Permit, Section X.I.2.  Dischargers must then conduct monthly visual observations of each drainage area, as well as visual observations during discharge sampling events.  General Permit, Section XI.A.1 and 2.

     Dischargers must collect and analyze storm water samples from two (2) storm events within the first half of each reporting year (July 1 to December 31) and two (2) storm events during the second half of each reporting year (January 1 to June 3).  General Permit, Section XI.B.  Section XI.B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS") and oil and grease ("O&G"), certain industry-specific parameters set forth in Table 2 of the General Permit, and other pollutants likely to be in the storm water discharged from the facility based on the pollutant source assessment.  General Permit, Section XI.B.6.  Dischargers must submit all sampling and analytical results via SMARTS within thirty (30) days of obtaining all results for each sampling event.  General Permit, Section XI.B.11.

     RDF has failed to develop and implement an adequate Monitoring Implementation Plan for its Facility, and has thus violated the monitoring requirements of the General Permit.  For example, RDF has failed to monitor for every potential pollutant that is likely to be present at its Facility, including nutrients and pathogens.  In addition, RDF has failed to collect the required number of samples for each reporting period.  RDF has also failed to monitor every discharge location of storm water associated with industrial activities at its Facility.  Each day that RDF has failed to develop and implement an adequate Monitoring Implementation Plan is a separate and distinct violation of the Act and Permit.  RDF has been in violation of the Monitoring requirements every day since at least October 21, 2017.

     **6.     RDF Has Failed to Develop and Implement an Adequate Storm Water Pollution Prevention Plan.**

     The General Permit requires dischargers to develop and implement a site-specific SWPPP.  General Permit, Section X.A.  The SWPPP must include, among other elements: (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable.  *See id.*

     Dischargers must revise their SWPPP whenever necessary and certify and submit via the Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS for any non-significant revisions not more than once every three (3)

Notice of Violation and Intent to File Suit
October 21, 2022
Page 10

months in the reporting year.  General Permit, Section X.B.

CATs' investigation indicates that RDF has been operating with an inadequately developed and implemented SWPPP in violation of General Permit requirements.  RDF has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary, resulting in the Facility's numerous continuing effluent limitation violations.

Each day RDF failed to develop and implement an adequate SWPPP at its Facility is a violation of the General Permit.  The SWPPP violations described above were at all times in violation of Section X of the General Permit.  RDF has been in violation of these requirements at its Facility every day since at least October 21, 2017.

### 7.  RDF Has Failed to Submit Timely, True and Correct Reports.

Section XVI of the Permit requires dischargers to submit an Annual Report by July 15th of each reporting year to the Regional Board.  The Annual Report must be signed and certified by a discharger's Legally Responsible Person, or Duly Authorized Representative. General Permit, Sections XVI.A, XXI.K.  The Annual Report must include a compliance checklist, certifying compliance with the General Permit and an explanation of any non-compliance. General Permit, Section XVI.B.

CATs' investigations indicate that RDF has submitted incomplete Annual Reports and purported to comply with the Permit despite significant noncompliance at its Facility.  Each day RDF failed to submit timely, true and correct reports is a separate violation of the Clean Water Act.  RDF has been in violation of these requirements at its Facility every day since at least October 21, 2017.

### III.    Persons Responsible for the Violations.

CATs puts RDF on notice that they are the persons and entities responsible for the violations described above.  If additional persons are subsequently identified as also being responsible for the violations set forth above, CATs puts RDF on formal notice that it intends to include those persons in this action.

### IV.    Name and Address of Noticing Parties.

The name, address and telephone number of each of the noticing parties is as follows:

Patricia Clary, Executive Director
Californians for Alternatives to Toxics
600 F Street, Suite 3 #911
Eureka, CA 95521
(707) 834-4833

## V.    Counsel.

CATs has retained legal counsel to represent it in this matter.  Please direct all communications to:

Andrew L. Packard
William N. Carlon
Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952
(707) 782-4060
andrew@packardlawoffices.com
wncarlon@packardlawoffices.com

## VI.    Conclusion

CATs believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the CWA against RDF and their agents for the above-referenced violations upon the expiration of the 60-day notice period.  If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

