Diane G. Kindermann Henderson (SBN 144426)
dkindermann@aklandlaw.com
Glen C. Hansen (SBN 166923)
ghansen@aklandlaw.com
ABBOTT & KINDERMANN, INC.
2100 21st Street
Sacramento, California 95818
Telephone:  (916) 456-9595
Facsimile:  (916) 456-9599

Attorneys for Defendants
REICHARDT DUCK FARM, INC., and
JOHN REICHARDT

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIANS FOR ALTERNATIVES TO TOXICS, a non-profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>REICHARDT DUCK FARM, INC., and JOHN REICHARDT,<br><br>Defendants. | Case No: 3:22-CV-09065-AGT<br><br>**DEFENDANTS REICHARDT DUCK FARM, INC., and JOHN REICHARDT'S OPPOSITION TO PLAINTIFF CALIFORNIANS FOR ALTERNATIVES TO TOXICS' MOTION TO ENFORCE CONSENT DECREE**<br><br>Date:     November 21, 2025<br>Time:    10:00 a.m.<br>Location: Courtroom A – 15th Floor<br>Judge: Hon. Magistrate Judge Alex G. Tse |

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................................................................ 2
TABLE OF AUTHORITIES .......................................................................................................... 3
I.   INTRODUCTION ............................................................................................................... 4
     A.   Statement Of The Facts Of The Case........................................................................ 4
          1.   Storm Water ................................................................................................... 5
          2.   Process Water ................................................................................................ 5
     B.   Statement Of Key Claims ......................................................................................... 6
     C.   Consent Decree ......................................................................................................... 8
     D.   Meet And Confer Process ......................................................................................... 9
II.   ARGUMENT ..................................................................................................................... 11
     A.   Defendants Are In Compliance With The Consent Decree. ................................. 11
          1.   CAT Is Wrong, Well Drilling Revealed No Groundwater. ........................ 12
          2.   Continued Groundwater Monitoring Beyond The Term Of The
              Consent Decree Is Not Warranted ............................................................... 13
     B.   The Parties Could Be Ordered To Return To Mediation To
          Determine The Next Steps For The Wells. ............................................................ 13
     C.   Cat Should Not Be Entitled To Fees And Costs. ................................................... 14
III.   CONCLUSION .................................................................................................................. 15

# TABLE OF AUTHORITIES

**STATUTES**

33 U.S.C. § 1251–1387 .................................................................................................... 4, 7, 14

33 U.S.C. § 1311(a) ..................................................................................................................... 7

**OTHER AUTHORITIES**

Water Quality Order No. 2014-0057-DWQ ................................................................................ 8

Water Quality Order No. 91-13-DWQ ........................................................................................ 7

Water Quality Order No. 92-12-DWQ ........................................................................................ 8

Water Quality Order No. 97-03-DWQ ........................................................................................ 8

**RULES**

Federal Rules of Civil Procedure, Rule 11 ................................................................................ 14

## I. INTRODUCTION

Defendants REICHARDT DUCK FARM, INC., and JOHN REICHARDT (collectively "Defendants" or "RDF") oppose Plaintiff CALIFORNIANS FOR ALTERNATIVES TO TOXICS' ("Plaintiff" or "CAT") Motion to Enforce Consent Decree which should be denied in its entirety on the grounds that the RDF has timely complied with all of the obligations of the Consent Decree ("CD") including the drilling of the groundwater wells. As RDF will demonstrate, CAT chose to file this Motion when RDF had made the immediate drilling schedule clear to CAT. Additionally, CAT chose to file this Motion while the drilling was transpiring at RDF. RDF will demonstrate that there was no obligation to drill the wells two full years ago as CAT alleges, based on the clear language in the CD, and RDF will demonstrate that there is no legal or scientific reason to extend the term of the CD.

This citizen enforcement action was brought by CAT against RDF with no evidence of any discharges to surface and groundwater. The CD is clear that the settlement is only to avoid prolonged litigation and it does not constitute an admission of non-compliance with the Industrial General Permit or the Clean Water Act. CAT's introduction to its Motion is a summary regurgitation of its allegations in its complaint, completely ignoring RDF's ongoing compliance with all federal, state and local laws regarding its operations and compliance with the settlement between the parties in the form of the CD.