William N. Carlon
Law Offices of Andrew L. Packard
Counsel for CALIFORNIANS FOR
ALTERNATIVES TO TOXICS

Notice of Violation and Intent to File Suit
October 21, 2022
Page 12

## SERVICE LIST

**VIA CERTIFIED MAIL**

> Michael Regan, Administrator
> U.S. Environmental Protection Agency
> 1200 Pennsylvania Ave., N.W.
> Washington, D.C. 20460
>
> Martha Guzman, Regional Administrator
> U.S. Environmental Protection Agency, Region IX
> 75 Hawthorne Street
> San Francisco, CA 94105
>
> Merrick B. Garland, U.S. Attorney General
> U.S. Department of Justice
> 950 Pennsylvania Avenue, N.W.
> Washington, DC 20530-0001
>
> Eileen Sobeck, Executive Director
> State Water Resources Control Board
> P.O. Box 100
> Sacramento, CA 95812
>
> Matthias St. John, Executive Officer
> North Coast Regional Water Quality Control Board
> 5550 Skylane Boulevard Suite A
> Santa Rosa, CA 95403

**ATTACHMENT A**
**Notice of Intent to File Suit, Reichardt Duck Farm**
**Significant Rain Events,\* October 20, 2017 – October 21, 2022**

| | | | |
|---|---|---|---|
| October 20, 2017 | November 29, 2018 | March 23, 2019 | April 5, 2020 |
| November 4, 2017 | November 30, 2018 | March 25, 2019 | April 6, 2020 |
| November 9, 2017 | December 1, 2018 | March 26, 2019 | April 7, 2020 |
| November 10, 2017 | December 5, 2018 | March 27, 2019 | May 12, 2020 |
| November 11, 2017 | December 15, 2018 | March 28, 2019 | May 14, 2020 |
| November 14, 2017 | December 17, 2018 | March 29, 2019 | May 17, 2020 |
| November 15, 2017 | December 19, 2018 | April 5, 2019 | May 18, 2020 |
| November 16, 2017 | December 21, 2018 | April 6, 2019 | November 14, 2020 |
| November 17, 2017 | December 24, 2018 | April 16, 2019 | November 18, 2020 |
| November 26, 2017 | December 25, 2018 | May 16, 2019 | December 12, 2020 |
| November 27, 2017 | January 5, 2019 | May 17, 2019 | December 13, 2020 |
| January 5, 2018 | January 6, 2019 | May 19, 2019 | December 14, 2020 |
| January 6, 2018 | January 7, 2019 | May 20, 2019 | December 17, 2020 |
| January 8, 2018 | January 9, 2019 | November 27, 2019 | December 26, 2020 |
| January 9, 2018 | January 10, 2019 | December 1, 2019 | December 31, 2020 |
| January 19, 2018 | January 12, 2019 | December 2, 2019 | January 2, 2021 |
| January 22, 2018 | January 15, 2019 | December 4, 2019 | January 5, 2021 |
| January 25, 2018 | January 16, 2019 | December 5, 2019 | January 7, 2021 |
| January 26, 2018 | January 17, 2019 | December 7, 2019 | January 8, 2021 |
| February 26, 2018 | January 18, 2019 | December 8, 2019 | January 23, 2021 |
| March 1, 2018 | January 20, 2019 | December 11, 2019 | January 25, 2021 |
| March 2, 2018 | January 21, 2019 | December 12, 2019 | January 27, 2021 |
| March 3, 2018 | January 31, 2019 | December 18, 2019 | January 28, 2021 |
| March 8, 2018 | February 2, 2019 | December 19, 2019 | January 29, 2021 |
| March 13, 2018 | February 3, 2019 | December 22, 2019 | February 2, 2021 |
| March 14, 2018 | February 4, 2019 | December 25, 2019 | February 12, 2021 |
| March 15, 2018 | February 5, 2019 | December 30, 2019 | February 15, 2021 |
| March 16, 2018 | February 9, 2019 | January 8, 2020 | February 19, 2021 |
| March 21, 2018 | February 10, 2019 | January 9, 2020 | March 6, 2021 |
| March 22, 2018 | February 13, 2019 | January 14, 2020 | March 9, 2021 |
| April 6, 2018 | February 14, 2019 | January 16, 2020 | March 10, 2021 |
| April 7, 2018 | February 15, 2019 | January 17, 2020 | March 15, 2021 |
| April 12, 2018 | February 16, 2019 | January 22, 2020 | March 19, 2021 |
| April 16, 2018 | February 26, 2019 | January 26, 2020 | April 26, 2021 |
| April 17, 2018 | February 27, 2019 | January 29, 2020 | September 19, 2021 |
| October 2, 2018 | March 2, 2019 | March 7, 2020 | October 18, 2021 |
| October 3, 2018 | March 6, 2019 | March 14, 2020 | October 20, 2021 |
| November 22, 2018 | March 7, 2019 | March 15, 2020 | October 21, 2021 |
| November 23, 2018 | March 10, 2019 | March 25, 2020 | October 22, 2021 |
| November 24, 2018 | March 20, 2019 | March 29, 2020 | October 24, 2021 |
| November 28, 2018 | March 21, 2019 | March 30, 2020 | October 25, 2021 |

\* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.

**ATTACHMENT A**
**Notice of Intent to File Suit, Reichardt Duck Farm**
**Significant Rain Events,\* October 20, 2017 – October 21, 2022**

November 2, 2021
November 4, 2021
November 9, 2021
December 12, 2021
December 13, 2021
December 14, 2021
December 16, 2021
December 22, 2021
December 23, 2021
December 24, 2021
December 25, 2021
December 26, 2021
December 27, 2021
December 29, 2021
January 4, 2022
January 7, 2022
March 4, 2022
March 15, 2022
March 28, 2022
April 11, 2022
April 15, 2022
April 16, 2022
April 19, 2022
April 21, 2022
April 22, 2022
June 5, 2022
June 6, 2022
September 18, 2022
September 19, 2022

\* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.

**EXHIBIT C – Supplemental CWA Notice of Violation and Intent to Sue Letter**

Law Offices Of

# ANDREW L. PACKARD

245 Kentucky Street, Suite B3, Petaluma, CA 94952
Phone (707) 782-4060   Fax (707) 782-4062
Info@PackardLawOffices.com

March 17, 2023

**VIA CERTIFIED MAIL**

John Reichardt                                    John Reichardt
Reichardt Duck Farm                               185 Mystic Mountain Drive
3770 Middle Two Rock Road                         Sparks, NV 89441
Petaluma, CA 94952

Re:    **NOTICE OF VIOLATIONS AND INTENT TO FILE SUIT UNDER THE FEDERAL WATER POLLUTION CONTROL ACT ("CLEAN WATER ACT") (33 U.S.C. §§ 1251 *et seq.*)**

Dear John Reichardt:

This firm represents Californians for Alternatives to Toxics ("CATs") in regard to violations of the Clean Water Act ("the Act") occurring at Reichardt Duck Farm Inc.'s ("RDF") duck farm located at 3770 Middle Two Rock Road, near Petaluma, California ("Facility"). This letter is being sent to you as the responsible owner and operator of the enterprise, and as the registered agent for this entity. Unless otherwise noted, John Reichardt and Reichardt Duck Farm Inc. shall hereinafter be collectively referred to as "RDF." The purpose of this letter is to provide RDF with notice of the violations of the Clean Water Act occurring at the Petaluma Facility, including, but not limited to, unpermitted discharges of liquid manure and waste water from the Facility into local surface waters.

RDF is in ongoing violation of the substantive and procedural requirements of the Clean Water Act, 33 U.S.C. § 1251 *et seq*.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Act subjects RDF to a penalty for all violations occurring during the period commencing five years prior to the date of the Notice Letter. These provisions of law authorize civil penalties of up to $64,618 per day per violation for all Clean Water Act violations occurring after November 2, 2015.

In addition to civil penalties, CATs will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law. Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)) permits prevailing parties to recover costs and fees, including attorneys' fees.

The Clean Water Act requires that sixty (60) days prior to the initiation of a citizen-enforcement action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen enforcer

Notice of Violation and Intent to File Suit
March 17, 2023
Page 2

must give notice of its intent to file suit. Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the Chief Administrative Officer of the water pollution control agency for the State in which the violations occur. *See* 40 C.F.R. § 135.2. As required by the Act, this letter provides statutory notice of the violations that have occurred, and continue to occur, at the Facility. 40 C.F.R. § 135.3(a). At the expiration of sixty (60) days from the date of this letter, CATs intends to file suit under Section 505(a) of the Act in federal court against RDF for violations of the Clean Water Act.