## CASE BACKGROUND

### A. Statement Of The Facts Of The Case

This civil suit was brought by Plaintiff for alleged violations of California's General Industrial Storm Water Permit ("General Permit") pursuant to the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. sections 1251–1387 (the "Clean Water Act," the "CWA" or the "Act") against Defendants.

Defendants own and operate an approximately three hundred seventy-three (373)-acre duck farm and processing Facility located at 3770 Middle Two Rock Road, outside of Petaluma, California. Prior to the 2023 Avian Flu Outbreak, the Facility generally housed more than 100,000 ducks at any given time and kept them year-round. After that outbreak, all ducks were

lost. Prior to the 2025 Avian Flu outbreak that occurred this week, approximately 50,000 ducks were bred at the Facility. Prior to the Avian Flu outbreaks, duck processing, cleaning, and packaging where ducks are prepared for sale, occurred year-round. Areas where industrial activities take place that are subject to the General Permit comprise about thirty-seven (37) acres. Storm water and process water are managed in separate conveyance systems to prevent commingling and cross-contamination and enable proper process water treatment and recycling.

### 1. Storm Water

Storm water is managed under the guidelines of an NPDES permit, specifically the General Permit. The Facility storm water discharges directly through on-site drainage systems that discharge to an unnamed Creek, then to Laguna Lake in the Walker Creek ("Creek") watershed. The various drainage areas of the Facility flow into the Creek that flows through the Facility entering from the north of the property boundary, exiting to the south. To control industrial storm water pollutants, the Facility uses a collection of "Best Management Practices" ("BMPs") before storm water drains to the Creek. These BMPs are similar to those that are commonly deployed throughout the State by public and private entities. These BMPs have been developed by the regulated storm water industry in conjunction with State and local regulators to demonstrate effective techniques for reducing or eliminating pollutants in storm water. Such BMPs include Good Housekeeping, Preventative Maintenance, Spill and Leak Prevention and Response, Material Handling and Waste Management, Erosion and Sediment Controls, Employee Training Program, Quality Assurance and Record Keeping, Exposure Minimization, Storm Water Containment and Discharge Reduction. Specific examples of BMPs also deployed by the Facility are: Covered and contained duck housing and processing; site-wide erosion control on exposed land and roads; separate piping, berms, and ponds to segregate duck waste; covered areas for material storage and handling; sediment traps; and vegetated swales. Thus, the Facility includes a number of structures and structural BMPs that address and prevent the contamination of storm water runoff at the Facility before it ultimately leaves the industrial area to the south consistent with the recommendations in the General Permit.

### 2. Process Water

For the on-site management of process water, the Facility utilizes a sophisticated wastewater pond system ("WPS") to manage its industrial process water, using state of the art biological treatment technology which the Defendants design, implement, operate, and maintain to protect water quality. No process water is discharged to Waters of the United States (also referred as "navigable waters").

During operations there are three (3) types of process wastewater managed with this WPS: 1) liquid waste and sanitization washdown water from processing; 2) liquid waste and manure from duck house washing; 3) and incidental storm water that comes in contact with manure or falls within the WPS area. All processed wastewater is contained within buildings or within berms and collected in a series of pipes that flow to the WPS for treatment. First, all types of process wastewater are treated using rotary screens for gross solids removal where larger solids are separated and sent off-site for beneficial reuse and liquid wastewater that passes through is sent to a settling pond for finer solids removal. From the settling pond, the water is sent to a series of ponds (A, B and C Ponds) south of Middle Two Rock Road where, as part of the WPS, the defendants have designed a system to inoculate the WPS with cultures of facultative bacteria using equipment referred to as "aerobic bacterial generators." The bacteria cultures that thrive in these ponds serve to reduce biological oxygen demand ("BOD"), solids, and nutrients, including nitrogen. After treatment in these ponds, the water is returned to the northern part of the Facility near the duck houses where it may be disinfected with sodium hypochlorite and reused for duck house washing.