## I.      Background.

### A.      Californians for Alternatives to Toxics

CATs is a non-profit association dedicated to the preservation, protection and defense of the environment, wildlife and natural resources of California waters, including the waters into which RDF discharges polluted storm water. Members of CATs enjoy the waters that the Facility discharges into, including Laguna Lake, Chileno Creek, Walker Creek, Tomales Bay and the Pacific Ocean ("Impacted Waters"). Members of CATs use and enjoy the Impacted Waters for fishing, estuarine habitat and the rare, threatened and endangered species it supports, the wildlife habitat, marine habitat, and other designated beneficial uses. The discharge of pollutants from the Facility into the Impacted Waters impairs each of these uses. Further, discharges of polluted storm water from the Facility are ongoing and continuous. Thus, the interests of CATs' members have been, are being, and will continue to be adversely affected by RDF's failure to comply with the Clean Water Act and the General Permit.

### B.      The Clean Water Act.

Congress enacted the CWA in 1972 in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The Act prohibits the discharge of pollutants into United States waters except as authorized by the statute. 33 U.S.C. § 1311; *San Francisco Bay Keeper, Inc. v. Tosco Corp*., 309 F.3d 1153, 1156 (9th Cir. 2002). The Act is administered largely through the NPDES permit program. 33 U.S.C. § 1342. In 1987, the Act was amended to establish a framework for regulating storm water discharges through the NPDES system. Water Quality Act of 1987, Pub. L. 100-4, § 405, 101 Stat. 7, 69 (1987) (codified at 33 U.S.C. § 1342(p)); *see also Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 840-41 (9th Cir. 2003) (describing the problem of storm water runoff and summarizing the Clean Water Act's permitting scheme). The discharge of pollutants not specifically allowed by a NPDES permit is illegal. *Ecological Rights Found. v. Pacific Lumber Co*., 230 F.3d 1141, 1145 (9th Cir. 2000).

Much of the responsibility for administering the NPDES permitting system has been delegated to the states. *See* 33 U.S.C. § 1342(b); *see also* Cal. Water Code § 13370 (expressing California's intent to implement its own NPDES permit program). Concentrated animal feeding operations ("CAFO"), are point sources under the Clean Water Act. 33 U.S.C. § 1362(14). As such, a CAFO is prohibited from discharging pollutants into waters of the United States under normal operating conditions and may only discharge in the event of a 25-year, 24-hour storm event if that CAFO has coverage under and complies with a general or individual NPDES

permit. 33 U.S.C. § 1311(a). To be considered a CAFO, a facility must first be defined as an animal feeding operation ("AFO") and meet the criteria established in the CAFO regulation. An AFO is an agricultural operation where animals are kept and raised in confined situations where the following conditions are met: (1) animals have been, are, or will be stabled or confined and fed or maintained for a total of 45 days or more in any 12-month period; and, (2) crops, vegetation, forage growth, or post-harvest residues are not sustained in the normal growing season over any portion of the lot or facility. 40 C.F.R. § 122.23(b)(1). A CAFO is an AFO that is defined as a Large CAFO or as a Medium CAFO by the terms of 40 C.F.R. § 122.23. An operation that confines ducks is considered a Large CAFO is the above conditions are met, and there are at least 30,000 ducks (if the AFO uses other than a liquid manure handling system[1]) or 5,000 ducks (if the AFO uses a liquid manure handling system). 40 C.F.R. § 122.23(b)(4)(xii) and (xiii).

The San Francisco Bay Regional Water Quality Control Board ("Regional Board") administers the waste discharge permit program for confined animal facilities in Region 2, which includes Sonoma County and is the region in which RDF is located. The Regional Board issued the General Waste Discharge Requirements for Confined Animal Facilities Within the San Francisco Bay Region, Order No. R2-2016-0031 ("General Order"). However, the General Order is not a NPDES permit, and any CAFO who discharges or proposes to discharge pollutants to the waters of the United States are required to obtain permit coverage under a NPDES permit, and are not required to seek coverage under the General Order. Accordingly, discharges from any CAFO in Region 2 should be covered under an individual NPDES permit.