**B.   Statement Of Key Claims**

Plaintiff alleged many facts and legal arguments that were simply incorrect or could not be proven by Plaintiff in this case. Specifically, contrary to the allegations in the Motion and as set forth in the Declarations of Travis Peterson, Loni Lyttle and Peter Lantry:

- There have been significant reductions in the stormwater results for Fecal Coliform, E. Coli, Ammonia, TKN, Nitrate plus Nitrite, and Phosphorous, among other constituents and they will continue to be reduced with the ongoing implementation of BMPs employed by the Facility. RDF follows the measures in

both the General Permit with Level 1 and Level 2 reporting, and has reported all results to CAT with the CD Action Plans. (Decl. of Lyttle, ¶¶ 3-6.)

- Defendants do not discharge pollutant-contaminated storm water, liquid manure, and wastewater from the Facility into an unnamed Creek that runs through the Facility, or into any "Water of the United States." (Decl. of Lyttle, ¶ 3.)

- There is no evidence: (1) that there is any seepage of any water from the ponds on the Facility into the groundwater; (2) that there is seepage of any water from any spraying into the groundwater; or (3) that the groundwater in the vicinity of the Creek is hydrologically connected to the Creek. (Decl. of Lantry, ¶¶ 13, 19.)

- There is no evidence: (1) that there is seepage of any water from any spraying into the unnamed Creek; or (2) that "manure wastewater" is discharged into the unnamed Creek. (Decl. of Lyttle, ¶¶ 3-6, 9.)

- There is no evidence that, during significant rain events, storm water laden with pollutants discharges from the Facility's storm water conveyances into the unnamed Creek. (Decl. of Lyttle, ¶¶ 4-6, 11.)

- There is no evidence that storm water containing pollutants harmful to fish, plant and bird life, and human health is being discharged from the Facility directly or indirectly to the unnamed Creek during each significant rain event.

- There is no evidence whatsoever that Defendants discharge water containing liquid or solid animal wastes into the unnamed Creek or groundwater.

- Because Defendants do not discharge liquid manure to any Impacted Waters, they do not require an individual National Pollutant Discharge Elimination System ("NPDES") Permit, and so they do not violate section 301(a) of the Act, 33 U.S.C. section 1311(a). (Decl. of Lyttle, ¶¶ 3-6, 9.)

- There is no evidence that Defendants discharge pollutant-contaminated storm water from the Facility. Therefore, Defendants do not violate the Act or the State of California's General Industrial Permit for storm water discharges, State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ,

1  as amended by Water Quality Order No. 92-12-DWQ, Water Quality Order No.
2  97-03-DWQ, and Water Quality Order No. 2014-0057-DWQ, NPDES General
3  Permit No. CAS000001 (hereinafter "General Permit" or "Permit").

4  • Defendants have not engaged in, and presently do not engage in, any violation of
5  the filing, monitoring, reporting, discharge and management practice requirements,
6  and other procedural and substantive requirements of the General Permit and the
7  Act. (Decl. of Lyttle, ¶¶ 3-6, 9.)

8  • Defendants' storm water controls at the Facility achieve both Best Available
9  Technology Economically Achievable ("BAT") for toxic and nonconventional
10 pollutants and the Best Conventional Pollutant Control Technology ("BCT") for
11 conventional pollutants.

12 • Contrary to what is stated in the Motion, there have been extreme reductions in
13 Fecal Coliform, E. Coli, Ammonia, TKN, Nitrate plus Nitrite, and Phosphorous,
14 among other constituents and they will continue to be reduced with the continued
15 implementation of the ongoing BMPs employed by the Facility. CDFG follows the
16 General Permit measures with Level 1 and Level 2 reporting and provided the
17 information to CAT with the CD Action Plans.