Once regulated by a NPDES permit, permittees must comply with all terms and conditions of that permit. Permittees who violate the terms of any applicable permit are subject to citizen enforcement actions, and citizens may bring suit against a party discharging pollutants into waters of the United States without a permit. *See, e.g., Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526 (9th Cir. 2001). The Clean Water act authorizes citizens to file suit against any person alleged to be in violation of an effluent standard or limitation. 33 U.S.C. § 1365(a)(l). An "effluent standard or limitation" includes a "permit or condition thereof issued under section 1342." 33 U.S.C. § 1365(f)(6).

According to publicly-available records, RDF lacks coverage under a general or individual CAFO NPDES permit. RDF's coverage under the General Industrial Permit – the subject of CAT's previous Notice of Violation – does not authorize the discharge of pollutants

---

[1] An AFO is considered to have a liquid-manure handling system if it uses pits, lagoons, flush systems (usually combined with lagoons), or holding ponds, or has systems such as continuous overflow watering, where the water comes into contact with manure and litter. In addition, operations that stack or pile manure in areas exposed to precipitation are considered to have liquid-manure handling systems. Duck operations are considered to use a liquid-manure handling system if (1) the ducks are raised outside with swimming areas or ponds or with a stream running through an open lot, or (2) the ducks are raised in confinement buildings where fresh or recycled water is used to flush the manure to a lagoon, pond, or other storage structure. NDPES Permit Writers' Manual for CAFOs, Chapter 2.2.4.

from the CAFO manure and wastewater management system, and explicitly prohibits the discharge of unauthorized non-storm water.

### C. RDF's Petaluma Facility

Information available to CATs indicates that RDF's industrial activities at the approximately 373-acre Facility include, but are not limited to: operations associated with a concentrated animal feeding operation related to the raising and slaughtering of ducks. Based on public reporting in the press about the Facility, CATs is informed, and on that basis, believes that the Facility contains approximately 200,000 to 300,000 ducks at any time. CATs is informed, and on that basis, believes that the Facility uses a liquid-manure handling system.

The Facility includes rows of houses in which ducks are confined, wastewater processing, storage, and disposal facilities, dry litter and manure processing, storage, and disposal areas, a fueling station, a shop and a network of roads that provide connectivity between the various industrial areas.

RDF flushes the duck houses into a series of lagoons, pits, and/or holding ponds. RDF stacks and piles manure and litter in areas exposed to precipitation. An unnamed creek runs through RDF's Facility. The unnamed creek is a tributary to Laguna Lake, which discharges to Chileno Creek, which is a tributary to Walker Creek, which ultimately discharges to Tomales Bay and the Pacific Ocean ("Impacted Waters"). The Impacted Waters are waters of the United States within the meaning of the Clean Water Act.

The Tomales Bay watershed in western Marin County is one of the major estuaries on the west coast of the United States. It has a diverse ecosystem and several notable tributaries, including Lagunitas Creek, which has one of the few remaining viable coho salmon runs in central California. *Water Quality Control Plan for the San Francisco Bay Basin* ("Basin Plan") Section 4.1.3.3. The Water Board identified Tomales Bay as an area where commercial shellfishery is threatened and authorized the formation of a technical advisory committee to investigate and develop a remediation strategy. California Regional Water Quality Control Board San Francisco Bay Region Resolution 94-018. On February 8, 2007, the U.S. EPA approved the Total Maximum Daily Load ("TMDL") for pathogens in the Tomales Bay and the Basin Plan has been amended to incorporate the TMDL along with an implementation plan to achieve the TMDL. Basin Plan Section 7.3.1. "The overall goal of the Tomales Bay Watershed Pathogens Total Maximum Daily Load (TMDL) is to ensure protection of water contact recreational uses and Bay shellfish harvesting, thereby minimizing human exposure to disease-causing pathogens." *Id.*

According to the 2020-2022 303(d) List of Impaired Water Bodies, Tomales Bay and its tributaries, including Walker Creek, downstream of the Facility are impaired for: Mercury,

Nutrients, Sedimentation/Siltation, and Pathogens.[2]  Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already impaired surface waters and aquatic-dependent wildlife.