18 CAT's Motion focuses on the groundwater monitoring wells project set forth in the
19 Consent Decree. That project has been pursued in a timely manner in 2024 and again in 2025;
20 even without input from CAT on the programmatic document demanded by CAT in the CD, in
21 which the well locations had to be identified and mutually agreed upon.

22      C.    **Consent Decree**

23 Specifically, Section 2(f) lines 21-25 of the Consent Decree state: " On or before January
24 1, 2024, Defendants shall provide to Plaintiff a draft Monitoring and Reporting Plan ("MRP") for
25 review and comment. The MRP shall comply with the minimum requirements in Attachment A of
26 the General Waste Discharge Requirements for Confined Animal Facilities within the San
27 Francisco Bay Region. Plaintiff shall provide its comments and responses to the draft MRP to
28 Defendants." Section 2(m) lines 4-7 of the Consent Decree further state: "…Defendants agree to

1  incorporate into the MRP the requirement that Defendants monitor groundwater for Nitrate and
2  Total Coliform Bacteria consistent with the minimum requirements in Attachment A of the
3  General Waste Discharge Requirements for Confined Animal Facilities within the San Francisco
4  Bay Region." "…To that end, Defendants shall install eight (8) individual boreholes for the
5  purposes of groundwater monitoring of the first water table…Four will be placed immediately
6  down-gradient of the wastewater treatment storage Ponds A, B, and C; four farther down gradient;
7  or at other locations to be mutually determined by the parties…" (See Section 2(m), lines 7-14)

8  Therefore, the Consent Decree required that RDF install the boreholes following
9  incorporation into the MRP, after the receipt of CAT's comments on a final MRP, and when the
10 borehole locations were mutually determined by the parties.

11 The MRP draft was timely submitted to the Plaintiff on or about January 1, 2024, with the
12 proposed location of the groundwater wells shown on the included map MRP 3. (Decl. of
13 Kindermann, ¶ 6.)

14 I received no comments to the draft MRP, verbal or otherwise, until CAT's letter dated
15 July 11, 2025. (Decl. of Kindermann, ¶ 7.)

16 RDF has been forthcoming with CAT regarding the drilling schedule and permit status as
17 soon as RDF received MRP comments from Plaintiff in accordance with the language in the
18 Consent Decree. (Decl. of Kindermann, ¶¶ 9, 11.)

19 The drilling project has remained consistent with the schedule provided to CAT
20 in that Meet & Confer call on September 18, 2025.

21 **D.  Meet And Confer Process**

22 RDF is in compliance with the CD in all respects. Since the Effective Date of the CD,
23 RDF has made continued good-faith efforts and has accomplished the timely preparation and
24 submittal of all materials. RDF has performed all other actions, including the drilling of wells to
25 allow groundwater testing and monitoring the first water table encountered to provide the
26 groundwater data sought by CAT. (Decl. of Peterson, ¶¶ 14, 23) (See Declaration of Andrew L.
27 Packard, Exhibit A, p.11., Section I. Commitments of Defendants, 2(m). Groundwater
28 Monitoring.)

The Declarations of Peterson, Lyttle, and Langtry, filed herewith, detail the actions regarding compliance with the CD on the issues identified in this motion.

RDF timely submitted the draft Monitoring and Reporting Plan ("MRP") to CAT on or about January 1, 2024, (Decl. of Kindermann, ¶ 6), with the proposed location of the groundwater wells shown on the included map MRP 3. (See Decl. of Lyttle, Exhibit 2, "2024/2025 Sampling Locations".)

I received no comments verbal or otherwise from CAT on the draft MRP until CAT's letter dated July 11, 2025. (See Decl. of Kindermann, ¶ 7, Exhibit 1.)

CAT's letter of June 20, 2025, confirms that CAT had not submitted to RDF any comments on any of the documents submitted, including but not limited to the MRP. (Decl. of Andrew L. Packard, Exhibit D, pp.1-2.)