## II.     RDF's Violations of the Act.

CATs is informed and believes that RDF, through its operation of the Facility, is in ongoing violation of both the substantive and procedural requirements of the Clean Water Act. These violations are ongoing and continuous.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, RDF is subject to penalties for violations of the Act since March 17, 2018.

### A.     RDF Discharges Pollutants from Its CAFO to Surface Waters Without a Permit.

RDF's duck farm qualifies as a Large CAFO because the operation confines at least 5,000[3] ducks for more than 45 days each year, and the areas within which the animals are confined (duck houses) do not sustain any crops, vegetation, forage growth, or post-harvest residues in the normal growing season.  Furthermore, RDF utilizes a liquid manure handling system.

RDF's improper manure management and storage practices are causing unpermitted discharges of liquid and solid animal waste.  Upon information and belief, RDF sprays liquid manure on its crop fields immediately preceding, during, and immediately after precipitation events.  Applications are also made in quantities that exceed any notion of an "agronomic rate." RDF applies liquid manure to its fields in such quantities and under such conditions that cause the liquid manure to run off the fields via swales, drainages, ditches, and/or other discrete conveyances into surface waters adjacent to the fields.  CATs is informed and believes that RDF sprays liquid manure on fields that are saturated and located on hillsides that drain to in-field watercourses that drain to local surface waters.

RDF's manure storage ponds are undersized and the duck houses are in such disrepair that the Facility is unable to retain the 25-year, 24-hour storm event.  Thus, RDF disposes of liquid manure from its lagoons in anticipation of storm events in order to maintain freeboard, and not for agricultural purposes.

---

[2] 2020-2022 Integrated Report – All Assessed Waters, *available at* https://gispublic.waterboards.ca.gov/portal/apps/webappviewer/index.html?id=e2def63ccef54eedbee4ad726ab1552c (last accessed March 16, 2023).

[3] CATs is informed and believes that RDF confines well over 30,000 ducks, approximately 100,000 at any given time, and would qualify as a Large CAFO under either 40 C.F.R. § 122.23(b)(4)(xii) or (xiii).

Notice of Violation and Intent to File Suit
March 17, 2023
Page 6

The pollutants that have been, are being, and will continue to be discharged include facility waste water, process water, wash water, liquid and solid animal wastes, debris, sediment, chemicals, and deceased duck s or parts thereof. Animal waste contains, among other pathogens and pollutants, fecal coliform and *E. coli* bacteria, nitrogen, phosphorus, suspended solids, and pharmaceuticals.

Discharges of liquid and solid animal waste, wastewater, process water, wash water, debris, sediment, deceased ducks or parts thereof, fuel and chemicals resulting from RDF's improper manure application and storage practices, and improper operational practices, as described above, have occurred and continue to occur regularly, each time RDF sprays liquid manure on its fields before, during, and after Significant Rain Events.[4] In addition to the recurring discharges described above, upon information and belief, unpermitted discharges resulting from the improper manure management and storage practices described above have occurred on at least the following specific dates:

- March 12, 2023
- March 13, 2023
- March 15, 2023
- March 16, 2023
- March 17, 2023

## III. Persons Responsible for the Violations.

CATs puts RDF on notice that they are the persons and entities responsible for the violations described above. If additional persons are subsequently identified as also being responsible for the violations set forth above, CATs puts RDF on formal notice that it intends to include those persons in this action.

## IV. Name and Address of Noticing Parties.

The name, address and telephone number of each of the noticing parties is as follows:

Patricia Clary, Executive Director
Californians for Alternatives to Toxics
600 F Street, Suite 3 #911
Eureka, CA 95521
(707) 834-4833

---

[4] Significant Rain Events are identified in Attachment 1 to this letter.