**The Drilling Project Timeline Reflects RDF's Compliance With The Consent Decree**

On September 18, 2025, RDF participated in a Meet & Confer phone conference with CAT, CAT's expert, Peterson and Lyttle. RDF verbally confirmed that the drilling project was underway, a qualified contractor was under contract, and the schedule was as follows: "Permit application will be submitted by September 29, Permitting review and issuance anticipated by October 20, pre-drilling activities and subsurface clearances are scheduled to be completed by October 21, Drilling and well installation to commence between October 22 – 24, Well development and sampling scheduled for between October 27 – 31." (Decl of Peterson, ¶ 23.) CAT provided no comment on this schedule.

RDF was forthcoming with CAT regarding the drilling schedule and permit status as soon as RDF received MRP comments in accordance with the Consent Decree.

The drilling project has remained consistent with the schedule provided to CAT in that Meet & Confer call on September 18, 2025. (Decl. of Peterson, ¶¶ 14, 26.)

The drilling project is active and experts are evaluating new and significant data gathered during the irrigation seasons and during the October 21, 2025 subsurface investigation. The Declarations of Lantry, Lyttle and Peterson speak to the findings of the drilling expert. (Decl. of Lyttle, ¶¶ 8, 9, 12-15.)

## II. ARGUMENT

### A. Defendants Are In Compliance With The Consent Decree.

The Declarations confirm that RDF has complied with the CD. Regarding the 2023-2024 rainy season, the CD was executed on September 23, 2023, and still had to be circulated through a 45-day review process with the United State Department of Justice during which time the CD could be amended or modified. Thus, the rainy season commenced (October 15, 2023) prior to this Court's order of November 22, 2023, and by then it was too late for any drilling. (Decl. of Peterson, ¶ 15.)

RDF timely submitted the MRP to CAT on January 1, 2024, and the MRP included potential drilling locations. (Decl. of Kindermann, ¶ 6.) CAT did not respond to the MRP until July 11, 2025. (See Decl. of Kindermann, ¶ 7.) Even without CAT's consent to the drilling locations in a final MRP, after the 2023-2024 rainy season, RDF worked with a contractor and sought permits from the County. (Decl. of Peterson, ¶ 16.) Between the contractor and the County, the permits were not issued prior to the 2024-2025 rainy season. The CD takes this situation into consideration and confirms at Section I. 2(f), that the absence of necessary third-party generated information to complete the preparation and implementation of the MRP may delay completion. Thus, under the language of the CD, as to the MRP and well locations to be mutually agreed to by the parties, plus the absence of third party generated information, RDF was not out of compliance with the CD.

At the September 18, 2025 Meet & Confer, RDF provided the exact dates of drilling and those dates and actions were met. CAT did not object to those dates. (See Decl. of Peterson, ¶ 23, Decl. of Kindermann, ¶ 9.) The Motion was served on RDF after the drilling had already commenced consistent with the plan outlined in the Meet and Confer call with CAT on September 18, 2025. RDF was forthcoming with CAT regarding the drilling schedule and permit status as soon as RDF received MRP comments in accordance with the Consent Decree. The drilling project has remained consistent with the schedule provided to CAT in that Meet & Confer call on September 18, 2025. (Decl. of Peterson, ¶¶ 13, 14, Decl. of Kindermann, ¶¶ 9, 12.)

**DEFENDANTS' OPPOSITION TO MOTION TO ENFORCE CONSENT DECREE**

The drilling project is active and experts are evaluating new and significant data gathered during the irrigation seasons and during the October 21, 2025 subsurface investigation. (Decl. of Langtry, ¶¶ 4, 13, 15, 18.)

No groundwater was observed during the advancement of the three exploratory borings. As such, monitoring wells were not installed, and the borings were backfilled with grout to the existing grade prior to departure from RDF's location.

The remainder of the exploratory borings were not advanced pending discussions with RDF's Technical Project Manager.

### 1. CAT Is Wrong, Well Drilling Revealed No Groundwater.

The Consent Decree at Section 2(m) <u>Groundwater Monitoring</u>, lines 8 to 9, state that eight (8) individual boreholes shall be advanced "…for the purposes of groundwater monitoring of the first water table encountered." A water table--or unconfined--aquifer is an aquifer whose upper water surface (water table) is at atmospheric pressure, and thus is able to rise and fall. Water table aquifers are usually closer to the ground surface than confined aquifers.