Notice of Violation and Intent to File Suit
March 17, 2023
Page 7

**V.    Counsel.**

CATs has retained legal counsel to represent it in this matter.  Please direct all communications to:

Andrew L. Packard
William N. Carlon
Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952
(707) 782-4060
andrew@packardlawoffices.com
wncarlon@packardlawoffices.com

**VI.    Conclusion**

CATs believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the CWA against RDF and their agents for the above-referenced violations upon the expiration of the 60-day notice period. If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

William N. Carlon
Law Offices of Andrew L. Packard
Counsel for CALIFORNIANS FOR
ALTERNATIVES TO TOXICS

Notice of Violation and Intent to File Suit
March 17, 2023
Page 8

## SERVICE LIST

**VIA CERTIFIED MAIL**

>   Michael Regan, Administrator
>   U.S. Environmental Protection Agency
>   1200 Pennsylvania Ave., N.W.
>   Washington, D.C. 20460
>
>   Martha Guzman, Regional Administrator
>   U.S. Environmental Protection Agency, Region IX
>   75 Hawthorne Street
>   San Francisco, CA 94105
>
>   Merrick B. Garland, U.S. Attorney General
>   U.S. Department of Justice
>   950 Pennsylvania Avenue, N.W.
>   Washington, DC 20530-0001
>
>   Eileen Sobeck, Executive Director
>   State Water Resources Control Board
>   P.O. Box 100
>   Sacramento, CA 95812
>
>   Eileen White, Executive Officer
>   San Francisco Regional Water Quality Control Board
>   1515 Clay Street, Suite 1400
>   Oakland, CA 94612

**ATTACHMENT 1**
**Notice of Intent to File Suit, Reichardt Duck Farm**
**Significant Rain Events,\* March 17, 2018 – March 17, 2023**

| | | | |
|---|---|---|---|
| March 21, 2018 | February 10, 2019 | January 9, 2020 | March 6, 2021 |
| March 22, 2018 | February 13, 2019 | January 14, 2020 | March 9, 2021 |
| April 6, 2018 | February 14, 2019 | January 16, 2020 | March 10, 2021 |
| April 7, 2018 | February 15, 2019 | January 17, 2020 | March 15, 2021 |
| April 12, 2018 | February 16, 2019 | January 22, 2020 | March 19, 2021 |
| April 16, 2018 | February 26, 2019 | January 26, 2020 | April 26, 2021 |
| April 17, 2018 | February 27, 2019 | January 29, 2020 | September 19, 2021 |
| October 2, 2018 | March 2, 2019 | March 7, 2020 | October 18, 2021 |
| October 3, 2018 | March 6, 2019 | March 14, 2020 | October 20, 2021 |
| November 22, 2018 | March 7, 2019 | March 15, 2020 | October 21, 2021 |
| November 23, 2018 | March 10, 2019 | March 25, 2020 | October 22, 2021 |
| November 24, 2018 | March 20, 2019 | March 29, 2020 | October 24, 2021 |
| November 28, 2018 | March 21, 2019 | March 30, 2020 | October 25, 2021 |
| November 29, 2018 | March 23, 2019 | April 5, 2020 | November 2, 2021 |
| November 30, 2018 | March 25, 2019 | April 6, 2020 | November 4, 2021 |
| December 1, 2018 | March 26, 2019 | April 7, 2020 | November 9, 2021 |
| December 5, 2018 | March 27, 2019 | May 12, 2020 | December 12, 2021 |
| December 15, 2018 | March 28, 2019 | May 14, 2020 | December 13, 2021 |
| December 17, 2018 | March 29, 2019 | May 17, 2020 | December 14, 2021 |
| December 19, 2018 | April 5, 2019 | May 18, 2020 | December 16, 2021 |
| December 21, 2018 | April 6, 2019 | November 14, 2020 | December 22, 2021 |
| December 24, 2018 | April 16, 2019 | November 18, 2020 | December 23, 2021 |
| December 25, 2018 | May 16, 2019 | December 12, 2020 | December 24, 2021 |
| January 5, 2019 | May 17, 2019 | December 13, 2020 | December 25, 2021 |
| January 6, 2019 | May 19, 2019 | December 14, 2020 | December 26, 2021 |
| January 7, 2019 | May 20, 2019 | December 17, 2020 | December 27, 2021 |
| January 9, 2019 | November 27, 2019 | December 26, 2020 | December 29, 2021 |
| January 10, 2019 | December 1, 2019 | December 31, 2020 | January 4, 2022 |
| January 12, 2019 | December 2, 2019 | January 2, 2021 | January 7, 2022 |
| January 15, 2019 | December 4, 2019 | January 5, 2021 | March 4, 2022 |
| January 16, 2019 | December 5, 2019 | January 7, 2021 | March 15, 2022 |
| January 17, 2019 | December 7, 2019 | January 8, 2021 | March 28, 2022 |
| January 18, 2019 | December 8, 2019 | January 23, 2021 | April 11, 2022 |
| January 20, 2019 | December 11, 2019 | January 25, 2021 | April 15, 2022 |
| January 21, 2019 | December 12, 2019 | January 27, 2021 | April 16, 2022 |
| January 31, 2019 | December 18, 2019 | January 28, 2021 | April 19, 2022 |
| February 2, 2019 | December 19, 2019 | January 29, 2021 | April 21, 2022 |
| February 3, 2019 | December 22, 2019 | February 2, 2021 | April 22, 2022 |
| February 4, 2019 | December 25, 2019 | February 12, 2021 | June 5, 2022 |
| February 5, 2019 | December 30, 2019 | February 15, 2021 | June 6, 2022 |
| February 9, 2019 | January 8, 2020 | February 19, 2021 | September 18, 2022 |

\* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.

**ATTACHMENT 1**
**Notice of Intent to File Suit, Reichardt Duck Farm**
**Significant Rain Events,\* March 17, 2018 – March 17, 2023**

| | |
|---|---|
| September 19, 2022 | March 1, 2023 |
| November 2, 2022 | March 5, 2023 |
| November 7, 2022 | March 6, 2023 |
| November 8, 2022 | March 8, 2023 |
| November 9, 2022 | March 10, 2023 |
| December 1, 2022 | March 12, 2023 |
| December 4, 2022 | March 13, 2023 |
| December 5, 2022 | March 14, 2023 |
| December 6, 2022 | |
| December 9, 2022 | |
| December 10, 2022 | |
| December 11, 2022 | |
| December 12, 2022 | |
| December 27, 2022 | |
| December 28, 2022 | |
| December 29, 2022 | |
| December 30, 2022 | |
| December 31, 2022 | |
| January 1, 2023 | |
| January 3, 2023 | |
| January 4, 2023 | |
| January 5, 2023 | |
| January 6, 2023 | |
| January 7, 2023 | |
| January 8, 2023 | |
| January 9, 2023 | |
| January 10, 2023 | |
| January 11, 2023 | |
| January 12, 2023 | |
| January 13, 2023 | |
| January 14, 2023 | |
| January 15, 2023 | |
| January 16, 2023 | |
| January 19, 2023 | |
| February 3, 2023 | |
| February 5, 2023 | |
| February 11, 2023 | |
| February 24, 2023 | |
| February 25, 2023 | |
| February 27, 2023 | |
| February 28, 2023 | |

\* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.

**EXHIBIT D**

| Parameter | Test Method | Reporting Units | Evaluation Level | Instantaneous Maximum NAL, if Applicable |
|---|---|---|---|---|
| pH | See Section XI.C.2 of the General Permit | pH units | N/A | Less than 6.0 Greater than 9.0 |
| Total Suspended Solids | SM 2540-D | mg/L | 100 | 400 |
| Oil & Grease | EPA 1664A | mg/L | 15 | 25 |
| nitrate + nitrite as N (N + N) | SM 4500-NO3-E | mg/L as N | 0.68 | _____ |
| Ammonia as N | SM 4500-NH3 B+C or E | mg/L | 2.14 | _____ |
| Biological Oxygen Demand | SM 5210B | mg/L | 30 | _____ |
| Total phosphorous | SM 4500-P B+E | mg/L as P | 2.0 | _____ |
| Fecal coliform | SM 9221 | MPN/100 mL | 200 | _____ |
| *E. coli* | SM 9223(b) | MPN/100 mL | 320 | _____ |
| Total Kjeldahl Nitrogen | SM 4500-N org C, using colorimetric detection | mg/L | 1 | |

SM – Standard Methods for the Examination of Water and Wastewater, 18th edition
EPA – U.S. EPA test methods

[PROPOSED] CONSENT DECREE

Case No: 3:22-CV-09065-AGT