Only shale bedrock was encountered at approximate depths of 6½ and 7½ feet bgs. The bedrock appeared to have a low permeability that would restrict the lateral and downward migration of groundwater. The hydrologist also noted that the lateral and vertical migration of any coliform and nitrates in groundwater would be attenuated by the low permeability bedrock.

What is key however, is that no groundwater was encountered in the exploratory borings at the RDF's site.

Instead of further peppering the site with exploratory holed that in the hydrologist opinion would yield more of what they discovered, he recommended installation of only three (3) groundwater monitoring wells nearest the ponds (RDF 01, RDF 02 and RDF 03) with screen intervals that extend above the top of the soil/bedrock interface. These wells could then be monitored for the presence of groundwater during the wet season (November through March).

He further recommended that, if groundwater is observed in wells RDF 01, RDF 02 and RDF 03 in a sufficient quantity to allow the collection of samples, and testing does not detect the

presence of significant nitrate and total coliform impacts, then the additional wells located further from the ponds would not be necessary for documenting potential impacts from the ponds. This is because groundwater impacts, if any, associated with the irrigation would be expected to be the most significant at the ponds. If groundwater was observed in these three (3) wells in a sufficient quantity to allow the collection of samples, and if laboratory analyses detect significant nitrate and total coliform impacts, then the need for downgradient wells could be evaluated.

Langtry also noted, the locations of proposed wells RDF 05, RDF 06, RDF 07 and RDF 08 are down-slope from adjacent properties. As such, detections of coliform or nitrates in these wells could be attributed to off-Site sources and, would not be useful for determining the lateral extent of impacts from the wastewater ponds.

The proposal outlined at the settlement conference for the CD, was made in a vacuum with no understanding of the site geology. For CAT';s goal of examining water quality, the hydrologist recommended a solution and RDF urges the Court to amend the CD to pursue drilling monitoring as set forth in in the Declaration of Peter Langtry.

**2.    Continued Groundwater Monitoring Beyond The Term Of The Consent Decree Is Not Warranted**

We understand that the irrigation management practices have been generally consistent over the past 60 years. Therefore, any effects to groundwater quality associated with the irrigation would be expected to be stable and not significantly change over time. Therefore, after installation of wells RDF 01, RDF 02 and RDF 03 and the first monitoring event, continued groundwater monitoring of these wells is not needed to document and manage groundwater quality.

**B.    The Parties Could Be Ordered To Return To Mediation To Determine The Next Steps For The Wells.**

Pursuant to the Consent Decree in the above matter at Section III. *Dispute Resolution, Enforcement, Waivers and Releases*, RDF suggested in lieu of a hearing, that CAT participate in a conference before Magistrate Judge Alex G. Tse to address all of the disputed issues raised in

CAT's Motion to Enforce Consent Decree filed October 17, 2025, and scheduled to be heard on November 21, 2025. (Decl. of Kindermann, ¶ 15.)

### C. Cat Should Not Be Entitled To Fees And Costs.

Plaintiff asks that this Court "order Defendants to reimburse Plaintiff's fees and costs incurred in connection with this motion, consistent with Section III.13 of the Consent Decree, and subject to further application to the Court." (Motion 6:12-15.) Section III.13 of the Consent Decree provides:

> The Parties shall be entitled to seek fees and costs incurred in any such motion, and such fees and costs shall be awarded, pursuant to the provisions set forth in the then-applicable federal Clean Water Act and Rule 11 of the Federal Rules of Civil Procedure, and applicable case law interpreting such provisions.

(Motion, 4:8-11; Ex. A to Decl. of Andrew L. Packard, p. 17.)

CAT's request should be denied by this Court should not order Defendants to reimburse Plaintiff's fees and costs incurred in connection with the Motion, for the following four (4) reasons, each of which alone is sufficient to support a denial of CAT's request.

First, nowhere in the Motion has Plaintiff explained how, in connection with the Motion, Plaintiff has satisfied the "provisions set forth in the then-applicable federal Clean Water Act and Rule 11 of the Federal Rules of Civil Procedure, and applicable case law interpreting such provisions," as required in Section III.13 of the Consent Decree.

Second, as discussed above, this Court should deny the Motion on its merits because there has been no violation of the Consent Decree. As thoroughly described in detail in this response and the supportive documents, RDF moved forward with permitting prior to the 2023-2024 rainy season when it was not yet obligated to do so, as CAT had provided no comments so that RDF could complete a Final MRP which contains the location of the wells.

Third, assuming arguendo that RDF was required to move forward without any input from CAT, RDF unilaterally commenced the permitting process through retention of a well-known local expert (Clear Heart). The permit process was not completed, and based on the language in the consent Decree, RDF would not be deemed in violation where the Final MRP completion and implementation was prevented due to the absence of "necessary third- party

1   information". This term is defined in the CD to include Sonoma County who actually lost the
2   permit application. (Decl. of Travis Peterson, ¶¶ 19-21) Even before the County misplaced all
3   of the permit documentation from Clear Heart, the company was not responding to requests for
4   additional information from the County (Decl. of Travis Peterson, ¶ 20). The term "necessary
5   third party information" includes "soil engineers" and "geologists" such as the experts at Clear
6   Heart. Thus, the absence of a response from the permit applicant Clear Heart and the
7   disappearance of the permit application materials each prevented the well drilling for the 2024-
8   2025 rainy season and therefore RDF is not in violation of the CD. Plaintiff is therefore, not the
9   prevailing party with respect to the Motion.

10       Fourth, as detailed herein and in the declarations, RDF did locate another well drilling
11  company with expertise and availability and informed CAT in a phone call of September 11,
12  2025 of the specific schedule to commence the drilling this month. That schedule has been
13  followed. A simple phone call or e-mail to counsel for RDF could have answered the question
14  regarding status before CAT launched into this entirely unnecessary motion.

15       Fifth, the Avian Flu epidemic hit the Facility this week and the entire flock has been
16  eradicated as required by law. Thus, there are no resources to fund CAT further and any
17  resources should be spent only on water quality and with either this Court to determining that
18  three (3) wells make sense in the locations recommended by Langtry. There simply is no
19  groundwater to be found readily. If there is deep groundwater as opposed to shallow
20  groundwater (CAT incorrectly assumed shallow groundwater), the Declarations of Loni Lyttle
21  and Peter Langtry underscore that any impacts to a deeper water table are unlikely. Thus, the
22  parties should focus limited resources on what and where to sample this year so that the CD can
23  be wrapped up on November 1, 2026.

24  **III.    CONCLUSION**
25       Based on the foregoing, RDF respectfully requests that the Court :
26  1.   Modify the Consent Decree at Section I.2(m) to conform to the drilling and
27       sampling protocol set forth in the Declaration of Peter Langtry at Paragraphs 15,
28       16 and 17;

2. Eliminate the proposed well locations of RDF 05, RDF 06, RDF 07 and RDF 08;

3. Deny CAT's request for an extension of the CD term; and

4. Deny CAT's request for CAT's fees and costs.

In the alternative, RDF respectfully requests that the Court :

1. Refer the parties to Magistrate Judge for mediation to address revisions only to the CD section I.2(m);

2. Deny CAT's request for an extension of the CD term; and

3. Deny CAT's request for CAT's fees and costs incurred with the motion; and

4. Confirm that the Parties will bear its own fees and costs with mediation.

Dated: October 31, 2025                    ABBOTT & KINDERMANN, INC.


                                           By:   /s/ Diane G. Kindermann Henderson
                                               DIANE G. KINDERMANN HENDERSON
                                               GLEN C. HANSEN
                                               Attorneys for Defendants
                                               REICHARDT DUCK FARM, INC., and
                                               JOHN REICHARDT

**DEFENDANTS' OPPOSITION TO MOTION TO ENFORCE CONSENT DECREE**